IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JENNIFER BATT, MADHU CHANDNANI, KAREN DAVISON, and WILLARD JENKINS, Individually and on Behalf of All Others Similarly Situated, on Behalf of the 3M VOLUNTARY INVESTMENT PLAN AND EMPLOYEE STOCK OWNERSHIP PLAN, and on Behalf of the 3M SAVINGS PLAN, | Case No. 25-cv-03149 (ECT/DTS) |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| 3M COMPANY; BOARD OF DIRECTORS OF 3M, and its members; 3M BENEFITS FUND INVESTMENT COMMITTEE, and its members; and 3M INVESTMENT MANAGEMENT CORPORATION, | |
| Defendants. | |

- i -

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 5

    A.    The Plans and Parties ...................................................... 5

    B.    Target Date Funds .......................................................... 6

        1.    TDFs .................................................................. 6

        2.    The 3M TDFs ................................................... 7

    C.    The 3M TDFs and Meaningful Benchmarks ................... 9

        1.    3M's Custom Benchmark ................................. 9

        2.    The Meaningful Benchmarks ........................... 9

    D.    Defendants' Breached Their ERISA Fiduciary Duties ................... 10

LEGAL STANDARD .......................................................................................... 11

ARGUMENT ....................................................................................................... 13

    I.    Plaintiffs Plausibly Allege a Claim for Breach of ERISA's Duty of Prudence ................................................................... 13

    A.    Underperformance Against Multiple Meaningful Benchmarks Sufficiently States a Claim ............................... 13

    B.    Plaintiffs Allege Meaningful Benchmarks ..................... 16

        1.    The 3M Custom "Benchmarks" Are Meaningless to Evaluate the 3M TDFs' Actual Performance ................... 16

        2.    The Comparator Funds and 3M TDFs Share Similar Strategies and Characteristics, Such as Size, Category, and Risk Ratio ................... 19

        3.    The S&P Indices Are Additional Meaningful Benchmarks ................... 22

        4.    Defendants' Criticisms Amount to Factual Disputes and Provide No Basis for Dismissal ................... 24

    C.    Plaintiffs Have Alleged Sustained Underperformance for More than a Decade ................... 38

    II.    Plaintiffs Plausibly Allege Claims for Failure to Monitor ................... 44

CONCLUSION ................................................................................................ 44

## TABLE OF AUTHORITIES

<u>CASES</u> <span style="float:right"><u>PAGE(S)</u></span>

*Abel v. CMFG Life Ins. Co.*,
 2024 U.S. Dist. LEXIS 14535 (W.D. Wis. Jan. 26, 2024) ......................................... 39

*Baird v. BlackRock Inst. Tr. Co., N.A.*,
 403 F. Supp. 3d 765 (N.D. Cal. 2019) ....................................................................... 44

*Becker v. Wells Fargo & Co.*,
 2021 U.S. Dist. LEXIS 90207 (D. Minn. May 12, 2021) .................................... 25, 43

*Behr v. Radisson Hotels Mgmt. Co.*,
 2025 U.S. Dist. LEXIS 88724 (D. Minn. May 9, 2025) ............................................. 1

*Bell Atl. Corp v. Twombly*,
 550 U.S. 544 (2007) ................................................................................................. 11

*Braden v. Wal-Mart Stores, Inc.*,
 588 F.3d 585 (8th Cir. 2009) .............................................................................. 13, 14

*Brown-Davis v. Walgreen Co.*,
 2020 U.S. Dist. LEXIS 252317 (N.D. Ill. Mar. 16, 2020) ............................. 21, 24, 26

*Davis v. Washington University in St. Louis*,
 960 F.3d 478 (8th Cir. 2020) .................................................................................... 14

*Dionicio v. U.S. Bancorp*,
 2024 U.S. Dist. LEXIS 50097 (D. Minn. Mar. 21, 2024) ................................... *passim*

*Dorman v. Charles Schwab Corp.*,
 2019 U.S. Dist. LEXIS 34058 (N.D. Cal. Feb. 8, 2019) ........................................... 39

*Dover v. Yanfeng US Auto. Interior Sys. I LLC*,
 563 F. Supp. 3d 678 (E.D. Mich. 2021) ............................................................. 21, 43

*Fritton v. Taylor*,
 2023 U.S. Dist. LEXIS 145940 (D. Minn. Aug. 21, 2023) ........................................ 40

*Gaines v. BDO USA, LLP*,
 663 F. Supp. 3d 821 (N.D. Ill. 2023) ...................................................... 20-21, 24, 26

*Hall v. Capital One Fin. Corp.*,
 2023 U.S. Dist. LEXIS 35391 (E.D. Va. Mar. 1, 2023) ............................................ 22

*Hawke Media, LLC v. Stable Grp. Holdings, LLC*,
 2024 U.S. Dist. LEXIS 110431 (D. Minn. June 24, 2024) ..................................... 1, 5

*Henderson v. Emory Univ.*,
  252 F. Supp. 3d 1344 (N.D. Ga. 2017) ................................................................ 26, 44

*Hoye v. CHA Gen. Servs.*,
  2025 U.S. Dist. LEXIS 20557 (D. Mass. Feb. 5, 2025) ............................................. 21

*Hughes v. Nw. Univ.*,
  595 U.S. 170 (2022) ........................................................................................ 14, 43

*Jacobs v. Verizon Communs., Inc.*,
  2017 U.S. Dist. LEXIS 162703 (S.D.N.Y. Sep. 28, 2017) ........................................ 44

*Johnson v. Parker-Hannifin Corp.*,
  122 F.4th 205 (6th Cir. 2024) ................................................................................ 24

*Karg v. Transamerica Corp.*,
  2019 U.S. Dist. LEXIS 140567 (N.D. Iowa Aug. 20, 2019) ......................... 15, 21, 42

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................................ 12

*Kistler v. Stanley Black & Decker, Inc.*,
  2024 U.S. Dist. LEXIS 117419 (D. Conn. July 3, 2024) .............................. 24, 34, 43

*Kloss v. Argent Trust Co.*,
  2023 U.S. Dist. LEXIS 220595 (D. Minn. Dec. 12, 2023) .................................... 6, 12

*Kohari v. MetLife Grp., Inc.*,
  2022 U.S. Dist. LEXIS 136505 (S.D.N.Y. Aug. 1, 2022) ......................................... 26

*Lard v. Marmon Holdings, Inc.*,
  2025 U.S. Dist. LEXIS 90776 (N.D. Ill. May 13, 2025) ........................................... 39

*Larson v. Allina Health Sys.*,
  350 F. Supp. 3d 780 (D. Minn. 2018) ................................................................ 12, 13

*Luckett v. Wintrust Fin. Corp.*,
  2024 U.S. Dist. LEXIS 144685 (N.D. Ill. Aug. 14, 2024) ........................................ 39

*Matousek v. MidAmerican Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) .......................................................................... *passim*

*Mattson v. Milliman, Inc.*,
  2022 U.S. Dist. LEXIS 246403 (W.D. Wash. Dec. 13, 2022) ....................... 21, 36-37

*McDonough v. Anoka Cty.*,
  799 F.3d 931 (8th Cir. 2015) ................................................................................ 12

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) ................................................................. 2, 13

*Moler v. Univ. of Md. Med. Sys.*,
   2022 U.S. Dist. LEXIS 124804 (D. Md. July 13, 2022) ................................ 21, 24, 42

*Morin v.* Essentia *Health*,
   2017 U.S. Dist. LEXIS 151266 (September 13, 2017) ........................................ 25, 26

*Patterson v.* Morgan *Stanley*,
   2019 U.S. Dist. LEXIS 174832 (S.D.N.Y. Oct. 7, 2019) ........................................ 41

*Payne v. Hormel Foods Corp.*,
   2024 U.S. Dist. LEXIS 168017 (D. Minn. Sep. 18, 2024) ................................. *passim*

*Phillips v. Cobham Advanced Elec. Sols., Inc.*,
   2025 U.S. Dist. LEXIS 184960 (N.D. Cal. Sept. 19, 2025) ........................................ 22

*Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*,
   967 F. Supp. 1148 (D. Minn. 1997) ......................................................... 1, 5

*Ramos v. Banner Health*,
   461 F. Supp. 1067 (D. Colo. 2020) ............................................................... 38

*Randall v. GreatBanc Tr. Co.*,
   2024 U.S. Dist. LEXIS 29208 (D. Minn. Feb. 21, 2024) ................................. *passim*

*Riley v. Olin Corp.*,
   2023 U.S. Dist. LEXIS 11771 (E.D. Mo. Jan. 24, 2023) ........................................ 35

*Rosenkranz v. Altru Health Sys.*,
   2021 U.S. Dist. LEXIS 237791 (D.N.D. Dec. 10, 2021) ........................................ 35

*Schissler v. Janus Henderson United States Holdings Inc.*,
   2023 U.S. Dist. LEXIS 189287 (D. Colo. Sep. 7, 2023) ..................................... 21, 26

*Smith v. CommonSpirit Health*,
   37 F.4th 1160 (6th Cir. 2022) .................................................................. 39

*Snyder v. UnitedHealth Grp., Inc.*,
   2021 U.S. Dist. LEXIS 230878 (D. Minn. Dec. 2, 2021) ................................. *passim*

*Snyder v. UnitedHealth Grp., Inc.*,
   2024 U.S. Dist. LEXIS 42952 (D. Minn. Mar. 12, 2024) ..................................... 13, 43

*Terraza v. Safeway Inc.*,
   241 F. Supp. 3d 1057 (N.D. Cal. 2017) ..................................................... 42, 44

*Thomson v. Caesars Holdings Inc.*,
    661 F. Supp. 3d 1043 (D. Nev. 2023) ................................................................... 24, 34

*Tibble v. Edison Int'l*,
    575 U.S. 523, 529 (2015) ........................................................................................ 6, 14

*Trauernicht v. Genworth Fin. Inc.*,
    2023 U.S. Dist. LEXIS 162470 (E.D. Va. Sep. 12, 2023) ..................................... 2, 16

*Troudt v. Oracle Corp.*,
    2017 U.S. Dist. LEXIS 41344 (D. Colo. Mar. 22, 2017) ........................................... 44

*Valenzuela v. Advantage Sales & Mktg., LLC*,
    2024 U.S. Dist. LEXIS 210439 (C.D. Cal. Nov. 18, 2024) ....................................... 44

*Vellali v. Yale University*,
    308 F. Supp. 3d 673 (D. Conn. 2018) ....................................................................... 26

## RULES

FED.R.CIV.P. 8 ......................................................................................................................... 11

FED.R.CIV.P. 12 ......................................................................................................... 3, 25, 26, 12

FED.R.CIV.P. 56 ....................................................................................................................... 25

FED.R.EVID. 401 ........................................................................................................................ 5

FED.R.EVID. 403 ........................................................................................................................ 5

## Other

29 C.F.R. § 2550.404a-5 ............................................................................................................ 18

75 Fed. Reg. 64910 (Oct. 20, 2010) .......................................................................................... 18

Plaintiffs submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss [ECF No. 26] ("Motion") and supporting Memorandum of Law [ECF No. 28] ("MTD").[1] Plaintiffs further object to the Defendants' improper efforts to resolve disputed factual allegations in their favor by advancing **16 exhibits** comprising **387 pages** of extraneous material—**none** were attached to the Complaint, and **12 of them** were not even mentioned therein.[2] For the reasons set forth below, the Motion should be denied.

