**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

JENNIFER BATT, et al.,

              Plaintiffs,

      v.

3M COMPANY, et al.,

              Defendants.

Case No. 25-cv-03149 (ECT/DTS)

**MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FIRST
AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................ 2

    A. Plaintiffs and the Plans ............................................................................ 2

    B. The Court's March 10 Order .................................................................... 3

III. LEGAL STANDARD ........................................................................................ 4

IV. ARGUMENT .................................................................................................... 5

    A. Count I Should Be Dismissed Because the FAC Still Does Not Plead a Meaningful Benchmark .......................................................................... 5

        1. Plaintiffs' Comparator Funds Still Are Not Meaningful Benchmarks ....... 6

        a. Different Glide Paths ("To" vs. "Through") ............................................... 6

        b. Different Asset Allocations ...................................................................... 7

        c. Different Management Strategy (Active vs. Passive) ................................ 9

        d. Different Investment Vehicles (CITs vs. Mutual Funds) .......................... 10

        2. The LifePath Custom Indices Are Not Meaningful Benchmarks for the 3M TDFs ................................................................................................. 12

        3. Plaintiffs' Additional Comparison Metrics Do Not Change the Meaningful Benchmark Analysis .................................................................................. 13

    B. Plaintiffs' Glide-Path and Fact-Sheet Allegations Do Not Cure the Benchmark Defect in Count I ................................................................ 14

        1. The Glide-Path Allegations Do Not Support a Prudence Claim .............. 15

        2. The Fact-Sheet Allegations Do Not Support a Prudence Claim .............. 16

    C. Plaintiffs' Renewed Performance Allegations Still Do Not State a Claim in Count I ................................................................................................ 18

    D. Count II Should Be Dismissed ............................................................. 21

        1. The FAC Does Not Plead a Transfer or Use of Plan Assets for IMC's Benefit .................................................................................................... 22

        2. The FAC Does Not Plead Self-Dealing Under § 1106(b)(1) .................. 23

        3. Plaintiffs Plead No Concrete Injury Traceable to the Transaction Alleged in Count II .............................................................................................. 25

    E. The Failure to Monitor Claim (Count III) Fails Because Plaintiffs Do Not State a Viable Underlying Claim .......................................................... 25

F.    Plaintiffs' Claims Should Be Dismissed with Prejudice...................................26

V.    CONCLUSION ...........................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. CMFG Life Ins. Co.*,
No. 22-cv-449-wmc, 2024 U.S. Dist. LEXIS 14535
(W.D. Wis. Jan. 26, 2024) ................................................................................. 6

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
579 F. Supp. 3d 1133 (N.D. Cal. 2022), *aff'd*, 137 F.4th 1015
(9th Cir. 2025), *cert. granted*, No. 25-498 (U.S. Jan. 16, 2026) ................................. 18

*Barrett v. O'Reilly Auto., Inc.*, 112 F.4th 1135, 1138 (8th Cir. 2024) .............................. 15

*Batt v. 3M Co.*,
No. 25-cv-3149, 2026 U.S. Dist. LEXIS 48639
(D. Minn. Mar. 10, 2026) (ECF No. 51) ................................................................ *passim*

*Beldock v. Microsoft Corp.*,
No. C22-1082JLR, 2023 U.S. Dist. LEXIS 71233
(W.D. Wash. Apr. 24, 2023) ............................................................................... 14

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ......................................................................... 12, 17

*Cho v. Prudential Ins. Co. of Am.*,
No. 19-19886 (JMV) (SCM), 2021 U.S. Dist. LEXIS 185397
(D.N.J. Sept. 27, 2021) ..................................................................................... 19

*Christensen v. Qwest Pension Plan*,
462 F.3d 913 (8th Cir. 2006) .............................................................................. 17

*Collins v. Ne. Grocery, Inc.*,
No. 24-2339-cv, 2025 U.S. App. LEXIS 20979
(2d Cir. Aug. 18, 2025) ................................................................................. 23, 24

*Cunningham v. Cornell University*,
604 U.S. 693, 709 (2025) .............................................................................. 22, 25

*Davis v. Washington Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ......................................................................... 4, 5, 10

*Doll v. Evergy, Inc.*,
No. 25-00043-CV-W-SRB, 2025 U.S. Dist. LEXIS 271639
(W.D. Mo. Sept. 10, 2025) .................................................................................. 15

*Enstrom v. SAS Inst.*,
No. 5:24-CV-105-D, 2025 U.S. Dist. LEXIS 37602
(E.D.N.C. Mar. 3, 2025) ..................................................................................... 19

*Fritton v. Taylor Corp. (Fritton I)*,
No. 22-cv-00415, 2022 U.S. Dist. LEXIS 222996
(D. Minn. Dec. 12 2022) ................................................................................ 15, 26

*Fritton v. Taylor Corp. (Fritton II)*,
No. 22-cv-00415, 2023 U.S. Dist. LEXIS 145940
(D. Minn. Aug. 21, 2023) .................................................................................... 11

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996) ........................................................................................... 22

*Luckett v. Wintrust Fin. Corp.*,
No. 22-cv-03968, 2023 U.S. Dist. LEXIS 121362
(N.D. Ill. July 14, 2023) ....................................................................................... 9

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ................................................................ 4, 13, 14, 15

*McDonough v. Anoka Cnty.*,
799 F.3d 931 (8th Cir. 2015) .............................................................................. 24

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ........................................................................... 7, 21

*Parmer v. Land O'Lakes, Inc.*,
518 F. Supp. 3d 1293 (D. Minn. 2021) ............................................................... 10

*Peeler v. Bayada Home Health Care, Inc.*,
No. 1:24-cv-00231-MR, 2026 U.S. Dist. LEXIS 14223 (W.D.N.C. Jan.
27, 2026) ....................................................................................................... 24, 25

*Phillips v. Cobham Advanced Elec. Sols., Inc.*,
No. 23-cv-03785-EKL, 2025 U.S. Dist. LEXIS 184960
(N.D. Cal. Sept. 19, 2025) .................................................................................. 10

*Polanco v. WPP Grp. USA, Inc.*,
   No. 24-cv-9548 (JGK), 2025 U.S. Dist. LEXIS 210810
   (S.D.N.Y. Oct. 24, 2025) ................................................................................. 23, 26

*Riley v. Olin Corp.*,
   No. 4:21-cv-01328-SRC, 2023 U.S. Dist. LEXIS 11771
   (E.D. Mo. Jan. 24, 2023) ........................................................................................ 11

*Rozo v. Principal Life Ins. Co.*,
   48 F.4th 589 (8th Cir. 2022) ................................................................................... 23

*Smith v. CommonSpirit Health*,
   37 F.4th 1160 (6th Cir. 2022) ................................................................................... 9

*Stalley ex rel. United States v. Cath. Health Initiatives*,
   509 F.3d 517 (8th Cir. 2007) .................................................................................... 5