## **INTRODUCTION**

Defendants breached ERISA's fiduciary duty of prudence, 29 U.S.C. §1132(a)(2)-(3), by: (1) selecting and retaining underperforming investment options—the 3M TDFs—for the Plans between 2019 and 2024, despite more suitable TDFs having been readily available; and (2) failing to monitor the fiduciaries responsible for administration and management of the Plans' actions in retaining the imprudent 3M TDFs as investments. ¶3. These claims survive here, as the Complaint need only allege that the 3M TDFs

---

[1]     Capitalized terms not defined herein have the same meaning as in Plaintiffs' Class Action Complaint filed on August 7, 2025 [ECF No. 1] ("Complaint"). "¶_" citations herein refer to the Complaint. Unless otherwise specified, all internal quotation marks and citations herein are omitted and all emphasis added.

[2]     When Defendants, as here, submit "voluminous extra-pleading material to support their motion…the Court simply may not at this stage resolve factual disputes on the basis of preemptive (and untested) submissions." *Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*, 967 F. Supp. 1148, 1152 (D. Minn. 1997). Accepting and construing the MTD's Exhibits 1, 4, 6-10, and 12-16 as Defendants request would "violate the fundamental rule" requiring "a complaint's allegations, along with reasonable inferences to be drawn from those allegations, [be] accepted as true." *Behr v. Radisson Hotels Mgmt. Co.*, 2025 U.S. Dist. LEXIS 88724, at *5 (D. Minn. May 9, 2025) (Tostrud, J.), *citing LeMay v. Mays*, 18 F.4th 283, 288-89 (8th Cir. 2021); *Hawke Media, LLC v. Stable Grp. Holdings, LLC*, 2024 U.S. Dist. LEXIS 110431, at *7-10 (D. Minn. June 24, 2024) (Tostrud, J.). Nor can judicial notice admit evidence in contravention of relevancy, foundation, and hearsay rules. *Id.*

substantially underperformed in comparison to "meaningful benchmarks," *i.e.*, ones that share similar investment strategies and characteristics, such as size, category, and risks. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822-23 (8th Cir. 2018); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279-81 (8th Cir. 2022). "[T]his requirement is not intended to be such a barrier that plaintiffs cannot bring potentially meritorious ERISA claims." *Payne v. Hormel Foods Corp.*, 2024 U.S. Dist. LEXIS 168017, at *16 (D. Minn. Sep. 18, 2024).

The Complaint cogently advances highly-specific and well-pled allegations showing the 3M TDFs' sustained underperformance. The MTD largely opts to ignore them and rewrite the Complaint's allegations by reference to inadmissible exhibits in an attempt to mislead this Court into believing that Plaintiff's claims are unsupported.[3] On the rare occasion that the MTD acknowledges the Complaint's allegations, it inappropriately

---

[3]    *See* n.2, *supra*, noting 12 of the 16 exhibits attached to the Declaration of Rajin Olson ("Olson Decl.") were not cited or even referred to in the Complaint. For example, Defendants submit the "Morningstar 2021 Target-Date Strategy Landscape Report" for the years 2020-2022 and 2025 as Exhibits 7-10 ("Landscape Reports"). While the Complaint includes no reference to, or information from any of these reports, Defendants nevertheless cite the Landscape Reports no less than 9 times to: (i) insert entirely new factual issues concerning "collective investment trusts" vs. "mutual funds"; and (ii) confuse the issues at hand with new and irrelevant information about the "BlackRock LifePath Index Funds"— such as their purported "ratings." *See, e.g.*, MTD 7-8. *See, e.g., Trauernicht v. Genworth Fin. Inc.*, 2023 U.S. Dist. LEXIS 162470, at *26-27 (E.D. Va. Sep. 12, 2023) (declining to consider Morningstar 2022 Target-Date Strategy Landscape Report at dismissal stage). There—as here—Defendants advance these "for other factual assertions, such as how much revenue the BlackRock TDFs gained in a year and the rating of the BlackRock TDFs." *Cf. id.* at *27, *with* MTD 7. Such matters are "not integral" to the Complaint's allegations. *Id.*

challenges the factual bases of such allegations[4] to pretend the Comparator Funds and S&P Indices are not "meaningful benchmarks" under *Matousek* and *Meiners* (MTD 1-2, 10-23). Defendants repeatedly cite *Matousek* as though it upended all precedent on what constitutes a "meaningful benchmark" and imposed highly specific showings and requirements to allege one. MTD 1-2, 10-23; *see, e.g., id.* at 15 ("*Matousek* makes clear that a meaningful benchmark **must** involve funds that hold similar securities."); *see also id.* at 18.

Not so. *Matousek* did not create stringent bright-line requirements to allege a "meaningful benchmark," but clarified that, as before, Plaintiffs must only allege "sound basis for comparison—a meaningful benchmark.... ***[T]here is no one-size-fits-all approach***.... Nudging the complaint past the plausibility threshold depends on the ***totality of the specific allegations***." *Matousek*, 51 F.4th at 281-82 (quoting and discussing *Meiners*, 898 F.3d at 822). Plaintiffs clear this plausibility threshold and provide a "sound basis" (under both *Matousek* and *Meiners*) to use the Comparator Funds and S&P Indices as meaningful benchmarks to gauge the 3M TDFs' performance.[5] Compared to these

_____

[4]    *See, e.g., Randall v. GreatBanc Tr. Co.*, 2024 U.S. Dist. LEXIS 29208, at *15 (D. Minn. Feb. 21, 2024) (Tostrud, J.) ("In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.").

[5]    *See, e.g.*, ¶¶71–82 (alleging, *inter alia*, that Plaintiffs selected the four Comparator TDF's "based on their similar characteristics" to the 3M TDFs—"characteristics such as size, category, and risk ratio," that "[b]ased on the similarities of the Comparator Funds' structures and Morningstar's inclusion of each...in the same Morningstar Category, the Comparator Funds represent meaningful comparators," and "[w]hen combined with the S&P Indices, Plaintiffs have identified meaningful benchmarks that provide a sound basis of comparison").

meaningful benchmarks, the 3M TDFs exhibited chronic poor performance on a trailing-three years basis for at least eight consecutive years (2016-2023), a trailing-five-years basis for at least six years (2018-2023), a ten-year basis by 2023, and on a cumulative basis for a decade.  ¶¶82-140; *see also Payne*, 2024 U.S. Dist. LEXIS 168017, at *22 (underperformance sufficiently pled by comparing against two meaningful benchmarks over six year period); *Snyder v. UnitedHealth Grp., Inc.*, 2021 U.S. Dist. LEXIS 230878, at *13-14 (D. Minn. Dec. 2, 2021) ("*Snyder I*") ("long term underperformance" shown by six meaningful benchmarks—four comparator funds and two indices—"plausibly raises an inference of imprudence" sufficient to survive dismissal).

Moreover, accepting Defendants' arguments on what does and does not constitute a "meaningful benchmark" in this action would lead to disastrous consequences, undermine the very purpose of ERISA, and effectively absolve plan fiduciaries of the fiduciary duty of prudence.  According to Defendants' arguments, plan fiduciaries could avoid imprudent retention claims altogether (even were the subject fund to suffer significant sustained losses for decades) with three simple steps.  ***First***, create a "custom" TDF or fund.  ***Second***, create a custom non-investable "blended benchmark" purportedly mirroring the strategy of that TDF or fund.  ***Lastly***, defeat any and all imprudence allegations by arguing that the *only* possible benchmark/comparator that could be used to analyze the subject fund's performance is the self-created custom benchmark and, because the fund's performance is nearly identical to the custom benchmark's performance, there can be no underperformance.  Such result would lead to immeasurable harm to countless

individuals' ability to achieve the financial security necessary to retire and care for themselves or their families as they age.

The Court should not, and need not, permit this result because, as detailed herein, all of the MTD's arguments fail as a matter of law or fact as they, *inter alia*: (i) are premised on new, improperly raised facts that are either in direct contradiction to Plaintiffs' allegations, contradicted by Defendants' own records, and/or internally inconsistent; (ii) apply misstated legal standards; (iii) ignore the Complaint's actual allegations; and/or (iv) raise factual disputes providing no basis for dismissal. The MTD should be denied.

## FACTUAL BACKGROUND

### A.    The Plans and Parties

3M, headquartered in Minnesota, is a multinational conglomerate industry, worker safety, and consumer goods business.  ¶21; MTD 3, *citing* Olson Decl., Ex. 1.[6]  Plaintiffs are former 3M employees and participants in the Plans that invested in or are still invested in one or more vintages within the 3M TDFs.  ¶¶15-20.  As of 2023, the Plans had over 58,000 participants, entrusting $12.4 billion in assets to the care of the Plans' fiduciaries.  ¶¶42-43.  The Plans boast more assets than 99.625% of all defined contribution plans that

---

[6]    This exhibit is silent with respect to 3M's business and situs, instead presenting publicity stills and self-serving characterizations (*e.g.*, "we apply science in collaborative ways *to improve lives daily*"; "solving real problems…becomes *amazing and awe inspiring*").  None bear upon the Complaint's allegations of imprudent mismanagement (*see* FED.R.EVID. 401, 403) and should not be considered.  *Piper Jaffray*, 967 F. Supp. at 1152 ("[T]he Court must resist the temptation to peer into Piper's website, compare *Wall Street Journal* listings of fund prices or otherwise consider matter not contemplated by the pleadings.");  *Hawke*, 2024 U.S. Dist. LEXIS 110431, at *7-11 (cautioning against admitting irrelevant evidence through judicial notice).

filed Form 5500s in 2023. *Id.*

Defendants are the Plans' fiduciaries. ¶¶21-25. Defendants' fiduciary duties require independent investigation and regular monitoring of each Plan's investment options with the care and skill of a prudent investor. ¶52. ERISA imposes "a continuing duty to monitor [Plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments." *Id.* (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015)). Prudence requires a review at "regular intervals." *Id.*

### B.    Target Date Funds

#### 1.    TDFs

TDFs are a type of fund designed to achieve certain investment results based on an investor's anticipated retirement date. ¶45. TDFs are meant to offer investors dynamic asset allocation that gradually shifts to a more conservative profile to minimize risk as time progresses, generally moving from stocks to funds over time in what is referred to as a "glide path." ¶¶46-47.[7]

---

[7] When discussing glide paths, Defendants advance Olson Decl., Ex. 6—a printout from a government website—to support their argument. MTD 5-6. This publication bears no relation to the parties of this case and is not judicially noticeable. *Kloss v. Argent Trust Co.*, 2023 U.S. Dist. LEXIS 220595, at *7 (D. Minn. Dec. 12, 2023) (denying judicial notice of "government publications" because "academic publications and learned treatises covering various business topics…are unrelated to the parties in this case and, therefore, are not adjudicative facts permitted by [FED.R.EVID. 201]"). Moreover, this exhibit was not cited, referenced, or otherwise relied upon in the Complaint and cannot be incorporated by reference.