*Thole v. U.S. Bank N.A.*,
   590 U.S. 538 (2020) .................................................................................................. 5

*Tussey v. ABB, Inc.*,
   746 F.3d 327 (8th Cir. 2014) ................................................................................... 15

*Wright v. Medtronic, Inc.*,
   No. 09-CV-0443, 2011 U.S. Dist. LEXIS 923
   (D. Minn. Jan. 5, 2011) ........................................................................................... 17

**Statutes**

29 U.S.C. § 1104 ............................................................................................................ 17

29 U.S.C. § 1106(a)(1)(D).................................................................................. 4, 21, 22, 25

29 U.S.C. § 1106(b)(1) .................................................................................. 4, 21, 23, 24, 25

29 U.S.C. § 1108(b)(2)(A)................................................................................................ 22

**Other Authorities**

29 C.F.R. § 2550.408b-2(e)(3) ........................................................................................ 24

Fed. R. Civ. P. 12(b)(1) .................................................................................................... 5

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 4

## I. INTRODUCTION

Plaintiffs' First Amended Complaint (ECF No. 53, "FAC") fails as a matter of law to cure the defect this Court identified when it dismissed the original complaint: the absence of a meaningful benchmark for the challenged 3M target date funds ("3M TDFs"). *Batt v. 3M Co.*, No. 25-cv-3149 (ECT/DTS), 2026 U.S. Dist. LEXIS 48639, at *12–22 (D. Minn. Mar. 10, 2026) (ECF No. 51). While the FAC is long on investment jargon and pretty tables, it utterly fails to compare apples to apples. Just like the original complaint, the FAC does not identify a single comparator investment that both meaningfully aligns with the 3M TDFs' strategy and shows the kind of substantial and sustained underperformance needed to support an inference of imprudence. Instead, Plaintiffs gerrymander comparisons through averages, reconstructions, and aggregated charts that mask the one-to-one allocation and performance differences that matter under the meaningful benchmark standard. Under Eighth Circuit law, Plaintiffs cannot place mismatched fruits and vegetables in one basket, average them, and call the result a meaningful benchmark.

Nor do Plaintiffs allege any plausible fiduciary process errors, like failure to hold meetings or failure to follow watch-list procedures. Instead, they criticize investment disclosures (e.g., by citing purported glitches in vendor data reports provided by an investment industry-leader, Morningstar) and the flexibility of glide paths (e.g., by ignoring terms like "gradually adjust" and "may be subject to change" in investment disclosures). As a matter of law, even if taken at face value, neither of these allegations is material to fiduciary process or related in any way to the damages Plaintiffs seek for investments they

1

made in the 3M TDFs during the putative class period.

In sum, Count I still seeks to infer imprudence from alleged outcomes rather than from well pleaded facts about fiduciary process. The Court should dismiss it with prejudice.

Count II fares no better. It asserts prohibited transaction claims based on conclusory allegations that 3M Investment Management Corporation ("IMC") received compensation in connection with investment management services for the retirement plans at issue. Plaintiffs identify no specific payment to IMC, no transfer or use of plan assets for IMC's benefit, and no self-dealing with plan assets. Nor do Plaintiffs plead any concrete injury traceable to that alleged transaction. Count II therefore fails.

Count III is wholly derivative of Counts I and II. *A fortiori*, it should be dismissed as well.

At bottom, Plaintiffs kick up as much dust as possible in the FAC, apparently in the hope that the same dispositive defects as in the original complaint will be obscured. But when the dust settles, the FAC should fare no better. And this time, Plaintiffs' claims should be dismissed with prejudice.

## II.    BACKGROUND

### A.    Plaintiffs and the Plans

As in the original complaint, the FAC concerns two retirement savings plans sponsored by 3M: the 3M Voluntary Investment Plan and Employee Stock Ownership Plan (the "VIP Plan") and the 3M Savings Plan (the "Savings Plan," and together with the VIP Plan, the "Plans"). FAC at Introduction. The Plans' assets are held in a common master trust. *See* Ex. 1 (2024 Form 5500 for 3M VIP & Savings Plan Trust). The Plans offer

investment options with varying risk and return profiles, including the 3M TDFs. *See* Ex. 2 (2025 Fee Disclosure).

The FAC alleges that 3M is the plan sponsor and "named fiduciary" of the Plans. FAC ¶ 21. It alleges that the members of the 3M Benefits Fund Investment Committee (the "BFIC") are fiduciaries under the Plans as the BFIC is "responsible for designating the investment options available under the Plans." *Id.* ¶ 24.[1] It also alleges that IMC, a wholly owned subsidiary of 3M, served as a functional fiduciary of the Plans. *Id.* ¶ 25.

Plaintiffs allege that, collectively, they invested in the 2030, 2040, 2045, 2050, and 2055 vintages of the 3M TDFs. *Id.* ¶¶ 16–19.

B.    **The Court's March 10 Order**

In its Order of March 10, 2026, the Court dismissed the original complaint because Plaintiffs had not plausibly alleged a meaningful benchmark for the challenged 3M TDFs. *Batt*, 2026 U.S. Dist. LEXIS 48639, at *12–22. The Court rejected both benchmark theories Plaintiffs advanced. The FAC should suffer the same fate since it is equally infirm.

For the comparator TDF theory, the Court held that Plaintiffs had not plausibly alleged that the proposed comparator suites were meaningful benchmarks for the 3M TDFs. The Court identified multiple comparability problems, including material differences in glide paths and different or incomparable asset compositions. *Id*. at *17–20.

For the S&P Target Date Index theory, the Court held that Plaintiffs had not

---

[1] The FAC refers to this committee as the "3M Benefits Fund Investment Committee." *Id.* Plaintiffs otherwise misstate aspects of the Plans' fiduciary governance structure, but those issues are not material to the arguments here, including the meaningful benchmark defect in Count I.

3

plausibly alleged that the 3M TDFs were designed to track those indices or shared like composition with them. *Id*. at *12–17. The Court also held that the S&P-index performance allegations showed only "moderate and inconsistent underperformance" and did not plausibly state a claim. *Id.* at *24–25.

III.   **LEGAL STANDARD**

The Court is well versed in the standards as applied to these circumstances, so we will not belabor this point again. *See Batt*, 2026 U.S. Dist. LEXIS 48639, at *11. As the Court knows, in an ERISA prudence case, the focus is on process, not results. *Batt*, 2026 U.S. Dist. LEXIS 48639, at *2–3 (quoting *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022)). When a plaintiff seeks to infer imprudence from alleged outcomes rather than well-pleaded process facts, the complaint must provide a "sound basis for comparison—a meaningful benchmark." *Id.* at *3, *12; *Matousek*, 51 F.4th at 278; *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020).