An investment fund can be either passively or actively managed.  ¶49.  Passive funds, such as "index funds," are meant to mirror the performance of an index.  *Id.*  For example, a passive index fund pegged to the S&P 500 would hold securities of the same or similar type matching the composition of the S&P 500 index.  *Id.*  In contrast, actively managed funds mean to beat the market using superior investment selection comprised of individual stocks, bonds, and/or assets selected by a manager or investment advisor.  *Id.*

TDF managers may choose to include actively managed funds and/or passive funds within the TDF itself.  ¶49.  Regardless of whether a TDF includes passively managed investments, the TDFs themselves are actively managed because managers make active decisions when designing a TDF's asset allocation over time.  ¶50.

### 2. The 3M TDFs

By at least 2006, Defendants had selected the 3M TDFs as the only target date investment option for the Plans.  ¶59.  Participants who want to invest in a target date strategy have no choice other than to invest in the 3M TDFs.  *Id.*  The 3M TDFs are advised by the 3MIC, 3M IMCO, and BlackRock Institutional Trust Company.  ¶62

According to Defendants, each of the vintages in the 3M TDFs is "diversified among broad types of asset classes and the mix is adjusted over time to gradually become more conservative as the target retirement year approaches."  ¶63.  The 3M TDFs are

actively managed funds. ¶¶49-50, 63; *see also* Olson Decl., Ex. 11 ("3M 2040 Fact Sheet"); Nicholson Decl., Ex. A (2025 3M TDF Fact Sheet) (same).[8]

The 3M TDFs were initially modeled after the BlackRock LifePath TDFs. ¶59. However, contrary to what Defendants would have this Court believe (MTD 3, 7-8, 12-17), the 3M TDFs are ***not*** identical to, nor synonymous with, the BlackRock LifePath TDFs.

The allocation of assets and glide paths of each of the vintages of the 3M TDFs are not static—because TDFs are actively managed funds, it is expected that a TDF's portfolio manager will readjust allocation and investment strategies in response to market trends, outlook and evolving analyses. ¶63.

Under the Plans, after newly hired employees are "automatically enrolled" in the 3M VIP Plan after three months of employment, their contributions are invested "100%" in the 3M TDF vintage "closest to the year in which the participant will reach age 65." ¶64. Defendants designated the 3M TDFs as the default funds in which to invest participants' contributions if they do not make an investment election. ¶65. As of 2024, approximately $3.78 billion—or 30.5%—of the Plans' total assets, was invested in 3M TDFs. ¶44.

---

[8]    "Nicholson Decl., Ex. __" refers to exhibits attached to the Declaration of Melinda A. Nicholson in Support of Plaintiffs' Opposition to the Motion filed herewith.

### C.    The 3M TDFs and Meaningful Benchmarks

#### 1.    3M's Custom Benchmark

3M utilized custom benchmarks to analyze the performance of the 3M TDFs.  ¶68. For example, the custom benchmark for the 3M 2030 TDF is named "Blended Benchmark: LifePath 2030 Blend."  *Id*.  Defendants suggest their custom "benchmarks" are a weighted mix of several indices, representing the asset classes in which the different vintages in the 3M TDFs were invested—meaning the custom benchmarks simply track/measure how successful the 3M TDF is at executing its literal strategy.  ¶69.  Thus, they simply mirror the overall strategy of the vintages in the 3M TDFs and, at best, serve to compare the 3M TDFs' managers' ability to implement their own strategies rather than compare the 3M TDFs' performance with actual meaningful peer comparator/competitor funds.  ¶69.

3M does not disclose the actual composition of the custom blended benchmarks used for vintages in the 3M TDFs.  *Id*.  3M's custom benchmarks do not analyze the 3M TDFs' relative performance to any peer TDFs, rendering them unreliable.  ¶71.  Indeed, the Department of Labor rejects custom benchmarks as prone to manipulation.  ¶71, n.7. Accordingly, Plaintiffs do not rely upon 3M's custom benchmarks when analyzing the 3M TDFs' performance and the Court should do the same.  *Id*.

#### 2.    The Meaningful Benchmarks

Plaintiffs identified multiple benchmarks and comparator funds to meaningfully gauge the performance of the 3M TDFs, including the S&P Indices and the corresponding vintages from four Comparator TDFs as meaningful benchmarks.  ¶¶71-76.

The TDF market is top heavy, with the majority of TDFs being managed as part of one of six TDF indexes—specifically: (1) Vanguard Target Retirement; (2) T. Rowe Price Retirement; (3) BlackRock LifePath Index; (4) American Funds Target Date Retirement; (5) Fidelity Freedom; and (6) Fidelity Freedom Index.  ¶77.

Each Comparator Fund was selected based on their similar characteristics to the 3M TDFs—each shares similar structures (they are all funds of funds), investment strategies, objectives, sizes, portfolios, risk ratios, and risks (*e.g.*, they share identical risks relating to the investment managers' chosen glide paths and asset allocations).  ¶¶75-82.

Similarly, the S&P Indices are appropriate meaningful benchmarks.  Indeed, according to Morningstar, over 50% of TDFs use the S&P Indices as their primary prospectus benchmark to approximate performance.  ¶73.  The S&P Indices include a separately calculated index for each target date.  *Id*.  Because each vintage in the 3M TDFs necessarily includes a different mix of asset classes which evolves as the relevant target dates approach, and the S&P Indices cover a wide range of the types of investment strategies or characteristics that can exist in the universe of TDFs, the S&P Indices are appropriate comparators.  ¶74.

### D.    Defendants' Breached Their ERISA Fiduciary Duties

The 3M TDFs exhibited chronic poor performance as compared to the meaningful benchmarks measured on a trailing-three years basis for at least eight consecutive years (2016-2023), a trailing-five-years basis for at least six years (2018-2023), a trailing-ten-years basis by 2023, and on a cumulative basis for a decade.  ¶¶82-140.

If participants had invested their funds in one of the Comparator Funds in 2014, by 2024, those same amounts would have made, on average, approximately $416 million more than those same funds made invested in the 3M TDFs.  ¶135.  Had Defendants fulfilled their duty with the care and skill of a prudent fiduciary, they would have seen in real-time that the 3M TDFs underperformed its appropriate benchmarks.  *Id*.  Despite years of underperformance and a multitude of better performing investment options, Defendants did not remove the 3M TDFs from the Plans.  ¶136.

Defendants breached their fiduciary duties by retaining the 3M TDFs despite chronic and sustained underperformance, impairing the Plans' overall investment performance, and wasting millions in retirement savings.  ¶138.  Confronted with such underperformance, a prudent fiduciary would have selected a new target date option. ¶139.[9]

## **LEGAL STANDARD**

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the…claim is and the grounds upon which it rests."  *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007).  Under *Twombly*, a complaint must "include enough facts to state a claim to relief that is plausible on its face."  *GreatBanc*, 2024 U.S. Dist.

---

[9]    Moreover, 3M appears to have had an additional interest in keeping these investment options in the Plans—its Investment Committee and/or subsidiary, 3M IMCO, served as an "investment advisor" to the 3M TDFs and consequently received substantial direct and indirect compensation for providing investment advice and management services to the Plans' participants.  *Id.*

LEXIS 29208, at *15.  "Although the factual allegations need not be detailed, they must be enough to raise a right to relief above the speculative level."  *Id*.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

In assessing plausibility, a court does not weigh probabilities; "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the violation."  *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015).  Rather than parsing a complaint's allegations to determine plausibility, specific allegations should be read holistically and the Complaint evaluated in its entirety.  *Matousek*, 51 F.4th at 279-81; *see also Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 790 (D. Minn. 2018).

On a Rule 12(b)(6) motion to dismiss, "a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Id.* at *15.  "If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018); *accord Kloss v. Argent Trust Co.*, 2023 U.S. Dist. LEXIS 220595, at *7 (D. Minn. Dec. 12, 2023) ("On a motion to dismiss, it is improper for a court to take judicial notice of disputed facts, as a high degree of indisputability is the essential prerequisite for taking judicial notice….").

Claims for breaches of the duty of prudence need only allege that the 3M TDFs' substantially underperformed in comparison to "meaningful benchmarks," *i.e.*, ones that

share similar investment strategies and characteristics, such as size, category, and risks. *Meiners*, 898 F.3d at 822-23; *Matousek*, 51 F.4th at 279-81; *see also Larson*, 350 F. Supp. 3d at 794 ("When determining whether a fiduciary has acted with prudence, the court looks at 'the totality of the circumstances,' including but not limited to, the plan structure and aims and the disclosures made to participants regarding the risks associated with the investments.").

Plaintiffs need not plead facts about Defendants' processes. Indeed, such would be difficult, if not impossible, considering such facts "tend systemically to be in the sole possession of defendants." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). Rather, the sole issue is whether the Court "may reasonably infer that the fiduciaries engaged in a flawed decision-making process" from the Complaint's allegations. *GreatBanc*, 2024 U.S. Dist. LEXIS 29208, at *24-25. Here, it can.

## **ARGUMENT**

### I.    **Plaintiffs Plausibly Allege a Claim for Breach of ERISA's Duty of Prudence**

#### A.    **Underperformance Against Multiple Meaningful Benchmarks Sufficiently States a Claim**

ERISA requires fiduciaries to closely monitor investments, remove imprudent investments, and make investment decisions based solely on the participants' best interests. *See* 29 U.S.C §1104(a)(1). These duties of loyalty and prudence are "the highest known to the law." *Snyder v. UnitedHealth Grp., Inc.*, 2024 U.S. Dist. LEXIS 42952, at *17 (D. Minn. Mar. 12, 2024) ("*Snyder II*").

- 13 -

Prudent fiduciaries must act "with the care, skill, prudence, and diligence" of a prudent person "acting in a like capacity and familiar with such matters." 29 U.S.C. §1104(a)(1)(B); *Davis v. Washington University in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020). ERISA imposes "a continuing duty to monitor [Plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments," requiring a review at "regular intervals." *Tibble*, 575 U.S. at 529. Breach of this duty occurs where a fiduciary "fail[s] to properly monitor investments and remove imprudent ones" within a reasonable period of time. *Id.* at 529-30; *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) (same).

As an initial matter, Defendants criticize the Complaint for failing to allege specific facts about their flawed fiduciary process. *See, e.g.*, MTD 3 (asserting Plaintiffs' claims are insufficient as a matter of law as they purportedly "fail to allege any deficiencies in fiduciary process"). This argument, however, ignores Plaintiffs' process allegations. *See, e.g.*, ¶¶140 (alleging that "overall breadth and depth of the 3M TDFs' underperformance raises a plausible inference that 3M's selection and monitoring process was tainted by a lack of competency and/or complete failure of effort"); *see also* ¶¶7, 20, 164-65. Defendants appear to suggest that that Plaintiffs must satisfy heightened pleading standards detailing Defendants' processes for selecting, analyzing, and retaining the 3M TDFs. *See* MTD 2-3, 9-10, 22-23. On the contrary, it is well-settled that because "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences," they need not plead specific details of a fiduciary's decision-making process. *Braden*, 588 F.3d at 598. Defendants' demands for

particularized process allegations are not required to state a claim. Rather, Plaintiffs must only have alleged sufficient facts to "reasonably infer that the fiduciaries engaged in a flawed decision-making process." *GreatBanc*, 2024 U.S. Dist. LEXIS 29208, at *24-5.[10] Plaintiffs unquestionably have.