Separate statutory provisions govern Plaintiffs' prohibited transaction claim in Count II. ERISA prohibits a fiduciary from causing a plan to engage in a transaction that the fiduciary knows or should know constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of plan assets. 29 U.S.C. § 1106(a)(1)(D). ERISA also prohibits a fiduciary from dealing with plan assets in his own interest or for his own account. *Id.* § 1106(b)(1).[2]

---

[2] On a Rule 12(b)(6) motion, the Court may consider not only the complaint itself but also documents necessarily embraced by the pleadings and matters of public record. That includes relevant plan documents, participant disclosures, fund fact sheets, prospectuses,

4

Defendants also challenge Count II on Article III standing grounds, so that challenge is governed by Rule 12(b)(1). *See Stalley ex rel. United States v. Cath. Health Initiatives*, 509 F.3d 517, 520–21 (8th Cir. 2007). On a facial standing challenge, Plaintiffs must plead a concrete injury fairly traceable to the challenged conduct and redressable by the requested relief. *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020).

## IV.   ARGUMENT

### A.   Count I Should Be Dismissed Because the FAC Still Does Not Plead a Meaningful Benchmark

The Court dismissed the original complaint because Plaintiffs failed to plead a meaningful benchmark for the 3M TDFs. *Batt*, 2026 U.S. Dist. LEXIS 48639, at *12–22. The FAC dresses up the same allegations ostensibly in new garb, but it does not cure that defect. Count I still seeks to infer imprudence from investment outcomes, so Plaintiffs still need a meaningful benchmark.

The revised comparator fund theory retains the same material mismatches the Court already identified. The FAC also invokes the BlackRock LifePath Custom Indices (the "LifePath Custom Indices"), but that theory fails for the same reason the S&P Index theory failed: the FAC does not allege that the 3M TDFs track those indices or have a similar composition. Plaintiffs' additional sector, style, and risk metrics do not cure those threshold problems.

---

Form 5500 filings, and similar materials on which the FAC necessarily relies. *See Batt*, 2026 U.S. Dist. LEXIS 48639, at *11–12 & n.2; *Davis*, 960 F.3d at 482–85 & n.3.

### 1.   Plaintiffs' Comparator Funds Still Are Not Meaningful Benchmarks

#### a.   Different Glide Paths ("To" vs. "Through")

The 3M TDFs are "to" retirement funds. *Batt*, 2026 U.S. Dist. LEXIS 48639, at *19–20. The Court already recognized that "to" and "through" retirement glide paths are materially different for comparator purposes. *Id.*

Plaintiffs nevertheless again point to T. Rowe and Fidelity, even though both are "through" retirement funds. FAC ¶¶ 138–40 (identifying T. Rowe and Fidelity as "'Through Glide Path' Comparator TDFs'"); *Abel v. CMFG Life Ins. Co.*, No. 22-cv-449-wmc, 2024 U.S. Dist. LEXIS 14535, at *5–6 (W.D. Wis. Jan. 26, 2024) (describing T. Rowe Price Retirement and Fidelity Freedom as funds with a "through retirement" glidepath). As this Court already has determined, funds with "through" glide paths are not meaningful comparators for the 3M TDFs' "to" retirement design. *Batt*, 2026 U.S. Dist. LEXIS 48639, at *18–19.

Plaintiffs try to sidestep that problem by adopting what the FAC calls a "dual comparator methodology." FAC ¶ 136. Under that methodology, Plaintiffs first construct what they describe as an "approximate 'actual' glide path" and then use T. Rowe and Fidelity only against that reconstruction. *Id.* ¶¶ 104–10, 136–40.

But Plaintiffs' supposed "actual" glide path is only an approximation. The FAC says so. *Id.* ¶ 104. Plaintiffs assemble it from selected snapshots of different vintages as of September 30, 2024, and treat those separate snapshots as one continuous glide path. *Id*. ¶¶ 104–05. They then fill gaps with substitutes, using the stated target allocation at 50 years

6

before retirement and the Retirement Portfolio as a proxy after retirement. *Id.* ¶¶ 105–09. Only after constructing that approximation do they invoke T. Rowe and Fidelity as comparators. *Id.* ¶¶ 136–40.

That does not cure the "to" versus "through" problem. It confirms it. T. Rowe and Fidelity fit only Plaintiffs' reconstructed model, not the 3M TDFs' "to" retirement design. That is exactly the sort of effort to "dodge the requirement for a meaningful benchmark" that *Meiners* rejects. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823–24 (8th Cir. 2018) (rejecting a comparator fund with only "some similarity" as insufficient to provide a meaningful benchmark).

### b.    Different Asset Allocations

The same defect appears in Plaintiffs' allocation theory. This Court held that the original complaint presented multiple comparability problems, including "different or incomparable asset compositions." *Batt*, 2026 U.S. Dist. LEXIS 48639, at *17–20. For instance, the Court treated a 9-percentage point difference in bonds and a 10-percentage point difference in non-U.S. stocks between the 3M 2040 TDF and Vanguard 2040 TDF as material to comparability. *Id.* at *18–20.

In the FAC, Plaintiffs try to smooth over those allocation differences with averages. Plaintiffs' comparability theory rests principally on aggregated comparator averages for total equity, U.S. Equity, Non-U.S. Equity, and Fixed Income, rather than a one-to-one showing that each comparator fund is meaningfully comparable to the corresponding 3M TDF. FAC ¶¶ 144, 149. Those averages also shift by vintage because Plaintiffs exclude comparator families that lack a given vintage. *Id.* ¶ 149. The result is a moving composite,

7

not a like-for-like benchmark—one that masks the very allocation differences the meaningful-benchmark inquiry is supposed to test.

To show what Plaintiffs' averages mask, Exhibit 3 disaggregates Plaintiffs' own allocation figures from FAC ¶¶ 144 and 149. For each of Plaintiffs' four asset-allocation categories—Total Equity, U.S. Equity, Non-U.S. Equity, and Fixed Income—Exhibit 3 compares each 3M TDF vintage to each corresponding comparator TDF vintage for which Plaintiffs provided data. It then calculates the percentage-point differential by subtracting the comparator allocation from the corresponding 3M allocation. *See* Ex. 3 (Disaggregated Asset Allocation Data). Those one-to-one comparisons show repeated double-digit gaps across multiple fund families and asset classes.

For example, in total equity, the 3M 2030 TDF differs from Putnam by 23.72 percentage points, and the 3M 2025 TDF differs from T. Rowe and Fidelity by 13.31 and 14.64 points, respectively. In U.S. Equity, the 3M 2050, 2060, and 2065 TDFs differ from BlackRock Dynamic by more than 20 points. In Non-U.S. Equity, the 3M 2035, 2050, and 2055 TDFs differ from Putnam by 17.10, 18.93, and 19.81 points, respectively. In fixed income, the 3M 2030 TDF differs from Putnam by 17.90 points. Even Voya, one of the closer families on some measures, differs from the 3M 2025 TDF by 14.13 points in fixed income allocations. *See* Ex. 3 (Disaggregated Asset Allocation Data).