The Complaint's substantial analyses demonstrate the chronic long-term poor performance of each of the 3M TDF vintages relative to meaningful benchmarks. *See, e.g.*, ¶¶82-140. Plaintiffs' allegations amply provide a "sound basis" for using the Comparator Funds and the S&P TDIs as meaningful benchmarks under both *Matousek* and *Meiners*. *See, e.g.*, *Payne*, 2024 U.S. Dist. LEXIS 168017, at *18 (after "taking the facts as true and drawing all reasonable inferences in the plaintiff's favor," plaintiff had "plausibly pled meaningful benchmarks" where one comparator fund shared "structure, purpose, and risk profile," and the second comparator was "sufficiently similar to serve" as "meaningful benchmark" despite a "different risk profile" as it shared the "same goal").

Indeed, the Complaint plausibly alleges the 3M TDFs exhibited chronic poor performance compared to these meaningful benchmarks for a decade, and other indicia of

---

[10]    *See also Snyder I*, 2021 U.S. Dist. LEXIS 230878, at *9 ("Evidence of underperformance in comparison to a meaningful benchmark is itself circumstantial evidence of a flawed fiduciary process and sufficient to survive a motion to dismiss."); *Payne*, 2024 U.S. Dist. LEXIS 168017, at *10 (same); *Karg v. Transamerica Corp.*, 2019 U.S. Dist. LEXIS 140567, at *15 (N.D. Iowa Aug. 20, 2019) ("An ERISA claim alleging an imprudent investment process can survive a motion to dismiss [e]ven when the alleged facts do not directly address the process by which the Plan was managed, because a court can infer a flawed process from circumstantial factual allegations.").

imprudence.[11]  In short, accepting Plaintiffs' allegations as true, drawing all inferences in Plaintiffs' favor, and considering the "totality of the specific allegations"—as the Court is required to do at this stage—Plaintiffs have plausibly alleged a claim for breach of the fiduciary duty of prudence.  *See, e.g.*, *Payne*, 2024 U.S. Dist. LEXIS 168017, at *20-28.[12] None of the MTD's arguments overcome that reality.[13]

### B.   Plaintiffs Allege Meaningful Benchmarks

1. The 3M Custom "Benchmarks" Are Meaningless to Evaluate the 3M TDFs' Actual Performance

As noted, 3M utilized custom benchmarks to analyze performance.  Defendants represent these custom "benchmarks" are a weighted mix of several indices representative of the asset classes in which the different vintages in the 3M TDFs were invested.  This means that the custom benchmarks actually serve to track/measure how successful the 3M TDF is at executing its literal strategy.  ¶69.

The absurdity of this practice is best illustrated with a simple hypothetical.  Assume a fund's ("Hypo Fund") strategy is to: (1) invest 50% of its assets by attempting to mirror the S&P 500 Index ("SPI"); and (2) invest the other 50% by attempting to mirror the Dow

---

[11]    *See, e.g.*, ¶139.

[12]    *See also Trauernicht v. Genworth Fin. Inc.*, 2023 U.S. Dist. LEXIS 162470, at *38-42 (E.D. Va. Sep. 12, 2023) (denying motion to dismiss, noting plaintiffs "do explain why the Comparator TDFs were selected, the Complaint here does offer meaningful comparisons in this case").

[13]    MTD's process arguments underscore the need for discovery; Plaintiffs have concurrently served Requests for Production of Documents and Interrogatories on Defendants, but the time to respond has not elapsed.

Jones Industrial Average Index ("DJI"). Using Defendants' methodology, the Hypo Fund's "custom benchmark" would be called a "blended benchmark" with a weighted composition of: (1) 50% SPI; and (2) 50% DJI. Clearly, such a "benchmark" would not measure performance relative to anything. Rather, it simply measures how effective the Hypo Fund's managers are at executing their intended strategy.

The same is true for the 3M custom benchmarks, which simply mirror the overall (ever-shifting) strategies of the vintages in the 3M TDFs and, at best, serve to compare the 3M TDFs' managers' ability to implement their own strategies rather than contrast them against actual peer comparator/competitor funds. ¶69. This reality is obvious considering every vintage in the 3M TDFs purportedly matched or minimally outperformed these custom "benchmarks" across the board. *Id.* Defendants' use of "custom" benchmarks is even more nonsensical than the Hypo Fund's use of such benchmark. Unlike the Hypo Fund, which has an express purpose of tracking those two indices, the 3M TDFs' investment strategy is not to track any indices. *See, e.g.*, Nicholson Dec., Ex. A at 1 (stating the fund's "strategy" "seeks to maximize assets for retirement or for other purposes consistent with the quantitatively measured risk investors may be willing to accept, given their stated investment time horizons"). Further, Defendants do not disclose the actual composition of the custom blended benchmarks—*i.e.*, how the mix of indices used is

actually weighted.  Rather, 3M only discloses that the 3M TDFs may draw from "**any or all** of seven major asset classes."  ¶70.[14]

Because 3M's custom benchmarks do nothing to analyze the 3M TDFs' relative performance to any peers, the custom benchmarks should not be relied upon.  ¶71.  Indeed, the Department of Labor rejects the use of custom benchmarks as "benchmarks are more likely to be helpful when they are not subject to manipulation and are recognizable and understandable to the average plan participant, as is the case with broad-based indices…."[15] *Id.*  Accordingly, Plaintiffs do not use or refer to the 3M custom benchmarks in analyzing the 3M TDFs' performance.  *Id.*  Defendants administer these custom benchmarks, which are not used or recognized outside this specific context, and which can be easily manipulated by Defendants to manufacture a performance and measure the benefits the 3M TDFs purportedly provide.  *Id.*[16]  Accordingly, the custom benchmarks should be disregarded.

---

[14]    In contrast, 3M's "blended benchmark" for the "Inflation Response Multi-Asset Fund" it also offers as an investment option discloses precisely the blend of its custom benchmark: (i) 45% "Bloomberg U.S. TIPS"; (ii) 20% "Bloomberg Comdty"; (iii) 15% "JPMorgan Emerging Local Markets Index Plus"; (iv) 10% "Dow Jones U.S. Select REIT"; and (v) 10% "Bloomberg Gold Subindex."

[15]    *See* Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 Fed. Reg. 64910, 64916-64917 (Oct. 20, 2010).  For this reason, the Department mandates benchmarks be a "broad-based securities market index" and that such not be "administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used."  29 C.F.R. §2550.404a-5.

[16]    While the MTD acknowledges that Plaintiffs allege that 3M's "custom benchmarks" "should not be relied upon" (MTD 9), it lacks any argument attempting to refute Plaintiffs'

2.  The Comparator Funds and 3M TDFs Share Similar Strategies and Characteristics, Such as Size, Category, and Risk Ratio

In *Matousek*, the Eighth Circuit reaffirmed that, as before, Plaintiffs must allege "sound basis for comparison—a meaningful benchmark." 51 F.4th at 281-82.  It further explained: "In one case, a combination of a market index and other shares of the *same* fund did the trick, but ***there is no one-size-fits-all approach***…." *Id.* at 281-82.  Here, the Complaint's well-pleaded allegations more than provide a "sound basis" for using the Comparator Funds and the S&P TDIs as meaningful benchmarks.  *See, e.g.*, *Dionicio v. U.S. Bancorp*, 2024 U.S. Dist. LEXIS 50097, at *8 (D. Minn. Mar. 21, 2024) (under *Matousek*, "plans need not be numerically identical," as "'there is no one-size-fits-all approach' for determining whether a particular plan provides a meaningful benchmark.").

Defendants, ignoring or misconstruing the Complaint's allegations, argue that Plaintiffs' meaningful benchmarks allegations rely on "three sets of comparisons."  MTD 9.  According to Defendants, Plaintiffs merely: (1) "compare the 3M TDFs' performance to that of four off-the-shelf suites"; (2) "cite Morningstar categories"; and (3) "make performance comparisons" to the S&P Indices.  *Id.*  But Plaintiffs do not merely select "off-the-shelf suites" and "cite Morningstar categories" to support their inclusion.  Rather, each of the Comparator Funds was selected based on their similar characteristics to the 3M TDFs and are meaningful benchmarks under *Matousek*.  ¶¶75-82.

---

allegations explaining why the custom benchmarks are inappropriate comparators and fails to explain why these custom benchmarks are relevant in determining whether the 3M TDFs' performance were better or worse than any peer TDF.

Specifically, the Comparator Funds and the 3M TDFs all share similar structures (they are all funds of funds), investment strategies, objectives, sizes, portfolios, risk ratios, and risks (*e.g.*, identical risks relating to the investment managers' chosen glide paths and asset allocations). ¶¶75-82. For example, because the Plans had more assets than 99.625% of the defined contribution plans that filed 5500 forms for the year 2023, it would make most sense that, had Defendants opted to replace the 3M TDFs, they likely would have worked with one of the non-BlackRock suites that manage the majority of TDFs (American Funds, Fidelity Freedom, Vanguard, and T. Rowe Price—*i.e.*, the Comparator Funds), as such have experience managing assets as large as those held by the Plans. ¶77.

Plaintiffs use the fact that the Comparator Funds and the 3M TDFs are all within the same "Morningstar category" as additional confirmation that the Comparator Funds are meaningful benchmarks. *Id.* Plaintiffs identified four Comparator Funds for each of the seven 3M TDFs at issue—meaning, including the seven S&P Indices, Plaintiffs have identified 35-total comparators to serve as meaningful benchmarks. These allegations provide a "sound basis" to use each comparator as a meaningful benchmark. *See, e.g.*, *Dionicio*, 2024 U.S. Dist. LEXIS 50097, at *7 ("Unlike the plaintiffs in *Matousek* and *CommonSpirit*, plaintiffs in this case have not offered as comparators plans that have little in common with the defendant plan, but rather have provided relatively close matches given the Plan's exceptional size. Thus, … comparing the Plan with the mega plans identified…is a 'like-for-like comparison' that provides a meaningful benchmark"); *see also Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 830 (N.D. Ill. 2023) ("Rather than providing two comparator funds as in *Matousek*, Gaines has provided twenty comparator

funds—five for each alleged underperforming fund…allegations regarding underperforming funds is thus more detailed than the allegations in *Matousek* and sufficient at the pleading stage to support his duty of prudence claim"); *Karg*, 2019 U.S. Dist. LEXIS 140567, at *15 (dismissal denied where underperformance alleged relative to comparator funds within same Morningstar Category and relevant benchmark indices).[17]

Further, the MTD's argument that Plaintiffs' use of the "Morningstar Categories" is as insufficient under *Matousek* (MTD 19) is baseless.   In *Matousek*, the Eighth Circuit rejected the use of categories created by the Investment Company Institute ("ICI")—a non-profit organization that publishes and lobbies on behalf of investment companies—that contained "peer-group averages."   51 F. 4th at 281-82.   The court held that the "main reason" the "peer groups" could not be meaningful benchmarks was because "the composition of the peer groups remains a mystery."   *Id.* at 281.   Here, Plaintiffs are not using the ICI peer groups as a comparator.   In fact, they aren't even using the "Morningstar