Those one-to-one comparisons reveal what the FAC's averages sought to conceal. Plaintiffs' comparator lineup includes multiple fund families with double-digit allocation gaps in the very asset classes Plaintiffs use to plead comparability. Those are not minor variations within the same investment strategy. They are materially different asset mixes,

8

which in turn reflect materially different investment strategies. *See Batt*, 2026 U.S. Dist. LEXIS 48639, at \*17–20. Plaintiffs cannot plead a meaningful benchmark by averaging those differences away.

### c. Different Management Strategy (Active vs. Passive)

Plaintiffs' comparator theory also ignores a fundamental strategy mismatch. Plaintiffs allege that the 3M TDFs were "modeled after" the BlackRock LifePath TDFs. FAC ¶ 48. They cite BlackRock LifePath Index materials to describe the glide path. *Id.* ¶ 44 n.6. The BlackRock LifePath Index Funds are passively managed. *Luckett v. Wintrust Fin. Corp.*, No. 22-cv-03968, 2023 U.S. Dist. LEXIS 121362, at \*10 (N.D. Ill. July 14, 2023). The 3M TDFs are also composed of predominantly passive strategies.[3]

Plaintiffs, however, compare the 3M TDFs to active or blended suites. Fidelity Freedom, Putnam, and BlackRock Dynamic are all actively managed. *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1164 (6th Cir. 2022) (describing the Fidelity Freedom TDFs as "actively managed"); Ex. 4 (BlackRock Website) (marketing the BlackRock LifePath Dynamic Fund as having a "[d]ifferentiated active management approach"); Ex. 5 (Putnam Retirement Advantage Funds Prospectus)[4], at 27 (stating that

---

[3] The 2024 Form 5500 for the 3M Voluntary Investment Plan & Savings Plan Trust reflects that the master trust—from which the 3M TDFs are constructed—holds billions of dollars in index funds, including equity, real estate, commodity, and bond index funds. Ex. 1 (2024 Form 5500, 3M VIP & Savings Plan Trust) at 5–6, 13.

[4] Plaintiffs identify the Putnam Retirement Advantage XA as one of their Comparator TDFs. FAC ¶¶ 137, 141. The Putnam Retirement Advantage Prospectus addresses the mutual fund versions of the Putnam Retirement Advantage target-date series. Exhibit 5. Although CITs and mutual funds are not interchangeable for benchmark purposes, *see infra*

the "fund is actively managed"). T. Rowe uses "a blended strategy of primarily active management with passive management." *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1306 (D. Minn. 2021). Voya "invests primarily in a combination of actively managed funds and passively managed index funds." Ex. 6 (Voya Prospectus), at 5.

Under Eighth Circuit law, active and passive funds "have different aims, different risks, and different potential rewards that cater to different investors." *Davis*, 960 F.3d at 485. That comparison cannot supply a meaningful benchmark. *See, e.g.*, *Parmer*, 518 F. Supp. 3d at 1306–07 (rejecting comparisons between blended/active TDFs and wholly passive or wholly active suites because differing strategies, aims, and risks foreclose a meaningful benchmark).

Plaintiffs try to avoid that mismatch by defining all TDFs as active because managers make allocation decisions over time. FAC ¶ 47. That is not the rule. Courts instead focus on how target date suites are implemented, including whether they use index building blocks or actively managed underlying funds. *See Phillips v. Cobham Advanced Elec. Sols., Inc.*, No. 23-cv-03785-EKL, 2025 U.S. Dist. LEXIS 184960, at *19–21 (N.D. Cal. Sept. 19, 2025) (rejecting the theory that TDF suites are meaningful comparators merely because all TDF managers make active glide-path and asset allocation decisions).

### d.    Different Investment Vehicles (CITs vs. Mutual Funds)

The FAC's comparator theory also fails because Plaintiffs do not plead a like-for-like lineup in vehicle structure. The 3M TDFs are collective investment trusts ("CITs").

---

Section IV.A.1.d, Plaintiffs allege that whether a target date fund is offered through a CIT or mutual fund does not determine "[its] investment strategy." FAC ¶¶ 139 n.20.

FAC ¶ 58. Plaintiffs' comparator table reflects a mixed-vehicle lineup: T. Rowe is identified as a "Trust," while Fidelity Freedom K6, Voya Target Retirement R6, and BlackRock LifePath Dynamic Instl. are identified by share-class designations. FAC ¶ 141; *see also* FAC ¶ 139 n.20 (acknowledging that "certain" Comparator TDFs are structured as mutual funds or CITs). The corresponding prospectuses list ticker symbols for those share classes and identify the Fidelity, Voya, and BlackRock Dynamic comparators as mutual funds. Ex. 7 (Fidelity Prospectus) at 1; Ex. 6 (Voya Prospectus) at 1–3; Ex. 8 (BlackRock Dynamic Prospectus) at 1, 3.

In *Fritton II*, this Court held that the distinctions between collective trusts and mutual funds are "legal in character," are appropriate to consider at the motion-to-dismiss stage, and have "real-world consequences" for plan participants. *Fritton v. Taylor Corp. (Fritton II),* No. 22-cv-00415 (ECT/TNL), 2023 U.S. Dist. LEXIS 145940, at *18–19 (D. Minn. Aug. 21, 2023); *see also Riley v. Olin Corp.*, No. 4:21-cv-01328-SRC, 2023 U.S. Dist. LEXIS 11771, at *16–19 (E.D. Mo. Jan. 24, 2023) (rejecting a collective-trust/mutual-fund comparison despite allegations that the vehicles had the same underlying investments and asset allocations).

Plaintiffs try to minimize vehicle structure by calling the distinction between CITs and mutual funds a mere "legal wrapper." FAC ¶ 139 n.20. But *Fritton II* and *Riley* reject that premise. *See Fritton II,* 2023 U.S. Dist. LEXIS 145940, at *18–19; *Riley*, 2023 U.S. Dist. LEXIS 11771, at *16–19. Plaintiffs' own disclosure theory underscores that the vehicle distinction is not merely formal. The FAC invokes the 3M TDFs' CIT status to allege that participants had "no independent source of information" beyond the 3M TDF

Fact Sheets. FAC ¶ 58. That allegation may be framed as a criticism of the 3M TDFs, but it also confirms that vehicle structure matters to the meaningful benchmark analysis.

### 2. The LifePath Custom Indices Are Not Meaningful Benchmarks for the 3M TDFs

The FAC also invokes the LifePath Custom Indices as an additional benchmark. FAC ¶ 135; *see also id.* ¶¶ 254–55 (Table 10.a). But it fails to plausibly allege that those indices are meaningful benchmarks.