---

[17]    *See also Dover v. Yanfeng US Auto. Interior Sys. I LLC*, 563 F. Supp. 3d 678, 687 (E.D. Mich. 2021) (dismissal denied where comparators shared Morningstar Categories and Morningstar benchmark indices); *Mattson v. Milliman, Inc.*, 2022 U.S. Dist. LEXIS 246403, at *5 (W.D. Wash. Dec. 13, 2022) (rejecting assertion that equity allocations are "materially different" and thus do not share the same "aims, risks, and potential rewards" because those "requested factual determinations" are inappropriate on a motion to dismiss); *Brown-Davis v. Walgreen Co.*, 2020 U.S. Dist. LEXIS 252317, at *1-2 (N.D. Ill. Mar. 16, 2020) (allegations that certain funds underperformed two indices, including a Morningstar index and S&P indices, and three comparator funds were sufficient to state a viable duty of prudence claim); *Moler v. Univ. of Md. Med. Sys.*, 2022 U.S. Dist. LEXIS 124804, at *10 (D. Md. July 13, 2022) (dismissal denied and comparators found to be "meaningful benchmarks" where comparator funds were in the "same Morningstar category" as the subject funds); *Hoye v. CHA Gen. Servs.*, 2025 U.S. Dist. LEXIS 20557, at *8 n.2 (D. Mass. Feb. 5, 2025) (same); *Schissler v. Janus Henderson United States Holdings Inc.*, 2023 U.S. Dist. LEXIS 189287, at *59-60 (D. Colo. Sep. 7, 2023) (same).

Categories" as a comparator.  ¶¶75-82.  Rather, the fact that the Comparator Funds are grouped within the same "Morningstar Categories" is used only as *further* support as to why the Comparator Funds are meaningful benchmarks.  *Id.*  Moreover, the MTD's argument that Plaintiffs fail to provide any information about whether funds in the Morningstar Categories "hold similar securities, follow comparable strategies, or reflect a similar risk profile" ignores the Complaint's allegations, again.  *See* ¶78 ("A Morningstar Category is assigned by placing funds (*e.g.*, the 3M TDFs, Fidelity, T. Rowe Price, Vanguard, and American Funds) into peer groups ***based on their holdings***. Funds are placed in a Morningstar Category ***based on their portfolio statistics and compositions over the prior three years***."). The Comparator Funds are meaningful benchmarks.

### 3.  The S&P Indices Are Additional Meaningful Benchmarks

Despite the fact that over 50% of ***all*** TDFs use the S&P Indices as their primary prospectus benchmark to approximate performance (¶73), Defendants dispute Plaintiffs' use of the S&P Indices as an additional, meaningful comparator, arguing they are "non-investable composite indices" (MTD 1)[18] and that "such amalgams cannot provide the like-

---

[18]     Defendants contradict themselves by urging the Court to refer to the 3M Custom Benchmarks—which, in addition to being "non-investable composites" of "several indices," don't measure performance relative to anything other than to a 3M TDF's own, shifting, investment strategy. *See, supra* Arg.I.B.1. Thus, the MTD's reliance on *Hall v. Capital One Fin. Corp.*, 2023 U.S. Dist. LEXIS 35391 (E.D. Va. Mar. 1, 2023), for the proposition that the S&P Indices cannot serve as meaningful benchmarks because each is "not an actual fund" should be rejected. ¶73. The MTD's reliance on *Phillips v. Cobham Advanced Elec. Sols., Inc.*, 2025 U.S. Dist. LEXIS 184960 (N.D. Cal. Sept. 19, 2025), is misplaced for the same reason and as an out of circuit decision in direct conflict with Eighth Circuit precedent. The Eighth Circuit has concluded a market index can serve as a meaningful benchmark. *Matousek*, 51 F.4th at 281.

for-like comparisons that *Meiners* and *Matousek* require." MTD 20. In support of their position, Defendants cite *Matousek* as "rejecting reliance on peer-group averages as not providing a sound basis for comparison." *Id.* This argument should be rejected on several grounds.

First, the "peer groups" at issue in *Matousek* had to do with broad "categories" grouped by the ICI. Here, the S&P Indices are created by **S&P Global Ratings**—one of the "Big Three" credit-rating agencies. Second, the S&P Indices **are not peer groups**, they are indices. Lastly, *Matousek* did not conclude that "peer groups" cannot serve as a "sound basis for comparison" as a matter of law. Rather, it concluded that the complaint there failed to provide sufficient facts or information to determine whether there was a sound basis for using the peer-groups as comparators. *Id.* The *Matousek* court explained that the "main reason" the "peer groups" could not be meaningful benchmarks was because "the composition of the peer groups remains a mystery…there is **no explanation of what types of funds are in each group**, **much less the criteria used to sort them**…. Among the missing details is whether they hold similar securities, have similar investment strategies, and reflect a similar risk profile." *Id.* at 281.

In contrast here, Plaintiffs explain exactly what the S&P Indices are, what they measure, and why they are appropriate to serve as additional meaningful benchmarks to measure the 3M TDFs' performance. For example, the S&P Indices include a separately calculated index for each of the relevant retirement target dates (2025, 2030, 2035, 2040, 2045, 2050, and 2055). ¶73. Each index "measures the performance of sub-indices selected and weighted to represent a consensus of the opportunity set available in the U.S.

- 23 -

universe of target date funds." *Id.* Thus, because each of the vintages in the 3M TDFs necessarily includes a different mix of asset classes, and that mix evolves as the relevant target dates approach, and the S&P Indices cover a wide range of the types of investment strategies or characteristics that can exist in the universe of TDFs, the S&P Indices are appropriate comparators. *Id.* Accordingly, the Complaint's allegations plausibly allege a "sound basis" to use the S&P Indices as an additional meaningful benchmark under *Matousek. See, e.g.*, *Gaines*, 663 F. Supp. 3d at 830 (distinguishing *Matousek* and finding plaintiff alleged meaningful benchmarks by providing "some explanation of the peer group's composition" such as that "they are chosen by Morningstar because the funds 'share core similarities'").[19]

4. Defendants' Criticisms Amount to Factual Disputes and Provide No Basis for Dismissal

Defendants rely on multiple improperly submitted exhibits in an effort to disprove the Complaint's factual allegations concerning TDFs, the 3M TDFs, and the Comparator

---

[19]     *Accord Snyder I*, 2021 U.S. Dist. LEXIS 230878, at *10-14 (dismissal denied where six meaningful benchmarks alleged—including the S&P TDIs); *Kistler v. Stanley Black & Decker, Inc.*, 2024 U.S. Dist. LEXIS 117419, at *31-34 (D. Conn. July 3, 2024) (dismissal denied where five meaningful benchmarks alleged—four comparator funds and the S&P TDIs); *Brown-Davis*, 2020 U.S. Dist. LEXIS 252317, at *9 (finding S&P TDIs and another index meaningful benchmarks); *Thomson v. Caesars Holdings Inc.*, 661 F. Supp. 3d 1043, 1057-58 (D. Nev. 2023) (dismissal denied where funds underperformed relative to comparator funds and S&P TDIs); *Moler*, 2022 U.S. Dist. LEXIS 124804, at *10 n.7 (same); *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 217-20 (6th Cir. 2024) (explaining how indices can certainly be meaningful benchmarks).

Funds.  The Court should reject those efforts.[20]  The question before the Court is whether Plaintiffs have plausibly alleged a sound basis for the Comparator Funds and/or S&P Indices to serve as meaningful benchmarks to the 3M TDFs.  *Matousek*, 51 F.4th at 280-81; *Payne*, 2024 U.S. Dist. LEXIS 168017, at *18.  The ultimate determination on whether the 3M TDFs, in fact, underperformed as compared to the comparators, or any other potential benchmarks, is a question of fact to be addressed after discovery, expert reports, and summary judgment.  As such, to the extent Defendants' improperly submitted materials create any factual disputes with the Complaint, the court should refrain from considering or resolving such disputes.[21]  *See, e.g.*, *Becker v. Wells Fargo & Co.*, 2021 U.S. Dist. LEXIS 90207, at *4 n.5, *17 (D. Minn. May 12, 2021) ("Defendants rely on the Documents to create factual disputes which the Court cannot resolve at this stage in the proceedings.…[such] is improper at this stage") (collecting cases); *see also Morin v. Essentia Health*, 2017 U.S. Dist. LEXIS 151266, at *30 (September 13, 2017) (rejecting defendants' "alternate constructions of inferences to be drawn from the facts"), *report and*

---

[20]    *See, e.g.*, *GreatBanc*, 2024 U.S. Dist. LEXIS 29208, at *17 ("Defendants request that exhibits be considered to disprove factual allegations in the Amended Complaint. The exhibits, mainly account records, were not specifically referenced in the Amended Complaint.  Nor are Defendants' exhibits similar to an ERISA plan…that serves as the foundation to a plaintiff's claims.  This is not the time to consider evidence contrary to factual allegations in the Amended Complaint.").

[21]    Alternatively, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED.R.CIV.P. 12(d).  If the Court determines to convert Defendants' Motion into a motion for summary judgment, the Motion should be denied and Plaintiffs should be afforded the opportunity to take discovery pursuant to FED.R.CIV.P. 56(d).

*recommendation adopted*, 2017 U.S. Dist. LEXIS 178183 (D. Minn. Oct. 27, 2017).[22] However, even if the Court is inclined to consider those materials and new factual assertions, the materials Defendants cite do not actually support or prove the points for which Defendants use them.

Defendants claim that judicially noticeable facts contained in summary prospectuses (Olson Decl., Ex.'s 13-15) "confirm" a mismatch between the 3M TDFs and Plaintiffs' comparables, highlighting supposedly different glide paths and asset allocations versus the 3M TDFs. *See* MTD 14-5. Defendants are wrong.[23] However, if the Court is

---

[22]   *See also Snyder I*, 2021 U.S. Dist. LEXIS 230878, at *11 ("To the extent that Defendants dispute the similarities between the Wells Fargo TDFs and the Morningstar Comparators, these are factual issues that the Court cannot resolve on a motion to dismiss. At this stage, because the Court must construe all reasonable inferences in Snyder's favor and take all allegations in the Complaint as true, it would be inappropriate to reach a conclusion other than what the Complaint asserts—the Morningstar Comparators fall within the same peer universe as the Wells Fargo TDFs."); *Gaines*, 663 F. Supp. 3d at 829-30 ("Although BDO contends that certain comparator funds have 'obvious flaws,'…that is a factual assertion that does not necessitate dismissal of Gaines's claim"); *Schissler*, 2023 U.S. Dist. LEXIS 189287, at *59-60 (dismissal denied, noting defendants' "disagreements with Plaintiffs' comparisons and benchmarks present factual disputes (that are inappropriate to resolve on a Rule 12(b)(6) motion), but those disagreements do not mean that Plaintiffs' claim is not plausible"); *Vellali v. Yale University*, 308 F. Supp. 3d 673, 687-88 (D. Conn. 2018) (holding that the defendant's argument that the benchmarks used are not proper "is not appropriately addressed at the motion to dismiss stage"); *Brown-Davis*, 2020 U.S. Dist. LEXIS 252317, at *2 (denying motion to dismiss where "facts [we]re disputed with regard to the similarities between the Funds and Comparator Funds and benchmark indexes"); *Kohari v. MetLife Grp., Inc.*, 2022 U.S. Dist. LEXIS 136505 (S.D.N.Y. Aug. 1, 2022) (same); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1352 (N.D. Ga. 2017) (same).