First, the same defect that doomed Plaintiffs' S&P-index theory remains. The Court recognized that "market indices" may be meaningful benchmarks "when the challenged funds 'were designed to track' the index." *Batt*, 2026 U.S. Dist. LEXIS 48639, at *14–15 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)). Here, the FAC alleges the opposite: the 3M TDFs "do not 'track'" the LifePath Custom Indices. FAC ¶ 135.

Second, even apart from tracking, Plaintiffs plead no concrete basis for comparison. The FAC alleges only in conclusory terms that the LifePath Custom Indices and the 3M TDFs share "like composition." FAC ¶ 254. It pleads no facts showing overlap in holdings, asset allocation weights, or risk profile with any particular LifePath Custom Index. Nor does the FAC identify which BlackRock benchmark it means; BlackRock uses different custom benchmarks for different LifePath product lines. *Compare* Ex. 9 (BlackRock Index Prospectus) at 16–17, 27 (using the LifePath Index 2030 Fund Custom Benchmark) *with* Ex. 8 (BlackRock Dynamic Prospectus) at 30–31 (using the LifePath Dynamic 2030 Fund Custom Benchmark). The FAC therefore does not tie the challenged 3M TDFs to any

LifePath Custom Index in a way that permits a meaningful comparison. *See Batt*, 2026 U.S. Dist. LEXIS 48639, at \*12–15; *Matousek*, 51 F.4th at 281.

### 3. Plaintiffs' Additional Comparison Metrics Do Not Change the Meaningful Benchmark Analysis

Plaintiffs offer four additional comparison metrics: (i) sector exposure, FAC ¶¶ 154–62, App. A; (ii) Morningstar Equity Style Box classifications, FAC ¶¶ 163–70, App. B; (iii) standard deviation, FAC ¶¶ 177–80; and (iv) Sharpe Ratio, FAC ¶¶ 173–75. None cures the comparator defects addressed above. *See* Sections IV.A.1.a–d, *supra*.

Plaintiffs rely on aggregate sector averages that misleadingly obscure differences among particular TDF suites. FAC ¶¶ 154–55; *see also* FAC App. A. For example, while Plaintiffs describe the 3M TDFs' Real Estate allocation differences from the comparator average as only 4.0 to 4.6 percentage points, FAC ¶ 159, the one-to-one data show Real Estate allocation gaps exceeding 5 percentage points across every Fidelity vintage, the Putnam 2030 through 2050 vintages, and the Voya 2030 through 2045 vintages. Ex. 10 (Disaggregated Sector Allocations Data).[5] The same pattern appears in other sectors, including Technology and Financial Services. *See id.*

Plaintiffs' reliance on matching Morningstar Equity Style Box classifications fares no better. FAC ¶¶ 165, 169, App. B. This Court already held that Morningstar category labels, without more, do not plausibly show a meaningful benchmark. *Batt*, 2026 U.S. Dist. LEXIS 48639, at \*22 (explaining that "the fact that Morningstar categorized the 3M TDF

---

[5] Exhibit 10 breaks out Plaintiffs' sector-allocation figures from FAC Appendix A by TDF vintage and comparator and shows the one-to-one percentage-point differences for each sector.

Series together with the comparator TDF series does not plausibly show what the meaningful-benchmark standard requires").

The FAC also invokes standard deviation and Sharpe Ratio to support Plaintiffs' alleged "risk ratio" comparison. FAC ¶¶ 124–27; *see also id.* ¶¶ 171–80. But as the Court explained, "[a]lleging that the funds share the same 'risk ratio' implies they have comparable asset allocations." *Batt*, 2026 U.S. Dist. LEXIS 48639, at *18. Plaintiffs' own allocation figures show material differences. *See supra* Sec. IV.A.1.b. Their risk metric argument also rests on averages across comparator families rather than any individual comparator with a comparable risk profile. FAC ¶¶ 173, 177. And the Sharpe Ratio is, at most, a risk adjusted performance measure, FAC ¶ 171, not a measure of whether two TDF suites are comparable in composition, strategy, and structure. *See Beldock v. Microsoft Corp.*, No. C22-1082JLR, 2023 U.S. Dist. LEXIS 71233, at *5–6, 8–9 (W.D. Wash. Apr. 24, 2023) (holding that Sharpe Ratio allegations did not plead a meaningful benchmark because they were only additional measures of investment performance).

### B.    Plaintiffs' Glide-Path and Fact-Sheet Allegations Do Not Cure the Benchmark Defect in Count I

Beyond their performance allegations, Plaintiffs add two theories to Count I. First, they allege deviations from what they characterize as the 3M TDFs' stated glide path. FAC ¶¶ 100–20. Second, they allege certain deficiencies in the 3M TDF Fact Sheets. *Id.* ¶¶ 58–99.

Neither theory cures the benchmark defect. As this Court explained in applying *Matousek*, a meaningful benchmark remains necessary where the complaint lacks

14

"significant allegations of wrongdoing." *Fritton v. Taylor Corp. (Fritton I)*, No. 22-cv-00415 (ECT/TNL), 2022 U.S. Dist. LEXIS 222996, at \*18 (D. Minn. Dec. 12 2022) (quoting *Matousek*, 51 F.4th at 279 and *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)). The FAC does not come close. It alleges no direct process failure, such as "failing to hold meetings" or "rubber-stamping the work of the recordkeeper." *Barrett v. O'Reilly Auto., Inc.,* 112 F.4th 1135, 1138 (8th Cir. 2024).[6]

The glide-path theory rests on a fixed allocation mandate the Plan does not impose. It also contradicts Plaintiffs' prior argument that similar allocation differences did not defeat benchmark comparability. The fact-sheet theory rests on alleged Morningstar reporting anomalies, not on facts tied to any fiduciary decision or process for monitoring the 3M TDFs.

### 1.      The Glide-Path Allegations Do Not Support a Prudence Claim

Plaintiffs derive their fixed allocation theory from selected language in the 2021 Investment Fund Summary. FAC ¶¶ 54–55, 100–03. In particular, they rely on the statement that "[t]he Portfolio's asset class mix is intended to remain nearly constant over time." Ex. 11 (July 2021 Investment Fund Summary) at 6.

The July 2021 Investment Fund Summary does not impose the rigid operational requirement Plaintiffs now read into it. FAC ¶¶ 54–55. The same summary characterizes the LifePath discussion as only a "general description" and explains that managers

---

[6] *Cf. Doll v. Evergy, Inc.*, No. 25-00043-CV-W-SRB, 2025 U.S. Dist. LEXIS 271639, at \*9–12 (W.D. Mo. Sept. 10, 2025) (denying dismissal where the complaint alleged concrete process failures tied to investment policy and watch list procedures).

"gradually adjust" each Portfolio's mix "to try to maximize the return for the level of risk that is appropriate for the time horizon." Ex. 11 (July 2021 Investment Fund Summary) at 6–7. It also states that the Portfolios' stated asset allocation *"may be subject to change."* *Id.* (emphasis added). That language describes how the Portfolios are generally managed over time, not a promise of exact adherence to the target-allocation chart.