[23]   In fact, some of Defendants' exhibits are not even the summary prospectuses for the comparables referenced in the Complaint. *Compare* ¶79 (listing Fidelity "2040 K6 FHTKX" and Vanguard "2040 Trust I FOUSA06R64" as comparators), *with* Olson Decl., Ex. 13 at 1 ("Fidelity Freedom® 2040/FFFFX" summary prospectus) and Olson Decl., Ex.

inclined to consider the MTD's arguments raising new factual issues to challenge the Comparator Funds and S&P Indices as meaningful benchmarks to the 3M TDFs, all such arguments fail as they either: (i) completely ignore the Complaint's relevant allegations; (ii) raise wholly irrelevant fact patterns; and/or (iii) are premised on new facts directly contradicted by Plaintiffs' allegations and the record.

> i.    The 3M TDFs Are "Actively-Managed" and the 3M TDFs Are Not Synonymous with the BlackRock TDFs

The MTD asserts that, because the 3M TDFs were "modeled" after the "BlackRock TDFs," and the Landscape Reports refer to the "BlackRock TDFs" as "passively managed," the 3M TDFs must therefore also be passively managed.  MTD 7, 16-18.  This argument is in direct contradiction to the Complaint's allegations that the 3M TDFs are "**actively managed**."  ¶63.  Nevertheless, Defendants use this new, contradictory, fact pattern to then argue that Plaintiffs' Comparator Funds are "mismatched" because "Plaintiffs ignore the fundamental divide between passive and active management."  MTD 17.  Because this argument is premised on Defendants' rewritten facts, it should be rejected

---

15 ("Vanguard Target Retirement 2040 Fund Investor Shares (VFORX)" summary prospectus).  Similarly, Defendants advance a summary prospectus for a T. Rowe 2040 mutual fund.  *See* Olson Decl., Ex. 14.  But the Complaint's comparator is the *T. Rowe Price Retirement 2040 Trust (Class A) F00000Z2LC*.  These exhibits are irrelevant and should not be considered by the Court.  Inasmuch as Defendants have submitted incorrect summary prospectuses, Plaintiffs wish for the Court to have an accurate record and have attached the fund fact sheet for the 2040 Vanguard TDF Comparator Fund (Vanguard® Target Retirement 2040 Trust I), a T. Rowe brochure discussing CITs identifying *T. Rowe Price Retirement 2040 Trust (Class A) F00000Z2LC*, and the summary prospectus for the actual 2040 Freedom TDF Comparator Fund (Fidelity Freedom® 2040 Fund - K6/FHTKX) as Nicholson Decl., Exs. B, C, and D, respectively.

outright. *Greatbanc*, 2024 U.S. Dist. LEXIS 29208, at *15. But Defendants' own records make clear the 3M TDFs were, in fact, actively managed. For example, the "3M 2040 Fact Sheet" discloses that one of the "Principal Risks" from investing in the 2040 3M TDF is "Active Management," which is defined as: "Performance is subject to the risk that the advisor's investment strategies are not suited to achieving the investment objective or do not perform as expected…." Olson Decl., Ex. 11 at 5.

Similarly, the MTD cites the Landscape Reports for the proposition that "Morningstar has consistently awarded" the BlackRock TDFs with its "highest Gold rating" and asserts that the "3M TDFs share these core features with their BlackRock counterparts." MTD 7-8.[24] Yet the BlackRock TDFs' "ratings" and the Landscape Reports are wholly irrelevant to Plaintiffs' allegations and none of the 3M TDFs have been awarded or recognized as high performing by Morningstar or anyone else. Further, again, the 3M TDFs are ***not*** synonymous with the BlackRock TDFs. This fact is obvious on a quick review of a 3M TDF's "fact sheet" as compared to the allocations of a BlackRock TDF's same vintage. For example, following is the "Asset Allocation" of the 3M 2025 TDF as of September 30, 2024:

---

[24]    While not relevant here, this assertion is not even accurate; for example, the BlackRock LifePath Index 2030 Fund "Fact Sheet" indicates a "bronze" level medal. *See* https://www.blackrock.com/us/individual/literature/fact-sheet/linax-lifepath-index-2030-fund-factsheet-us0669238224-us-en-individual.pdf.



**Asset Allocation**

| Asset Class | Net | Short | Long |
|---|---|---|---|
| ■ U.S. Equity | 25.33 | 0.00 | 25.33 |
| ■ Non-U.S. Equity | 14.21 | 0.00 | 14.21 |
| ■ Fixed Income | 49.97 | 18.40 | 68.37 |
| ■ Other | 6.46 | 0.02 | 6.48 |
| ■ Cash | 4.03 | 0.16 | 4.19 |

Fund as of Sep 30,2024

Nicholson Decl., Ex. A at 4.  In contrast, one of the BlackRock 2025 TDF's allocation of assets, as of August 31, 2024 were:

**Portfolio Analysis** as of 08-31-24

Composition as of 08-31-24

| | % Assets |
|---|---|
| ● U.S. Stocks | 1.6 |
| ● Non-U.S. Stocks | 13.3 |
| ● Bonds | 56.8 |
| ● Cash | 2.4 |
| ● Other | 25.9 |

[25]

Following is a chart exhibiting the difference between the allocation of assets in the two funds:

---

[25]    *See* https://my.voya.com/static/epweb/pdf/ffs/8685.PDF.

| | 3M 2025 TDF vs BlackRock 2025 TDF Allocation of Assets | | | | |
| | U.S. Stocks | Non-U.S. Stocks | Bonds | Cash | Other |
|---|---|---|---|---|---|
| **3M 2025 TDF** | 25.3% | 14.21% | 49.97% | 4.03% | 6.16% |
| BlackRock 2025 TDF | 1.6% | 13.3% | 56.8% | 2.4% | 25.9% |
| *Diff.* | *-23.7%* | *-0.91%* | *-6.83%* | *-1.63%* | *-19.74%* |

Clearly, the 3M TDFs are not identical to the BlackRock TDFs. Accordingly, the Court should reject and disregard all of Defendants' arguments premised on the idea.[26]

> ii. *Defendants' "Glide Path," Allocations, and "CITs vs. Mutual Funds" Arguments Are Baseless Distractions*

The MTD repeatedly argues that the Comparator Funds' respective glide paths and target allocations are just too different from those of the 3M TDFs for them to serve as meaningful benchmarks. MTD 1-2, 5-8, 13-18. They are wrong. In fact, the glide paths and allocations Defendants complain about only further serve to prove the plausibility of the Complaint's allegations providing a "sound basis" for selecting each of the Comparator Funds as meaningful benchmarks.

For example, Defendants argue that the Comparator Funds and 3M TDFs are too different based on their glide paths and target allocations ***at retirement***. MTD 13-16, 18, 20. However, the glide paths and allocations prior to retirement are actually extremely

---

[26]    Similarly, the Court should reject Defendants' invitation to draw any kind of negative inferences between the various cases they cite about BlackRock TDFs. *See, e.g.*, MTD 12 ("Courts have repeatedly rejected claims premised on comparisons between BlackRock's LifePath TDFs.") (collecting cases about BlackRock TDFs).

similar across the funds. For example, following is the "target allocation" "glide path" from the 2040 3M TDF:



| Allocation % | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 |
|---|---|---|---|---|---|---|---|---|---|
| Bonds | 1.00 | 1.00 | 2.42 | 13.06 | 33.30 | 60.00 | 60.00 | 60.00 | 60.00 |
| U.S. Stocks | 49.37 | 49.37 | 48.73 | 43.82 | 34.47 | 22.18 | 22.18 | 22.18 | 22.18 |
| Non-U.S. Stocks | 45.17 | 45.13 | 44.42 | 38.79 | 28.17 | 14.49 | 14.49 | 14.49 | 14.49 |
| Cash | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Other | 4.46 | 4.50 | 4.43 | 4.33 | 4.06 | 3.33 | 3.33 | 3.33 | 3.33 |

Olson Decl., Ex. 11 at 1. And following is the "glide path" from the 2040 Vanguard TDF:



Nicholson Decl., Ex. B. Even a passing glance reveals that these glide-paths / allocations prior to retirement are highly similar. Nevertheless, it's worth highlighting some illustrative similarities in the numbers here. First, for the first 25-years (50-years-25-years out), both funds allocate between approximately 90-95% of assets to equity investments, with approximately 48% of that to U.S. stocks and approximately 43% to non-U.S. stocks.

*Id.* Second, for the next five years (25-years-20-years out), both reduce equity allocations to approximately 83%, with approximately 44% of that to U.S. stocks and approximately 43% to non-U.S. stocks. Lastly, for the next ten years (20-years-10-years out), both again reduce equity allocations, this time to approximately 64%, with approximately 34% of that to U.S. stocks and approximately 30% to non-U.S. stocks.

The glide paths and allocations for all of the Comparators prior to retirement are also highly similar to the 3M TDFs' allocations. *See, e.g.*, Nicholson Decl., Ex. D (Fidelity Freedom 2040 Summary Prospectus) at 4 (stays at around 95% equity for 20-years (50-years-30-years out), moves down to approximately 85% equity for next ten years (30-years-20-years out), and moves down to approximately 65% equity for next ten years (20-years-10-years out); *id.*, Ex. E (American Funds Target Date Retirement Funds – R6 Share Class Fact Sheet, dated March 31, 2019 ("2019 Am. Funds R6 TDF Fact Sheet") (stays at around 90% equity for 20-years (50-years-30-years out), moves down to approximately 85% equity for next ten years (30-years-20-years out), and moves down to 70% equity for next ten years (20-years-10-years out).

Importantly, all of the summary prospectuses Defendants attach are the most recent versions. A TDF's glide path is not static and subject to change over time. As such—even for the funds for which Defendants submitted the correct summary prospectuses—the glide paths and allocations therein are not necessarily the same glide paths or asset allocations present during the underperformance period alleged in the Complaint. For example, the summary prospectus Defendants attach for the 2025 American Funds TDF is dated January 1, 2025. Olson Decl., Ex. 12. The MTD uses this document to argue that the American

Funds TDFs are too different because the summary prospectus "show[s] about 55% equity at retirement."  MTD 15 (arguing all Comparator Funds "maintain equity exposures of 50% or more at the target date"); *id.* at 18 (asserting the lowest "Equity at Retirement" across all "TDF Comparators" is "50%").  However, as seen in the 2019 Am. Funds R6 TDF Fact Sheet (Nicholson Decl., Ex. E), the "glide path" applicable in 2019 was:



*Id.*  As seen, in 2019, contrary to Defendants' claims, the American Funds TDFs' glide (during the Complaint's underperformance period)[27] resulted in an "Equity Allocation" of *45%* at retirement.