Plaintiffs' own prior allegations and arguments undercut the fixed-glide-path theory they now advance. The original complaint acknowledged that a TDF's allocation and even its glide path "is not static." ECF No. 1 (Compl.) ¶ 63. Plaintiffs then argued in opposing the original motion to dismiss that target allocations are "just that, *targets*" and that "ultimate exactitude" is unnecessary for comparability. ECF No. 35 (Pls.' Opp. to Mot. to Dismiss) at 36–37 (emphasis in original). For example, Plaintiffs previously argued that a more than 20 percentage point deviation between the 2025 3M TDF's target and actual allocations was "not sufficiently material" to defeat benchmark comparability. *Id.* at 36–37. The FAC now reverses course, alleging that the target glide path was a fixed schedule, not a range or approximation, and that alleged deviations from that schedule establish a fundamental undisclosed breach. FAC ¶¶ 103–18, 120. Plaintiffs cannot treat similar allocation differences as immaterial to comparability and then recast them as proof of imprudence.

### 2. The Fact-Sheet Allegations Do Not Support a Prudence Claim

Plaintiffs also base Count I on alleged reporting issues in 2024 and 2025 versions

of the 3M TDF Fact Sheets. FAC ¶¶ 58–99.[7] Among other things, they challenge risk and benchmark fields appearing across several Fact Sheet versions. *Id.* ¶¶ 70–87. They also challenge the reporting of certain portfolio-composition figures in current Fact Sheets. For example, Plaintiffs allege that six current Fact Sheets reported 0.00% U.S. equity and identical holdings counts across vintages. *Id.* ¶¶ 88–94.

Plaintiffs allege that Morningstar created and maintained the 3M TDF Fact Sheets. *Id*. ¶ 56 (alleging that Defendants "commissioned Morningstar to create and maintain" the 3M TDF Fact Sheets). They also allege that the challenged current portfolio-composition figures "reflect errors in the data underlying the Current 3M [TDF] Fact Sheets, not actual changes in fund composition." *Id.* ¶ 94. Thus, Plaintiffs' own allegations frame those figures as Morningstar reporting anomalies.

ERISA does not transform every alleged vendor-reporting anomaly into fiduciary misconduct. The Eighth Circuit has rejected fiduciary-breach claims where vendor-generated benefit estimates were "clearly the result of a clerical or ministerial error" and there was no showing that plan fiduciaries lacked ordinary care in selecting or retaining the vendor or monitoring the relevant system. *Christensen v. Qwest Pension Plan*, 462 F.3d

---

[7] Plaintiffs frame many of the Fact Sheet allegations as deficiencies in participant disclosures. *See id.* But ERISA's fiduciary duty provision, 29 U.S.C. § 1104, does not create a general disclosure obligation beyond ERISA's specific disclosure regime, and the FAC does not plead facts showing that the challenged Fact Sheet issues violated any specific disclosure requirement under ERISA. *See Wright v. Medtronic, Inc*., No. 09-CV-0443 (PJS/AJB), 2011 U.S. Dist. LEXIS 923, at *20–21 (D. Minn. Jan. 5, 2011) ("[T]he Eighth Circuit is 'not quick to infer [additional] duties of disclosure under § 1104'" given "the extent of ERISA's specific disclosure requirements" (quoting *Braden*, 588 F.3d at 598)).

913, 917–18 & n.2 (8th Cir. 2006).

The FAC pleads no plausible linkage to fiduciary process here. It does not plead facts that Defendants knew or were on notice of any alleged Morningstar data problem, relied on the challenged Fact Sheet figures in monitoring the 3M TDFs, or made any fiduciary decision based on them. Nor does it plead facts showing that Defendants imprudently selected or retained Morningstar or used an imprudent process for reviewing the Fact Sheets.

The FAC also does not tie the fact sheet allegations to any alleged loss. And no named Plaintiff alleges that he or she read or relied on any challenged Fact Sheet or made a different investment decision because of one. *See Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1159–62 (N.D. Cal. 2022), *aff'd*, 137 F.4th 1015 (9th Cir. 2025), *cert. granted*, No. 25-498 (U.S. Jan. 16, 2026) (finding disclosure allegations insufficient where plaintiffs did not allege reliance on the challenged disclosures).

### C.      **Plaintiffs' Renewed Performance Allegations Still Do Not State a Claim in Count I**

Even if Plaintiffs had plausibly alleged a meaningful benchmark, Count I still fails because the FAC's performance allegations do not support a plausible inference of imprudence. Plaintiffs' underperformance theory aggregates materially different comparisons into one presentation. *See* FAC ¶¶ 136–42, 200–58. Once those comparisons are separated and assessed on their own terms, Plaintiffs identify no comparator that is both meaningfully comparable to the 3M TDFs and that shows substantial and sustained underperformance.

18

First, Plaintiffs' principal underperformance theory rests on averaged results for the periods at issue, not family-by-family comparisons. The FAC lists annual returns for each comparator family, but reports the 3-, 5-, and 10-year trailing figures only as a single aggregated "Delta" line. FAC ¶¶ 200–53. Plaintiffs then present the LifePath Custom Indices theory in a different format altogether, using only cumulative compounded returns rather than the annual and trailing period presentation used elsewhere. *Id.* ¶¶ 254–55. The FAC therefore never supplies a consistent performance showing tied to any one meaningful benchmark.

Second, even putting those methodological defects aside, the FAC still does not plead the kind of substantial, consistent underperformance necessary to support Count I. This Court already held that 10-year trailing underperformance hovering around 3.6 to 5 percentage points was likely insufficient and that improved recent performance complicated the inference Plaintiffs sought to draw. *Batt*, 2026 U.S. Dist. LEXIS 48639, at *24–25 (concluding that S&P index allegations showed only "moderate and inconsistent underperformance" and did not plausibly state a claim). Other courts have reached the same conclusion when confronted with modest, fluctuating, or comparator dependent performance gaps. *See, e.g.*, *Enstrom v. SAS Inst.*, No. 5:24-CV-105-D, 2025 U.S. Dist. LEXIS 37602, at *12 (E.D.N.C. Mar. 3, 2025) ("[A]lleged underperformance—between one and four percent of a benchmark—fails to state a plausible ERISA claim."); *Cho v. Prudential Ins. Co. of Am.*, No. 19-19886 (JMV) (SCM), 2021 U.S. Dist. LEXIS 185397, at *28–29 (D.N.J. Sept. 27, 2021) (finding underperformance ranging up to 3.71 percent insufficient).