In short, the glide paths and allocations at the dates relevant to evidencing underperformance are actually highly similar and certainly "sufficiently similar" for the Comparator Funds to serve as meaningful benchmarks under *Matousek*.  *Payne*, 2024 U.S. Dist. LEXIS 168017, at *18 (after "taking the facts as true and drawing all reasonable inferences in the plaintiff's favor," plaintiff "plausibly pled meaningful benchmarks"

---

[27]    The Complaint's underperformance allegations begin with data from 2013, and the Class Period starts in 2019.  ¶¶3, 11, 83-135, 141.

where one comparator shared "structure, purpose, and risk profile," and the second was "sufficiently similar to serve" as a "meaningful benchmark" despite having a "different risk profile" as it shared the "same goal"); *see also Dionicio*, 2024 U.S. Dist. LEXIS 50097, at \*8 (under *Matousek*, "***plans need not be numerically identical***," as "'there is no one-size-fits-all approach' for determining whether a particular plan provides a meaningful benchmark").  The Court should reject the MTD's arguments.[28]

Defendants' argument that the fact that two of the four Comparator Funds are "mutual funds" make them incomparable because the 3M TDFs are "collective investment trusts" ("CITs") should similarly be rejected.  MTD 17-18.  The MTD argues that the "3M TDFs are structured as CITs."  However, it cites the 2023 Form 5500 for the "3M Voluntary Investment Plan and Savings Plan Trust" (Olson Decl., Ex. 4 ("Master Trust 5500") as support for that assertion.  The Complaint says nothing about the 3M TDFs being "trusts" or "mutual funds," or anything about the "3M Voluntary Investment Plan and Savings Plan Trust."  Nevertheless, Defendants advance the Master Trust 5500 to suggest a critical distinction between CITs and mutual funds.  Here, there is not.  That the Plans' assets are held in a master trust does not mean that every fund the Plans invest in are CITs, mutual funds, or any other investment vehicles.  Rather, it means that the Plans' assets are held in

---

[28]    *See, e.g.*, *Kistler*, 2024 U.S. Dist. LEXIS 117419, at \*7-8 (rejecting the same glide path arguments as the "glide paths" showed that the "TDFs did not significantly differ from the comparators in riskiness" for funds further out from the target date); *Thomson*, 661 F. Supp. 3d at 1057-58 (rejecting the same glide path arguments as plaintiffs alleged enough facts to plausibly state their claim).

a *master* trust—that is all.  For example, following is from the 5500 Form for one of the Plans:

| Assets | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|
| (8) Participant loans | 1c(8) | 121503271 | 129995459 |
| (9) Value of interest in common/collective trusts | 1c(9) | 404348 | 801149 |
| (10) Value of interest in pooled separate accounts | 1c(10) | | |
| (11) Value of interest in master trust investment accounts | 1c(11) | 10434164994 | 11261029853 |

Olson Decl., Ex. 2 at 21.

As seen, in analyzing its own assets, the Plan has different metrics for "[v]alue of interest in common/collective trusts" and "[v]alue of interest in master trust investment accounts."  The MTD's reliance on cases finding differences between CITs and mutual funds defeat comparability are thus inapposite.  The overwhelming majority, if not all, of the cases where courts have found that CITs and mutual funds were not meaningful benchmarks involved allegations relating to excessive fees and/or expense ratios.[29]  Further, plaintiffs in such cases argue that fiduciaries breached their duties by failing to investigate moving from a mutual fund to a collective trust version of an investment (because CITs generally have lower fees).  *Id.*  None of these issues exist here.  In short, Defendants' CITs vs. mutual fund argument is easily rejected—this case is nothing like the recordkeeping fees and expense ratio cases where the issue has come up.  Further, whatever

---

[29]    The MTD cites such cases to support this argument.  *See Riley v. Olin Corp.*, 2023 U.S. Dist. LEXIS 11771, at *17 (E.D. Mo. Jan. 24, 2023) (plaintiffs alleged breaches as the plan "qualified for the collective trust versions of these funds"); *Rosenkranz v. Altru Health Sys.*, 2021 U.S. Dist. LEXIS 237791, at *4 (D.N.D. Dec. 10, 2021) (alleged breaches from "failing to investigate the availability of collective trusts").

"differences" there may be here are irrelevant or only serve to further support Plaintiffs' imprudence allegations.

Lastly, Defendants' arguments relating to asset allocation "at retirement" should be rejected. The MTD asserts that the allocations as compared between the 3M TDFs and each of the Comparator Funds are too dissimilar for any of the Comparator Funds to be an apt comparator. For example, the MTD argues that purported "judicially noticeable fund disclosures confirm" that the 3M TDF's allocation at retirement is "roughly 40% in equities," whereas the Comparators "each maintain equity exposures of 50% or more at the target date," including the "Fidelity 2040 vintage" which has "50% equity at retirement." *Id.* at 15. But the exhibits themselves undermine this argument. For example, the "Fidelity 2040" prospectus submitted clearly states that the baseline allocation at the target date is 50% but that allocation is subject to a 10% plus or minus deviation—*i.e.*, at the target date, the allocation could be the same 40%/60% split as the 3M TDFs' target. All the Comparator Funds have similar language.[30] Simply put, the allocations in the Comparator Funds and the 3M TDFs during the relevant periods here (the underperformance allegations in the Complaint *all* concern performance prior to the target date for *every vintage*) were either identical, highly similar, or not materially different to defeat comparability. *See, e.g.*, *Mattson*, 2022 U.S. Dist. LEXIS 246403, at *5 (denying dismissal; rejecting argument

---

[30]     *See, e.g.*, Olson Decl., Ex. 12 at 3 (summary prospectus for American Funds 2040, stating: the "fund will invest its assets within a range that deviates no more than 10% above or below the investment approach set forth above.").

that allocations were "materially different" with uncommon "aims, risks, and potential rewards").

Moreover, the target allocations from these glide path are just that, *targets*. For example, the 2025 3M TDF fact sheet states that, at retirement (*i.e.*, 2025), the fund's target allocations are: (i) 60%-Bonds; (ii) 22.18%-U.S. Stocks; (iii) 14.49%-Non-U.S. Stocks; (iv) 0.0%-Cash; and (v) 3.33%-Other. Nicholson Decl., Ex. A at 2. Yet, that same fact sheet says the fund's actual current allocations are: (i) 49.97%-Fixed Income—*i.e.*, bonds, a 10.03% deviation—meaning the 2025 3M TDF fund itself is deviating by ***more than 10%*** from its "target allocation" on bonds; (ii) 25.33%-U.S. Stocks, a 3.18% deviation; (iii) 14.21%-Non-U.S. Stocks, a 0.28% deviation; (iv) 4.03%-Cash, a 4.03% deviation[31]; and (v) 6.46%-Other, a 3.13% deviation. *Id.* at 4. Using this example, the deviations from the 2025 3M TDF's "target allocations" are greater than ***20%***. Thus, ultimate exactitude at every point in time for a benchmark cannot be required for it to be "meaningful."

Any differences between the Comparator Funds and the 3M TDFs Defendants complain of are either non-existent, or not sufficiently material, to defeat the sound basis for using them as meaningful benchmarks. *Payne*, 2024 U.S. Dist. LEXIS 168017, at *18; *Dionicio*, 2024 U.S. Dist. LEXIS 50097, at *8 (under *Matousek*, "plans need not be numerically identical").

---

[31]    According to the 3M TDF's "glide path" and "target allocations," the fund is ***never*** supposed to hold any assets in just "cash." *Id.*

## C.    Plaintiffs Have Alleged Sustained Underperformance for More than a Decade

Defendants' challenges to Plaintiffs' allegations of underperformance are similarly meritless.[32]   The Complaint alleges that the 3M TDFs' "performance is assessed based on comparable benchmarks for each of its vintages" and Plaintiffs used a "criterion of consecutive years of trailing 3, 5, and 10-years of underperformance as well as a cumulative basis compounded over time."  ¶72.  Despite these clear and straightforward explanations, the MTD asserts that all of these analyses "fall short" because they "present bare trailing-return figures with no disclosure of how those numbers were calculated" and "no disclosure of the methodology or data sources used."   MTD 21.   But calculating and comparing performance on an annual, 3, 5, and 10 year basis is standard industry practice.[33]

Additionally, the cases Defendants rely on to argue that the 3M TDFs' underperformance as compared to the Comparator Funds was not significant enough only

---

[32]    The MTD criticize the Complaint's underperformance allegations because its "charts omit other vintages in the lineup, including the Retirement, 2020, 2060, and 2065 funds."  *Id.* at 21.  But: (i) "Plaintiffs exclude the 2060 and 2065 vintages as the funds are too new to include.  As to the 'retirement' vintage, Plaintiffs have excluded that vintage as it represents a mix of older funds such that there are no straightforward comparisons available to serve as 'meaningful benchmarks' as would be necessary to analyze its performance"; and (ii) when a "3M TDF reaches the target date, it will have reached its most conservative level and will be merged into the 3M LifePath Retirement Portfolio" (*i.e.*, the "2020" 3M TDF no longer, or at least should no longer, exist—it should be part of the "retirement portfolio").  ¶¶3, 63.

[33]    *See, e.g.*, *Ramos v. Banner Health*, 461 F. Supp. 1067, 1097 (D. Colo. 2020) (noting investment policy statements for funds typically require evaluation of investment returns using three- and five-year benchmarks).  Indeed, Defendants even purport to calculate 5- and 10-year returns in analyzing performance relative to their custom "benchmarks."  *See, e.g.*, Olson Decl., Ex. 5 at 5.

underscores Plaintiffs' position.  MTD 22-23.  For example, the MTD cites *Lard v. Marmon Holdings, Inc.*, 2025 U.S. Dist. LEXIS 90776 (N.D. Ill. May 13, 2025), for the proposition that the Complaint's analyses are the type of "short-term snapshots" that courts have "consistently" found "inadequate for funds designed to span decades."  MTD 22-23.  The *Lard* plaintiff "amended their complaint to offer new allegations that the Marmon TDFs underperformed for ***two years—rather than the single year*** alleged in their prior unsuccessful complaint."  2025 U.S. Dist. LEXIS 90776, at *8-9.  Here, Plaintiffs allege ***10-years*** of underperformance.  The MTD's reliance on *Luckett v. Wintrust Fin. Corp.*, 2024 U.S. Dist. LEXIS 144685 (N.D. Ill. Aug. 14, 2024), is similarly misplaced.  MTD 22.  The *Luckett* plaintiff alleged just a single 3-year period and a single 5-year period of underperformance.  2024 U.S. Dist. LEXIS 144685, at *10.  In contrast. Plaintiffs' underperformance allegations show subpar results on a trailing-three-years basis for at least ***eight consecutive years*** (2016-2023), on a trailing five-years-basis for at least ***five consecutive years*** (2018-2023), on a ***ten-years-basis*** by 2023, and on a ***cumulative compounded basis***.  ¶¶135.  In short, *Lard*, *Luckett*, and all of the other authorities the MTD relies upon for this issue are inapposite.[34]

---

[34]   *See also Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) (underperformance relative to a single comparator "for a five-year period"); *Dorman v. Charles Schwab Corp.*, 2019 U.S. Dist. LEXIS 34058, at *2 (N.D. Cal. Feb. 8, 2019) (underperformance over a single "five-year interval"); *Abel v. CMFG Life Ins. Co.*, 2024 U.S. Dist. LEXIS 14535, at *16 (W.D. Wis. Jan. 26, 2024) (average 3- and 5-year "underperformance being between 1 and 3%").