19

The FAC's aggregate charts obscure that the one-to-one comparisons are mixed. Against Voya and BlackRock Dynamic, the disaggregated tables show multiple periods of outperformance. *See* Ex. 12 (Disaggregated Performance Data).[8] Where the 3M TDFs underperformed, recent gaps are often modest and measured in low single digits. *See id.* Under the Court's prior ruling, that mixed and limited recent underperformance is insufficient. *See Batt*, 2026 U.S. Dist. LEXIS 48639, at \*24–25.

Nor do T. Rowe and Fidelity salvage the FAC. Plaintiffs reserve those comparators for their reconstructed actual glide path theory rather than the 3M TDFs' disclosed strategy. FAC ¶¶ 104–10, 136–40. Even on Plaintiffs' own terms, later vintages show meaningful recent improvement against T. Rowe and narrower trailing-period gaps against Fidelity. Ex. 12 (Disaggregated Performance Data); *see Batt*, 2026 U.S. Dist. LEXIS 48639, at \*24–25 (stating that instances of improved recent performance "complicat[es] the picture" and does not support an inference of imprudence).

Putnam does not solve the problem either. Although Plaintiffs point to larger underperformance gaps in later vintages, the performance picture is not uniform: the 3M TDFs outperformed Putnam on certain trailing measures in the 2025 and 2030 vintages. *See* Ex. 12 (Disaggregated Performance Data) (showing the 3M TDFs outperformed Putnam at the 5- and 10-year trailing measures for the 2025 vintage and at the 3- and 10-

---

[8] Exhibit 12 presents one-to-one trailing-period performance comparisons derived from the performance figures Plaintiffs plead in FAC ¶¶ 200–253. It compares each comparator TDF to the corresponding 3M TDF by vintage and shows the percentage-point differences for the 3-, 5-, and 10-year trailing periods for which Plaintiffs pleaded figures.

year trailing measures for the 2030 vintage). More fundamentally, Putnam is not a meaningful comparator. Plaintiffs' own allocation figures show some of the largest divergences from the 3M TDFs. *See supra* Sec. IV.A.1.b. Putnam also differs in management strategy: it is actively managed, while the 3M TDFs are predominantly passive. *See supra* Sec. IV.A.1.c. Plaintiffs cannot cure those comparability defects by emphasizing hindsight performance. *See Meiners*, 898 F.3d at 823–24 ("No authority requires a fiduciary to pick the best performing fund.").

The same is true of Plaintiffs' LifePath Custom Indices theory. The FAC presents that theory only through cumulative compounded returns. FAC ¶¶ 254–55. And even on Plaintiffs' own presentation, the results are mixed by vintage: the 2025, 2030, and 2035 vintages outperformed the LifePath Custom Indices, while the alleged underperformance is concentrated in later vintages. *Id*. ¶ 255.

In the end, Plaintiffs still identify no comparator that both meaningfully aligns with the 3M TDFs' strategy and shows the kind of substantial and sustained underperformance needed to support an inference of imprudence. Count I therefore fails even apart from the FAC's failure to plead a meaningful benchmark.

### D.   <u>Count II Should Be Dismissed</u>

Count II asserts prohibited transaction claims under §§ 1106(a)(1)(D) and 1106(b)(1) based on compensation Plaintiffs seek to attribute to IMC. FAC ¶ 296. The FAC fails to state either claim. It does not plausibly allege any transaction by which plan assets were transferred to, or used for the benefit of, IMC. Nor does it plausibly allege that any fiduciary dealt with plan assets in its own interest or for its own account. In any event,

Plaintiffs plead no concrete injury traceable to the transaction alleged in Count II.

### 1. The FAC Does Not Plead a Transfer or Use of Plan Assets for IMC's Benefit

Section 1106(a)(1)(D) prohibits a fiduciary from causing a plan to engage in a transaction that the fiduciary knows or should know constitutes a "direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D); *see Lockheed Corp. v. Spink*, 517 U.S. 882, 888–89 (1996) ("[I]n order to sustain an alleged transgression of § [1106(a)], a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction.").[9]

Plaintiffs identify no transaction transferring plan assets to IMC or using plan assets for IMC's benefit. The FAC alleges only that IMC was selected by the other 3M Defendants to serve as an "investment advisor" to the Plans and received compensation in connection with plan services. FAC ¶¶ 25–26. But the only quantified payment figure Plaintiffs allege went to 3M, not IMC, and the amount paid specifically to IMC is "presently unknown." *Id.* ¶ 26.

Plaintiffs also reference a fee disclosure provided to participants stating that the Intermediate-Term Bond Fund's total asset-based fees were 0.24%, or $2.40 per $1,000

---

[9] In *Cunningham v. Cornell University*, the Supreme Court held, in the context of a § 1106(a)(1)(C) claim, that plaintiffs need not plead that a statutory exemption is inapplicable. 604 U.S. 693, 709 (2025). The Court made clear, however, that plaintiffs "must plausibly allege that a plan fiduciary engaged in a transaction proscribed" under ERISA to state a prohibited transaction claim. *Id.* At the same time, ERISA does not make every payment from a plan to a party in interest unlawful. Section 1108(b)(2)(A) expressly exempts reasonable arrangements with a party in interest for "services necessary for the establishment or operation of the plan," so long as "no more than reasonable compensation is paid." 29 U.S.C. § 1108(b)(2)(A).

invested. FAC ¶ 26. But that underlying fee disclosure does not identify IMC as the payee or plead a transfer from the Plans to IMC. Ex. 13 (2023 Fee Disclosure). Plaintiffs' speculation that IMC received "some portion" of that fee does not plausibly allege that plan assets were transferred to, or used for the benefit of, IMC. Count II therefore does not identify any transaction within § 1106(a). *See, e.g.*, *Polanco v. WPP Grp. USA, Inc.*, No. 24-cv-9548 (JGK), 2025 U.S. Dist. LEXIS 210810, at *24–29 (S.D.N.Y. Oct. 24, 2025) (dismissing prohibited transaction claims where plaintiffs failed to allege a transaction within the meaning of § 1106(a)).

### 2.     The FAC Does Not Plead Self-Dealing Under § 1106(b)(1)

Section 1106(b)(1) bars a fiduciary from dealing with plan assets in its own interest or for its own account. 29 U.S.C. § 1106(b)(1); *see also Rozo v. Principal Life Ins. Co.*, 48 F.4th 589, 593 (8th Cir. 2022). Here, Plaintiffs assert that Defendants' selection of IMC to serve as an "investment advisor" to the Plans allowed Defendants to "obtain additional compensation through self-dealing." FAC ¶¶ 292–93. But the only reported payments went *to 3M*, not IMC. FAC ¶ 26. The FAC alleges no separate payment stream to IMC and no nonconclusory facts showing that any fiduciary used plan authority to cause the Plans to pay IMC or otherwise dealt with plan assets in its own interest or for its own account. At most, the FAC suggests that an affiliated service provider may have received compensation in connection with plan services. So what. That simply is not enough to plausibly plead self-dealing under § 1106(b)(1). *See Collins v. Ne. Grocery, Inc.*, No. 24-2339-cv, 2025 U.S. App. LEXIS 20979, at *13–14 (2d Cir. Aug. 18, 2025) (summary order) (holding § 1106(b) allegations too conclusory absent factual content distinguishing ordinary

23

compensation from prohibited self-dealing); *Peeler v. Bayada Home Health Care, Inc.*, No. 1:24-cv-00231-MR, 2026 U.S. Dist. LEXIS 14223, at *40–41 (W.D.N.C. Jan. 27, 2026) (applying *Collins* to dismiss a § 1106(b) claim supported only by conclusory allegations of self-dealing).