Similarly, the Court should reject Defendants' invitation to draw parallels between the highly detailed underperformance allegations in the Complaint and those this Court rejected in *Fritton v. Taylor*, 2023 U.S. Dist. LEXIS 145940 (D. Minn. Aug. 21, 2023) ("*Fritton II*").  *See* MTD 21.  In *Fritton II*, the plaintiffs alleged imprudence "by reference to a single fund that allegedly underperformed a benchmark that would not exist until five years later."  *Id.* at *24-25.  Those allegations largely argued that the funds had "ratio expenses that were significantly above the 'ICI median' for their fund categories."  *Id.* at *15.  Unlike the calculations and methodologies in Plaintiffs' Complaint, "net expense ratios" are not uniformly calculated.  *Id.* at *21.  Accordingly, it was entirely appropriate for the Court to criticize the *Fritton* plaintiffs' allegations as "devoid of any context or explanation regarding the methods by which these figures were calculated."  *Id.* at 25-26.  That same rationale does not apply here.  The data and calculations Defendants criticize as "devoid of any context" are anything but.  The annual return data is all public information applied to basic, industry-standard calculations.[35]

Additionally, *Fritton II*'s underperformance concerned "1.10% over the previous 3-year period, 0.18% over the previous 5-year period, and 0.55% over the previous 10-year period."  *Id.* at *26.  Here, the underperformance is not so minor—each of the 3M TDFs underperformed relative to Comparator Funds by significant margins.  For example, the

---

[35]    For example, the "formula" to calculate trailing-returns when comparing performance between two funds involves simple addition.  Calculating trailing-returns is merely adding three, five, or ten numbers (the differences in annual returns) together based on the number of years in the trailing return.

2025 3M TDFs underperformed by as much as ***-4.49%*** on a 3-year basis, ***-6.95%*** on a 5-year basis, and ***-10.55%*** on a 10-year basis.[36]  The underperformance metrics are similar, or worse, for the rest of the 3M TDFs.[37]  Indeed, all 3M TDFs underperformed compared to the average performance of the Comparator Funds' relevant vintages on a 10-year basis as follows: 2030 (***-10.46%***), 2035 (***-12.33%***); 2040 (***-12.98%***), 2045 (***-12.27%***), 2050 (***-10.76%***), and 2055 (***-9.98%***).[38]  Plaintiffs are not aware of any court that has held that 10 years of underperformance data on such a level is insufficient to allege underperformance.[39]

Additionally, the Complaint alleges each of the 3M TDFs underperformed compared to the average performance of the relevant vintages of the Comparator Funds by significant margins on a cumulative compound basis as follows: 2025 (***-16.79%***), 2030 (***-17.83%***), 2035 (***-22.03%***); 2040 (***-21.84%***), 2045 (***-23.87%***), 2050 (***-21.72%***), and 2055 (***-20.41%***).  *Id.*[40] at Tables 1.c., 2.c, 3.c, 4.c, 5.c, 6.c, and 7.c.

---

[36]    ¶82, Table 1.b.

[37]    *Id.* at Tables 2.b, 3.b, 4.b, 5.b, 6.b, and 7.b.

[38]    *Id.*  The Complaint also includes data measuring each of the 3M TDFs' performance as compared to the relevant S&P Indices, which shows underperformance for ten years across all 3M TDFs ranging from -3.69 to -5.03% depending on the vintage. *Id.*

[39]    Courts point to 10-years of underperformance as the ideal standard for evidencing underperformance. *See, e.g.*, *Patterson v. Morgan Stanley*, 2019 U.S. Dist. LEXIS 174832, at *32 (S.D.N.Y. Oct. 7, 2019) ("[A]llegations of consistent, ten-year underperformance may support a duty of prudence claim, if the underperformance is 'substantial.'").

[40]    The Complaint also includes data measuring the 3M TDFs' performance on a cumulative compound basis as compared to the relevant S&P Indices, which shows underperformance for ten years across all 3M TDFs ranging from -7.69 to -12.7% depending on the vintage. *Id.*

The MTD's argument that Plaintiffs' underperformance allegations constitute "hindsight driven performance allegations" insufficient to plausibly state a claim also falls flat. Allegations of "long-term underperformance is categorically different than showing what a fiduciary should have done in hindsight." *Moler*, 2022 U.S. Dist. LEXIS 124804, at *11 (underperformance allegations of three and five years sufficient). Long-term underperformance as compared to a meaningful benchmark can be used to "reasonably infer that the fiduciaries engaged in a flawed decision-making process." *GreatBanc*, 2024 U.S. Dist. LEXIS 29208, at *24-5.[41]

Simply put, the Complaint's level of detail, including the metrics used to evidence the sustained chronic nature of the 3M TDFs' underperformance, and its allegations of additional indicia of imprudence,[42] are more than sufficient to plausibly allege underperformance and state a claim for breach of the fiduciary duty of prudence. For example, in *Snyder I*, the court found allegations that the subject funds underperformed compared to four funds and two market benchmarks using "annualized" and "cumulative

---

[41] *See also Snyder I*, 2021 U.S. Dist. LEXIS 230878, at *9 ("Evidence of underperformance in comparison to a meaningful benchmark is itself circumstantial evidence of a flawed fiduciary process and sufficient to survive a motion to dismiss."); *Payne*, 2024 U.S. Dist. LEXIS 168017, at *10 (same); *Karg*, 2019 U.S. Dist. LEXIS 140567, at *15 (same).

[42] *See, e.g.*, ¶139 (alleging Defendants had an additional interest in retaining the funds—3M IMCO serving as investment advisor for the 3M TDFs and thus receiving compensation); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1077 (N.D. Cal. 2017) (dismissal denied where additional indicia of imprudence included the plan recordkeeper also being investment manager of the subject funds and thus, conflicts may have affected the fiduciaries' selection and retention decisions).

compounded" metrics sufficient to demonstrate "long-term underperformance" and "plausibly raise[] an inference of imprudence." *Snyder I*, 2021 U.S. Dist. LEXIS 230878, at *10-14.[43]  The same result should follow here.

In short, the standard is clear—when "fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes*, 595 U.S. at 176.  Accordingly, district courts across the country, including in this Circuit, have found similar, or even less substantial, allegations of underperformance sufficient to state a claim for breach of fiduciary duty premised on retaining poorly performing investments year after year. *See Snyder I*, 2021 U.S. Dist. LEXIS 230878, at *13-14 (dismissal denied where cumulative underperformance ranged from 5.23-21.23%); *Becker*, 2021 U.S. Dist. LEXIS 90207, at *2 n.2, *10-11 (dismissal denied where challenged funds' underperformance on a three-year basis ranged from 1-3.3%).[44]

---

[43]    The MTD argues that *Snyder* cannot be relied upon because it "predated the Eighth Circuit's decision in *Matousek*, which requires a like-for-like benchmark analysis." MTD 19.  As discussed, *supra*, *Matousek* did not upend the law on defining a "meaningful benchmark." Moreover, in *Snyder*, the parties' respective expert witnesses subsequently battled over those same comparator funds, benchmarks, and calculations with expanded metrics and data in the lead up to summary judgment—which the district court denied well after *Matousek* was issued. *Snyder II*, 2024 U.S. Dist. LEXIS 42952.  If expanded and expert analyses were sufficient to create a genuine issue of material fact after creating a full record, there's no reason to believe the *Snyder* case would have been, or should have been, dismissed in a post-*Matousek* world.

[44]    *See also Dover*, 563 F. Supp. 3d at 688 (sustaining "thin" "allegations of fund underperformance at the motion to dismiss stage as "sufficient to support a plausible claim of breach of duty of prudence"); *Kistler*, 2024 U.S. Dist. LEXIS 117419, at *31-34 (sustaining underperformance allegations analyzing three-, five-, and ten-year performance as well as on a cumulative basis as compared to four comparator funds and the S&P TDIs); *Payne*, 2024 U.S. Dist. LEXIS 168017, at *22 (sustaining underperformance allegations as

## II.    Plaintiffs Plausibly Allege Claims for Failure to Monitor

The parties agree that the monitoring claim is derivative of the duty of prudence claim.  MTD 23-24.  Plaintiffs respectfully suggest because their prudence claims are sufficiently alleged, the monitoring claim likewise survives.  *See, e.g.*, *GreatBanc*, 2024 U.S. Dist. LEXIS 29208, at *28-29 ("[B]ecause Plaintiffs plausibly pled an underlying breach of fiduciary duty, their duty to monitor claim survives.").

## **CONCLUSION**

Plaintiffs respectfully request that the Motion be fully denied.[45]


Dated:  November 7, 2025                    Respectfully submitted,

                                           */s/ Melinda A. Nicholson*
                                           Melinda A. Nicholson (*admitted pro hac vice*)
                                           Nicolas Kravitz (*admitted pro hac vice*)
                                           John A. Carriel (*admitted pro hac vice*)
                                           **KAHN SWICK & FOTI, LLC**
                                           1100 Poydras Street, Suite 960
                                           New Orleans, LA 70163
                                           Telephone: (504) 648-1842
                                           Facsimile: (504) 455-1498
                                           Email: melinda.nicholson@ksfcounsel.com

---

compared to two benchmarks "over a period of six years"); *Baird v. BlackRock Inst. Tr. Co., N.A.*, 403 F. Supp. 3d 765, 780 (N.D. Cal. 2019) (sustaining complaint where investment "underperformed by 5.6% on average" as compared to meaningful benchmark); *Valenzuela v. Advantage Sales & Mktg., LLC*, 2024 U.S. Dist. LEXIS 210439, at *18 (C.D. Cal. Nov. 18, 2024) (same); *Terraza*, 241 F. Supp. 3d at 1077 (same); *Henderson*, 252 F. Supp. 3d at 1352 (same); *Troudt v. Oracle Corp.*, 2017 U.S. Dist. LEXIS 41344, at *4 (D. Colo. Mar. 22, 2017) (same); *Jacobs v. Verizon Communs., Inc.*, 2017 U.S. Dist. LEXIS 162703, at *9 (S.D.N.Y. Sep. 28, 2017) (same).

[45]    In the event of dismissal, Plaintiffs request that the court stay its dismissal order by thirty days, allowing Plaintiffs to consider whether any shortcomings can be cured, and submit a motion for leave to amend in accordance with L.R. 15.1(b).

Email: nicolas.kravitz@ksfcounsel.com
Email: john.carriel@ksfcounsel.com

- AND -

David W. Asp, MN #0344850
Derek C. Waller, MN #0401120
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4091
Facsimile: (612) 339-0981
Email: dwasp@locklaw.com
Email: dcwaller@locklaw.com

*Attorneys for Plaintiffs, the Plans, and the Proposed Class*