The FAC's own allegations instead support the more natural inference that the challenged amounts reflect lawful sponsor-level expense payments or reimbursements to 3M, not self-dealing involving IMC. The only quantified Form 5500-reported amounts are reported to 3M, not IMC. FAC ¶ 26. And each Plan's governing document provides that the Fund may reimburse a Participating Company for a reasonable expense incurred in the administration of the Plan. *See* Ex. 14 (VIP Plan Document), at § 4.5 ("The Fund may reimburse a Participating Company for a reasonable expense incurred in the administration of the Plan paid by the Participating Company . . . ."); Ex. 15 (Savings Plan Document), at § 4.5 (same).

As a matter of law, the reimbursement of such direct expenses does not constitute self-dealing within the scope of § 1106(b)(1). *See* 29 C.F.R. § 2550.408b-2(e)(3) (providing that when a fiduciary receives no compensation other than reimbursement of direct expenses "properly and actually incurred," the provision of services does not, "in and of itself," constitute prohibited self-dealing under § 1106(b)). The lawful reimbursement of direct expenses provides an obvious alternative explanation that undermines Plaintiffs' self-dealing theory. *See McDonough v. Anoka Cnty.*, 799 F.3d 931, 946 (8th Cir. 2015) (stating that courts should consider "lawful, 'obvious alternative explanation[s]'" when assessing plausibility (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682

24

(2009))).

### 3. Plaintiffs Plead No Concrete Injury Traceable to the Transaction Alleged in Count II

Even if the FAC otherwise pleaded a transaction prohibited by §§ 1106(a)(1)(D) or 1106(b)(1), Count II would still fail because Plaintiffs plead no concrete injury fairly traceable to that transaction. Article III requires dismissal where plaintiffs allege a prohibited transaction but fail to identify an injury. *Cunningham*, 604 U.S. at 708–09 ("District courts must also, consistent with Article III standing, dismiss suits that allege a prohibited transaction occurred but fail to identify an injury.").

Count II identifies the alleged transaction as Defendants' supposed retention of IMC and alleged direct or indirect payments to IMC. FAC ¶ 296. It then asserts, without supporting facts, that damages and lost-opportunity costs resulted "[a]s a direct and proximate result" of those transactions. FAC ¶ 297. But the FAC does not allege that any payment allegedly made to IMC caused the 3M TDFs' alleged underperformance or reduced any named Plaintiff's account balance. At most, Plaintiffs allege investment underperformance, not any payment-based injury traceable to the transaction alleged in Count II. That traceability defect is dispositive. *See Peeler*, 2026 U.S. Dist. LEXIS 14223, at *37–40 (dismissing prohibited-transaction claim where allegations provided "no more than a speculative basis" for inferring plaintiffs incurred actual loss from the challenged payments). Count II therefore fails for lack of Article III standing.

### E. The Failure to Monitor Claim (Count III) Fails Because Plaintiffs Do Not State a Viable Underlying Claim

The Court already held that the failure-to-monitor claim fails without a plausible

underlying fiduciary breach. *Batt*, 2026 U.S. Dist. LEXIS 48639, at \*25 n.4. The FAC does not change that result. It again incorporates the same underlying allegations and repackages the same challenged conduct as a failure-to-monitor theory. FAC ¶ 299. The same derivative principle applies to the prohibited-transaction theory Plaintiffs now add. *See Polanco*, 2025 U.S. Dist. LEXIS 210810, at \*29–30 (dismissing derivative monitoring claim after dismissing breach-of-fiduciary-duty and prohibited-transaction claims). Because Plaintiffs do not state a viable prudence or prohibited transaction claim, the failure to monitor claim fails as well.

### F.     **Plaintiffs' Claims Should Be Dismissed with Prejudice**

The Court gave Plaintiffs a second opportunity to plead facts showing that their proposed comparisons are meaningful benchmarks for the 3M TDFs. They failed to do so. Under controlling Eighth Circuit precedent, the FAC still does not identify any benchmark that is both meaningful and supports a plausible imprudence claim. That is a persistent pleading failure, and further amendment would be futile. *See Fritton I*, 2022 U.S. Dist. LEXIS 222996, at \*32 ("[D]ismissal with prejudice is typically appropriate when a plaintiff has shown 'persistent pleading failures' despite one or more opportunities to amend . . . .").

Counts II and III should be dismissed with prejudice as well. Plaintiffs added Count II in the FAC, but do not plead the basic facts necessary to support either prohibited transaction theory. If Plaintiffs had those facts, they should have pleaded them. Count III is derivative of Counts I and II. Further amendment would be futile.

### V.     **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss

26

the First Amended Complaint with prejudice.


DATED: May 4, 2026                    */s/ Rajin S. Olson*

Rajin S. Olson (#0398489)
**THOMPSON HINE LLP**
US Bancorp Center
800 Nicollet Avenue, Suite 2925
Minneapolis, MN 55402
Telephone: (612) 605-5900
Facsimile: (612) 605-5901
Rajin.Olson@ThompsonHine.com

Brian J. Lamb (*admitted pro hac vice*)
Amanda R. Schwaben (*admitted pro hac vice*)
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
Brian.Lamb@ThompsonHine.com
Amanda.Schwaben@ThompsonHine.com

Nathaniel W. Ingraham (*admitted pro hac vice*)
**THOMPSON HINE LLP**
1919 M. Street, N.W., Suite 700
Washington, D.C. 20036
Telephone: (202) 331-8800
Facsimile: (202) 331-8330
Nate.Ingraham@ThompsonHine.com

*Attorneys for Defendants*

27

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

JENNIFER BATT, et al.,

        Plaintiffs,

    v.

3M COMPANY, et al.,

        Defendants.

Case No. 25-cv-03149 (ECT/DTS)

**CERTIFICATE OF WORD COUNT**
**COMPLIANCE**

This brief complies with the limits in Local Rule 7.1(f) and with the type-size limit of Local Rule 7.1(h). This brief was prepared in proportionally spaced typeface in 13-point font, using Microsoft Word Office 365. The text of the brief, including headings, footnotes, and quotations, contains 7,093 words as determined by the word-count function of Microsoft Word Office 365.

28