IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| JENNIFER BATT, MADHU CHANDNANI, KAREN DAVISON, and WILLARD JENKINS, Individually and on Behalf of All Others Similarly Situated, on Behalf of the 3M VOLUNTARY INVESTMENT PLAN AND EMPLOYEE STOCK OWNERSHIP PLAN, and on Behalf of the 3M SAVINGS PLAN,<br><br>              Plaintiffs,<br><br>    v.<br><br>3M COMPANY; BOARD OF DIRECTORS OF 3M, and its members; 3M BENEFITS FUND INVESTMENT COMMITTEE, and its members; and 3M INVESTMENT MANAGEMENT CORPORATION,<br><br>              Defendants. | Case No. 25-cv-03149 (ECT/DTS)<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 3

    A.    The Plans, the Participants, and the Captive 3M TDFs .................... 3

    B.    Participants' Sole Window: An Opaque, Error-Ridden Disclosure Regime ........................................................................... 3

    C.    The Meaningful Benchmarks: The LifePath Index and the Dual Comparator Set ...................................................................... 4

    D.    A Decade-Plus of Sustained Underperformance .............................. 4

    E.    The Glide-Path Deviations and IMCO's Self-Dealing ..................... 4

LEGAL STANDARD .......................................................................................... 5

ARGUMENT ....................................................................................................... 7

    I.    The FAC Plausibly Alleges a Breach of the Duty of Prudence ................... 7

    A.    The FAC Pleads a Meaningful Benchmark, Curing the Sole Defect Identified in the Opinion ......................................................... 7

        1.    The Dual Five-Family Comparator Set Satisfies *Matousek* Through Vintage-by-Vintage Parity ...................... 8

        2.    The LifePath Index Independently Corroborates the Benchmark, and Defendants Are Estopped from Denying It ................................................................................. 9

    B.    The Comparators Share Similar Composition and Risk Under *Matousek* ................................................................................. 11

        1.    The FAC Pleads the Three Comparability Variables *Matousek* Named—Composition, Strategy, and Risk Profile ...................................................................................... 12

        2.    Sector and Style Confirm the Match, and Defendants' Selective Disaggregation Proves It ....................................... 14

    C.    Defendants' Remaining Benchmark Attacks Provide No Basis for Dismissal ........................................................................... 20

        1.    Defendants' Custom "Blended Benchmark" Is Not a Meaningful Comparison ........................................................ 20

        2.    Defendants' Authorities Do Not Support Dismissal ............. 22

        3.    The "To Versus Through" Glide-Path Objection Fails Because the Dual-Comparator Design Removes Glide-Path Philosophy as a Variable ............................................... 22

        4.    The 3M TDFs Are Actively Managed, and Are Not "Index Funds" ...................................................................... 25

5.    Defendants' CIT-Versus-Mutual-Fund Argument Is Once Again a Distraction ........................................................ 27

D.    The FAC Pleads a Flawed Process and Sustained, Substantial Underperformance ............................................................ 28

1.    Prudence Is Pleaded Circumstantially; From Process, Not Results ................................................................ 28

2.    The Deficient Disclosures Corroborate the Flawed Process and Foreclose Defendants' Data-Precision Attacks ........................................................................ 29

3.    The Underperformance Is Substantial and Sustained Under the Standard This Court Already Applied .................. 31

4.    Defendants' Exhibit 12 Confirms the Claim It Was Built to Defeat .............................................................. 33

E.    The Deficient Disclosure Regime Is an Independent Breach of Prudence .............................................................. 34

1.    The Disclosure Regime Is Defendants' Own, and Maintaining It Deficiently Is Itself a Breach ........................ 34

2.    Reliance Is Not an Element of a §404 Prudence Theory ...... 37

F.    The Glide-Path Deviation States a Claim for Breach of the Duty to Follow Plan Documents Under §1104(a)(1)(D) ................ 37

1.    The Plan Documents Committed the Fiduciaries to a Fixed Glide Path, and the Funds Deviated from It Without Disclosure ............................................................. 37

2.    Defendants' Own Exhibit Forecloses the "No Mandate" Reading, and No Prior Position Estops the Claim ...................................................................... 38

3.    The Deviation Claim Is an Independent Ground for the Imprudence Claim ................................................... 39

II.    The FAC States a Prohibited-Transaction and Self-Dealing Claim ............ 40

A.    IMCO Is a Party-in-Interest, and Its Retention Caused Transfers of Plan Assets Within §406(a)(1)(D) .............................. 40

B.    The Arrangement Is Self-Dealing Under §406(b)(1), and the §1108 Defense Cannot Be Resolved on the Pleadings .................... 42

C.    The FAC Identifies a Concrete Injury, and Article III Standing Is Satisfied ............................................................ 43

III.    Plaintiffs Plausibly Allege Claims for Failure to Monitor ......................... 45

CONCLUSION ............................................................................................. 45

### TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Abel v. CMFG Life Ins. Co.,*
2024 WL 307489 (W.D. Wis. Jan. 26, 2024) ......................................................22-23

*Anderson v. Intel Corp. Investment Policy Committee,*
579 F. Supp. 3d 1133 (N.D. Cal. 2022), *aff'd*, 137 F.4th 1015 (9th Cir. 2025) .......... 37

*Barrett v. O'Reilly Auto., Inc.,*
112 F.4th 1135 (8th Cir. 2024) ............................................................................ 35

*Becker v. Wells Fargo & Co.,*
2021 WL 1909632 (D. Minn. May 12, 2021)...................................................... 12, 42

*Beldock v. Microsoft Corp.,*
2023 WL 3058016 (W.D. Wash. Apr. 24, 2023)...................................................... 17

*BJC Health Sys. v. Columbia Cas. Co.,*
348 F.3d 685 (8th Cir. 2003) ................................................................................. 6

*Braden v. Wal-Mart Stores, Inc.,*
588 F.3d 585 (8th Cir. 2009) ........................................................................*passim*

*Cho v. Prudential Ins. Co. of Am.,*
2021 WL 4438186 (D.N.J. Sept. 27, 2021) ............................................................ 33

*Christensen v. Qwest Pension Plan,*
462 F.3d 913 (8th Cir. 2006) ............................................................................... 35

*Collins v. Ne. Grocery, Inc.,*
2025 WL 2383710 (2d Cir. Aug. 18, 2025)............................................................. 42

*Cunningham v. Cornell Univ.,*
604 U.S. 693 (2025)....................................................................................*passim*

*Davis v. Washington Univ. in St. Louis,*
960 F.3d 478 (8th Cir. 2020) ........................................................................*passim*

*Dionicio v. U.S. Bancorp,*
2024 WL 1216519 (D. Minn. Mar. 21, 2024) ......................................................... 18

*Doll v. Evergy, Inc.,*
2025 WL 4042583 (W.D. Mo. Sept. 10, 2025) ....................................................... 39

*Enstrom v. SAS Inst.,*
2025 WL 685219 (E.D.N.C. Mar. 3, 2025) ............................................................ 32

*Fritton v. Taylor Corp.,*
2022 WL 17584416 (D. Minn. Dec. 12, 2022).....................................................39-40

*Fritton v. Taylor Corp.,*
   2023 WL 5348834 (D. Minn. Aug. 21, 2023) ............................................................... 27

*Gibb v. Scott,*
   958 F.2d 814 (8th Cir. 1992) ........................................................................................ 5

*Gorog v. Best Buy Co.,*
   760 F.3d 787 (8th Cir. 2014) ........................................................................................ 5

*Hughes v. Nw. Univ.,*
   595 U.S. 170 (2022) ..................................................................................................... 29

*Larson v. Allina Health Sys.,*
   350 F. Supp. 3d 780 (D. Minn. 2018) ..................................................................... 5, 12

*Lockheed Corp. v. Spink,*
   517 U.S. 882 (1996) ..................................................................................................... 41

*Luckett v. Wintrust Corp.,*
   2023 WL 4549620 (N.D. Ill. July 14, 2023)............................................................... 25

*Matney v. Barrick Gold of N. Am.,*
   80 F.4th 1136 (10th Cir. 2023) ...................................................................................... 9

*Matousek v. MidAmerican Energy Co.,*
   51 F.4th 274 (8th Cir. 2022) ..............................................................................*passim*

*McAuley v. Fed. Ins. Co.,*
   500 F.3d 784 (8th Cir. 2007) .................................................................................. 6, 12

*McDonough v. Anoka County,*
   799 F.3d 931 (8th Cir. 2015) ...................................................................................... 43

*McGeathy v. Reinalt-Thomas Corp.,*
   2026 WL 617343 (D. Ariz. Mar. 5, 2026) ................................................................. 20

*Meiners v. Wells Fargo & Co.,*
   898 F.3d 820 (8th Cir. 2018) .............................................................................*passim*

*Parmer v. Land O'Lakes, Inc.,*
   518 F. Supp. 3d 1293 (D. Minn. 2021)......................................................................... 9

*Payne v. Hormel Foods Corp.,*
   2024 WL 4228613 (D. Minn. Sept. 18, 2024)....................................................2, 17-18

*Peeler v. Bayada Home Health Care, Inc.,*
   2026 WL 208630 (W.D.N.C. Jan. 27, 2026) ....................................................... 42, 44

*Phillips v. Cobham Advanced Elec. Sols., Inc.,*
   2025 WL 2689268 (N.D. Cal. Sept. 19, 2025) ........................................................... 26

*Randall v. GreatBanc Trust Co.,*
   2024 WL 713997 (D. Minn. Feb. 21, 2024) ............................................................... 40

*Riley v. Olin Corp.,*
  2023 WL 371872 (E.D. Mo. Jan. 24, 2023) ................................................................ 27

*Snyder v. UnitedHealth Grp., Inc.,*
  2021 WL 5745852 (D. Minn. Dec. 2, 2021)............................................................ 31, 33

*Stalley v. Catholic Health Initiatives,*
  509 F.3d 517 (8th Cir. 2007) .................................................................................. 44

*Terraza v. Safeway Inc.,*
  241 F. Supp. 3d 1057 (N.D. Cal. 2017) .................................................................... 30

*Thole v. U.S. Bank N.A.,*
  590 U.S. 538 (2020)................................................................................................ 44

*Tussey v. ABB, Inc.,*
  746 F.3d 327 (8th Cir. 2014) .................................................................................. 36

*Varity Corp. v. Howe,*
  516 U.S. 489 (1996)................................................................................................ 36

*Vogt v. Crow Wing County,*
  2021 WL 6275271 (D. Minn. Nov. 1, 2021) .............................................................. 22

*Wright v. Medtronic, Inc.,*
  2011 WL 31501 (D. Minn. Jan. 5, 2011).................................................................. 36

*Zean v. Fairview Health Servs.,*
  858 F.3d 520 (8th Cir. 2017) ................................................................................ 5, 12

**STATUTE AND RULES**

29 U.S.C. § 1002(14)................................................................................................ 41

29 U.S.C. § 1104(a)(1)(D)................................................................................*passim*

29 U.S.C. § 1106 .............................................................................................*passim*

29 U.S.C. § 1108 .............................................................................................*passim*

29 U.S.C. § 1109(a) ................................................................................................ 43

29 C.F.R. § 2550.404a-5.......................................................................................... 36

FED.R.CIV.P. 8(d)(2) .............................................................................................. 18

FED.R.CIV.P. 12(b)(6) .....................................................................................*passim*

L.R. 15.1(b) ............................................................................................................ 45

**INTRODUCTION**

This Court's March 10, 2026 Order [ECF No. 51] ("Opinion" or "Op.") dismissed the original complaint without prejudice on a single ground: the pleading had not plausibly alleged a "meaningful benchmark" against which the 3M proprietary TDFs could be measured.[1] It did not hold the duty-of-prudence theory deficient in any other way. To the contrary, the Court found that the comparator-level underperformance Plaintiffs alleged bore "the hallmark of a successful underperformance claim." Op. 19. The benchmark, not the size of the loss, was the only gap. The Court also identified the showing that would close it: "comparable asset allocations," plausibly alleged, "would go a long way toward showing that the comparator TDFs are meaningful benchmarks." Op. 15.

The FAC makes this showing on every metric identified in governing Eighth Circuit authority. The Opinion asked for a comparator that shares "like composition" and a common risk profile; the FAC supplies multiple. Op. 11-15. It adds the LifePath Index—the index built to measure the strategy the 3M funds were "modeled after"—and a dual set of five mainstream target-date families: three matched to the funds' stated glide path, two to their actual behavior. ¶¶135-142. It then pleads parity vintage-by-vintage and metric by metric: equity allocation, asset-class composition, all eleven Morningstar sectors, equity style, and both risk ratios. ¶¶144-182. Against those benchmarks, the 3M TDFs

---

[1] Capitalized terms not defined herein have the same meaning as in the First Amended Complaint [ECF No. 53] ("FAC"). "¶_" citations herein refer to the FAC. Unless otherwise specified, all internal quotation marks and citations herein are omitted and all emphasis added.

underperformed for over a decade. The cumulative margins reach nearly thirty-one points against the Comparator TDF average, and significantly more against individual comparators. ¶¶11, 199-262; Tables 1.b-9.b.

To avoid these allegations, Defendants ask the Court to do what Rule 12(b)(6) forbids: credit their counsel's re-cut of Plaintiffs' own figures over the FAC's allegations, treat any single divergent data point or label as a categorical disqualifier, and read converging metrics in isolation rather than in their "totality" as the law requires. *Payne v. Hormel Foods Corp.*, 2024 WL 4228613, at *4 (D. Minn. Sept. 18, 2024). Defendants' Motion to Dismiss and supporting Memorandum of Law [ECF No. 61] ("Motion" or "MTD") fails for at least four reasons. First, the FAC pleads a meaningful benchmark and cures the sole defect the Opinion identified. It supplies the composition- and risk-matched comparator set, documents it with figures rather than labels, and backs it with an index built for the LifePath fund line. Second, the FAC pleads a flawed fiduciary process and sustained, substantial underperformance. The inference is circumstantial, as Eighth Circuit law permits, drawn from a decade-plus shortfall against matched comparators, and a documented deficient disclosure regime. Defendants' demand for proof of an imprudent result gets the standard backwards. Prudence is measured by process, not by hindsight on returns. Third, the FAC states a prohibited-transaction and self-dealing claim over the retention of 3M's wholly-owned subsidiary, IMCO, as a paid Investment Manager for the captive 3M TDFs. Whether IMCO's compensation was reasonable is an exemption Defendants must plead and prove—not an element Plaintiffs must negate. Lastly, the

failure-to-monitor claim is adequately pleaded and, as a derivative claim, rises with Counts I and II.

Defendants' central premise—that the comparators must match the 3M funds with numerical identity—is not the law of this, or any, Circuit. Crediting it would absolve fiduciaries of the very duty of prudence ERISA exists to enforce and leave the Plans' more than 58,000 participants and $12.4 billion in retirement savings without the protection the statute promises. The Motion should be denied.

## FACTUAL BACKGROUND

### A. The Plans, the Participants, and the Captive 3M TDFs

As of 2023, the Plans held approximately $12.4 billion for 58,127 participants. ¶¶38-39. Newly hired 3M employees are auto-enrolled, and the default investment is the 3M TDFs. ¶¶33-52. Since 2006, the 3M TDFs have been the only target-date option in the Plans. *Id.* A participant who is auto-enrolled and does not redirect his contributions is placed in them, with no competing target-date product to move to. *Id.* By 2024, that arrangement had concentrated $4.09 billion (37.5% of Plan assets) in the Series alone. ¶41. Defendants are the Plans' fiduciaries. ¶¶6-25. The 3M TDFs are actively managed CITs "modeled after" the BlackRock LifePath series, though not identical to it. ¶¶48-53.

### B. Participants' Sole Window: An Opaque, Error-Ridden Disclosure Regime

The 3M TDFs are CITs, not SEC-registered funds, so participants receive no prospectus or annual report. ¶58. Their only window is the Fact Sheets, alleged to be "the primary source of information" yet "woefully deficient." ¶56. The Fact Sheets disclose

only the top twenty-five holdings, and they are riddled with facially impossible data and broken benchmark fields (*see infra* Arg.I.E).  ¶¶62-93.  Participants are left unable to track how the funds are actually invested. *Id.*

### C.  The Meaningful Benchmarks: The LifePath Index and the Dual Comparator Set

The FAC identifies the comparators the original complaint lacked.  The first is the LifePath Index, the proprietary index BlackRock built to evaluate its own LifePath funds. ¶¶134-135.  The second is a set of five mainstream target-date families—three matched to the 3M TDFs' stated "to-retirement" path and two to their actual "through-retirement" shape.  ¶¶136-142.  The FAC then pleads quantitative parity with those comparators, vintage-by-vintage, on every factor identified in *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274 (8th Cir. 2022).  ¶¶144-180; App. A-B.

### D.  A Decade-Plus of Sustained Underperformance

The 3M TDFs underperformed the comparator set on a cumulative, compounded basis across every vintage. ¶¶182-258.  The gap deepened through the accumulation-phase and held over the trailing three-, five-, and ten-year periods, as well as against the LifePath Index at every accumulation-phase vintage.  *Id.*  Plaintiffs allege total Plan recoverable losses of "over one hundred million dollars."  ¶297.

### E.  The Glide-Path Deviations and IMCO's Self-Dealing

The Plans committed to a fixed "to-retirement" glide path and represented that each vintage would merge into a Retirement Portfolio "intended to remain nearly constant," with no deviation range disclosed.  ¶¶100-103.  Reconstructed from the funds' Fact Sheets, the

actual allocations departed materially from that path, and the "nearly constant" Retirement Portfolio was anything but—yet none of it was disclosed.  ¶¶104-120.

The Plans also retained IMCO, a wholly-owned 3M subsidiary and party-in-interest, as Investment Manager of each vintage.  ¶¶25-26.  That retention transferred Plan assets to a 3M affiliate.  ¶¶290-298.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Op. 3.  Courts "accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff]."  *Id.*

Two principles control the comparability dispute here.  First, on a 12(b)(6) motion the Court does not weigh evidence or resolve factual disputes.  Competing factual contentions "are fact determinations [that] cannot be considered on a motion to dismiss." *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 800 (D. Minn. 2018).  Where the pleading and the movant offer opposing accounts of the same data, the plaintiff's well-pleaded version is taken as true.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). Second, the Court may consider only the complaint and the materials "necessarily embraced by the pleadings."  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).  Considering anything else converts the motion into one for summary judgment.  *Id.* A defendant's own submissions fall outside the pleadings when they "provide[] some substantiation for and do[] not merely reiterate what is said in the pleadings."  *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992).  And the Eighth Circuit has repeatedly reversed

dismissals that rested on such defense-prepared materials without conversion, notice, and an opportunity for discovery.[2]

Here, the embraced materials are "the relevant fund prospectuses and plan disclosure documents," not Defendants' litigation-prepared recalculations of the FAC's own data. *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 484 n.3 (8th Cir. 2020). Defendants' recalculations are impermissible argument, and cannot displace the well-pled allegations at the pleading stage.

These principles carry particular force in ERISA litigation. A plaintiff need not plead "'specific facts' explaining precisely how the defendant's conduct was unlawful." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009). The duty of prudence is measured by the fiduciary's process, not by investment results. A plaintiff therefore need not plead the fiduciaries' internal deliberations; circumstantial allegations from which the Court can infer a flawed process suffice. *Id.* at 598; *Davis*, 960 F.3d at 482-83. That accommodation reflects the information asymmetry inherent in ERISA litigation. For the underperformance theory, the inference turns on the comparators the FAC provides. The complaint "must provide a sound basis for comparison—a meaningful benchmark," and "there is no one-size-fits-all approach." *Id.*; *Matousek*, 51 F.4th at 280-81. The question is whether the comparators "hold similar securities, have similar investment strategies, and reflect a similar risk profile." *Id.* Finally, ERISA places its prohibited-transaction

---

[2]    *See, e.g.*, *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 688 (8th Cir. 2003) (reversing dismissal premised on matters outside the pleadings); *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787-88 (8th Cir. 2007) (same).

exemptions outside the elements a plaintiff must plead. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 696 (2025) ("[I]t is defendant fiduciaries who bear the burden of pleading and proving that a §1108 exemption applies to an otherwise prohibited transaction under §1106.").

## ARGUMENT

### I.     The FAC Plausibly Alleges a Breach of the Duty of Prudence

#### A.     The FAC Pleads a Meaningful Benchmark, Curing the Sole Defect Identified in the Opinion

The Eighth Circuit measures an ERISA prudence pleading by the comparators it supplies, not by the labels the fiduciary prefers. Op. 2-3. This Court applied that standard in dismissing the original complaint and identified the showing that would satisfy it: a comparator set pleaded in enough detail to establish "comparable asset allocations." Op. 15. The FAC pleads each of those facts vintage-by-vintage, across five comparator families, and backs them with an index built for the LifePath fund line.

Defendants do not apply that standard; they rewrite it. They again overread *Matousek* (MTD 6-21) to demand numerical identity between the 3M TDFs and their comparators and then fault the FAC for failing to make this showing. But *Matousek* requires comparability, not identity, and disclaims the bright-line rule Defendants attribute to it. *Matousek*, 51 F.4th at 280-81. The FAC supplies the comparator detail that tests whether "a prudent fiduciary in like circumstances would have selected a different fund." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018). Defendants' reading

would convert a totality inquiry into a categorical gate—what the Eighth Circuit has rejected.

Meaningful benchmarks are established here on multiple independent grounds, and any one defeats the Motion.  First is the five-family comparator set (Arg.I.A.1), matched to the 3M TDFs vintage-by-vintage on composition, strategy, and risk (Arg.I.B).  Second is the LifePath Index, built for the fund line the 3M series was modeled after, which independently corroborates the comparison (Arg.I.A.2).  The Court need credit only one of the six.

> 1. The Dual Five-Family Comparator Set Satisfies *Matousek* Through Vintage-by-Vintage Parity

The FAC's primary benchmark is a dual comparator set built from five mainstream target-date families, each compared to the 3M TDFs vintage-by-vintage.  Three are matched to the funds' stated "target" glide path (LifePath Dynamic, Putnam, and Voya), and two to their actual glide path (T. Rowe and Fidelity).  ¶¶136-142.  The FAC also pleads the full fund-name and ticker matrix for all nine vintages.  ¶141.  So the comparators are named and identified, unlike *Matousek*'s pleading, which offered "no explanation of what types of funds are in each group."  *Matousek*, 51 F.4th at 281.  The dual design shows the 3M TDFs "underperformed regardless of which glide path model is used."  ¶140.  That vitiates any of Defendants' "to vs. through" defenses.

Likewise, the FAC compares target-date funds to target-date funds within a single product category[3]—the comparison the meaningful-benchmark rule contemplates, not the "apples and oranges" the Eighth Circuit has condemned. *Matousek*, *Davis*, and *Meiners* rejected comparators with "different aims, different risks, and different potential rewards" or "a different investment strategy." *Matousek*, 51 F.4th at 282; *Meiners*, 898 F.3d at 823 & n.2. The FAC pleads the opposite—five target-date families in the same category, each matched to the 3M TDFs' stated or actual glide path and tracking them vintage-by-vintage on allocation, sector, Morningstar style, and risk. ¶¶136-182, App. A-B; *see* Arg.I.B. Defendants' reliance on *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293 (D. Minn. 2021), as supporting a finding of incomparability is misplaced. MTD 9-10. *Parmer* rejected the proposed comparators because the plaintiffs "[did] not plead[] how their comparators have similar asset allocation or investment strategies," resting instead on the funds' shared "investment type." *Id.* at 1306-07. Here, the FAC fills that gap, pleading vintage-by-vintage parity in equity allocation, asset class, sector, Morningstar style, and risk metrics, measured against five target-date families. ¶¶136-182.

### 2. The LifePath Index Independently Corroborates the Benchmark, and Defendants Are Estopped from Denying It

The FAC supplies one further benchmark: the LifePath Index, the proprietary index BlackRock built to evaluate its own LifePath funds. ¶135. It is a benchmark of like

---

[3]   *See Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1153 (10th Cir. 2023) ("[W]e reject the notion that CITs could never be considered comparable to mutual funds"; the inquiry "will necessarily be context specific"). The deficiency that defeats a cross-vehicle comparison is the absence of composition facts, not the wrapper.

composition and common lineage. The 3M TDFs were "modeled after the BlackRock LifePath series," are managed by a 3M subsidiary "in coordination with BlackRock," and "bear the 'LifePath' name," and the Index "was purpose-built to measure performance of the 3M TDFs' purported strategy." ¶254. An index built to measure the very strategy the challenged funds were modeled to pursue shares their composition by design, which is why a market index drawn from the same fund line can supply a meaningful benchmark. *Braden*, 588 F.3d at 596; Op. 12.[4]

Defendants are in no position to deny that lineage; they have already affirmed it. On the first motion to dismiss, they told this Court that the 3M and BlackRock funds were one and the same. ¶135; Hr. Tr. 5:13-20 (3M counsel calling the 3M TDFs the "BlackRock 3M target-date funds"). They cannot now call the 3M TDFs too dissimilar from the LifePath line to be compared to the index built for that line. At the pleading stage, the FAC's "modeled after" and "like composition" allegations must be credited and the inference of comparability drawn in Plaintiffs' favor.

Defendants' only contrary argument is that the 3M funds do not mechanically "track" the Index. MTD 12. But the FAC never said they do—it states candidly that the funds "do not 'track'" the LifePath Indices. ¶135. "Designed to track" is one route to a meaningful index, not the only one, and the FAC rests the Index on shared composition

---

4    The MTD's assertion that the FAC does not "identify which BlackRock benchmark it means"—the "LifePath Index…Custom Benchmark" or the "LifePath Dynamic…Custom Benchmark" (MTD 12)—is puzzling. The FAC explicitly identifies the "BlackRock LifePath Custom <u>Index</u>" (¶135), not the "<u>Dynamic</u>" benchmark.

and lineage rather than replication.  The concession Defendants seize on thus answers a theory the FAC never advanced.

###### B.    The Comparators Share Similar Composition and Risk Under *Matousek*

The Opinion did not hold that any particular allocation gap defeats comparability as a matter of law.  It held that the original complaint pleaded no composition facts at all, resting on a bare, unexplained "risk ratio."  Op. 14-18.  The Court then looked to the only composition data before it—the complaint and embraced documents submitted during the first motion to dismiss—and noted dissimilarities.  *Id.*  That was a ruling about what the Court viewed as a pleading vacuum, not a numerical threshold.  The FAC fills the vacuum. It alleges parity vintage-by-vintage on equity allocation, asset-class composition, all eleven Morningstar sectors, equity style, and both risk ratios.  ¶¶136-182.  The question now is the ordinary one under Rule 12(b)(6): do those allegations, credited as true, support a reasonable inference of comparability?  Whether Defendants can assemble a contrary reading of the same figures is not the test.  And to the extent their one-to-one re-cut surfaces a wider cell, the gap is not a defect in the comparators.  It is evidence the 3M TDFs departed from the allocations that 3M represented they would hold.  Arg.I.F.

Defendants' invitation runs through three exhibits the Court should not credit.  MTD Exhibits 3, 10, and 12 are not record evidence.  They are "charts that [counsel] caused to be prepared," Ingraham Decl. ¶14, re-cutting the allocation, sector, and performance figures the FAC itself pleads (¶¶144-162, 199-253) into a one-to-one format chosen to foreground the widest cells.  They add no fact the pleading omitted.  They re-present the pleading's own data to argue the opposite inference.  That makes them matters outside the

- 11 -

pleadings, to be disregarded. *Larson*, 350 F. Supp. 3d at 800; *Zean*, 858 F.3d at 526; *McAuley*, 500 F.3d at 787. The Motion can and should be resolved on the pleading and the genuinely embraced fund documents. On those, the FAC's parity allegations control. *Becker v. Wells Fargo & Co.*, 2021 WL 1909632, at *7 (D. Minn. May 12, 2021) ("Defendants' reliance on the Documents to create factual disputes is improper at this stage.").

1. The FAC Pleads the Three Comparability Variables *Matousek* Named— Composition, Strategy, and Risk Profile

On composition, the FAC pleads equity-allocation parity across all nine vintages. Against the five-family average, the 3M TDFs differ by "an average absolute difference of approximately 2.5 percentage points," with a comparator average range of only "-1.11 to +4.18 percentage points." ¶¶144-145. *Meiners*, by contrast, faulted a single comparator "with a different investment strategy"—a bond allocation "higher…than Vanguard funds," a gap of nearly *30 points* between the challenged fund and the *sole* comparator. 898 F.3d at 823 & n.2; *compare Meiners v. Wells Fargo*, 0:16-cv-3981 (D. Minn.), ECF No. 43-6, at 77, *with id.*, ECF No. 4-3, at 3-4. The outlier Defendants challenge here is BlackRock's 2025 figure, and the FAC already flags it as distorted—the 11.74 figure "includes nearly 60%…allocated to 'Other.'" ¶144 n.22. Substituting the fund's 40% "target" maintains the comparator average within 3.3 points of the 3M 2025 TDF. *Id.* A gap that exists only because Defendants adopt a figure the complaint flags as distorted is not a defect in the comparators.

The asset-class breakdown deepens the showing: split into U.S. equity, non-U.S. equity, and fixed income, the deltas remain "generally within 5 percentage points or less" (¶¶149, 153). These are not the "apples and oranges" comparisons that doomed the claim in *Davis*. There, the comparison was an actively managed direct-hold real-estate account against an index fund for REITs. The two were structurally unlike, and the Panel affirmed dismissal on that ground. *Davis*, 960 F.3d at 484-86. In contrast, the FAC matches its comparators on equity allocation, sector, style, and risk (*see* ¶¶136-187), providing "a sound basis for comparison—a meaningful benchmark." *Davis*, 960 F.3d at 484.

The third *Matousek* variable is "a similar risk profile" (*see* 51 F.4th at 281), which the Court previously emphasized was missing. Op. 14-15. The FAC rectifies this shortcoming and clearly identifies both the standard deviation and the Sharpe ratio as the metrics that "give substance to the concept of a 'risk ratio.'" ¶127. It tabulates both. The five-year Sharpe deltas between the 3M TDFs and the comparator average fall within 0.05 of zero, and the three-year standard-deviation deltas within roughly a point. ¶¶173, 177. The FAC appropriately pleads that the data shows that "the 3M TDFs carry substantially the same level of risk as the Comparator TDFs, but…deliver inferior returns…because they are being poorly managed." ¶180. That is the comparability fact the Opinion said "would go a long way"—a documented, shared risk ratio, not a mystery. Op. 15.

These risk metrics rule out the inference that the 3M funds' lower returns reflect a more conservative strategy rather than imprudent management. *Matousek*, 51 F.4th at 281; *Meiners*, 898 F.3d at 822-23. Standard deviations run within roughly a point, and the 3M TDFs are, if anything, slightly less volatile than the comparator average at eight of nine

- 13 -

vintages on a three-year basis.  ¶177.  With risk held constant, the allocation differences Defendants rely on cut one of two ways—either they: (i) are too small to move the matched risk profile, in which case they are immaterial;  or (ii) reflect the 3M TDFs holding more equity and bearing more risk than the comparators, which only strengthens the claim. Simply put, a fund that takes at least as much risk as its peers but earns materially lower returns is the worse-managed fund.

Defendants' lead comparability attack is that Putnam holds far less equity than the 3M funds—23.72 points less at the 2030 vintage.  MTD 7-8; ¶144.[5]  However, Defendants are attempting to highlight the single largest difference and ignore the overwhelming similarity of these figures across all vintages and comparators.  For example, the 3M TDFs and Voya TDFs' total equity allocation across all vintages are within 3.02pp, and the 3M, T.Rowe and Fidelity TDFs are within 6.3pp across the 2030-2065 vintages.  ¶144.

2. <u>Sector and Style Confirm the Match, and Defendants' Selective Disaggregation Proves It</u>

The FAC adds two converging metrics—sector exposure and Morningstar style— that Defendants address only by isolating each from the rest.  Appendix A breaks out eleven Morningstar sectors for all nine vintages and alleges a "striking degree of sector-level consistency."  ¶¶154-162.  The single largest divergence out of the nine is real estate, "just

---

[5]    A fund holding that much less equity takes less market risk and, in a rising market, is expected to earn less.  Putnam earned more.  Despite its more conservative allocation, the Putnam 2050 vintage outpaced the 3M 2050 fund by 48.76pp on a cumulative basis. ¶231.  A fund taking less risk should not outperform the fund whose prudence is in question.  Yet that is exactly what the data shows here.

4.0 to 4.6 percentage points," with the remaining sectors clustered within roughly 1.5pp. *Id.* Defendants answer with a counsel-prepared exhibit that re-cuts Appendix A to foreground the widest real-estate cells. They assert the divergence "pattern appears in other sectors, including Technology and Financial Services." MTD 13. But Exhibit 10 says otherwise. 51/84 of the differentials in the Technology and Financial Services categories are within 1.5pp, and 70/84 are within 3pp. A "same pattern" generalization contradicted by the exhibit offered to support it is not a comparability defect. Instead, it confirms the sector consistency the FAC pleads.

The selectivity is starker still against the full field. Appendix A already breaks the *eleven* Morningstar sectors out for every vintage against each comparator family individually (462 one-to-one comparisons—the disaggregated basis Defendants themselves demand). This data shows how similar the 3M TDFs' sector allocations are to each of the Comparator TDFs. Of the *462 one-to-one comparisons*, the 3M TDFs' allocations are within: (i) *two percentage* points at *352* of them (76.2%); (ii) three percentage points at 373 (80.74%); (iii) four percentage points at 414 (89.6%); and (iv) five percentage points at 442 (95.7%).[6] Only twenty comparisons exceed five points, and eighteen are real estate—the single deliberate tilt the FAC identifies and ties to performance. ¶159. Set Real Estate aside and 99.5% fall within five points. In short, the

---

[6]     Indeed, the differentials are even closer with certain TDF families—for example, as compared to the: (i) Fidelity TDFs, 90 of the 99 (90.9%) are within 5pp; (ii) LifePath Dynamic TDFs, 83 of 88 (94.3%) of the data points are within 4pp; (iii) T. Rowe TDFs, 93 of the 99 (93.9%) are within 2pp; (iv) Voya TDFs, 72 of the 88 (81.8%) are within 2pp; and (v) the Putnam TDFs, 64 of the 88 (72.7%) are within just 1pp.

- 15 -

3M TDFs and the comparators spread their equity across the same sectors in nearly identical proportions. The wider cells Defendants spotlight lie not there but in the finer U.S.-versus-international split, which the matched Sharpe ratios and standard deviations show does not change the risk profile. ¶¶173-77. Defendants do not dispute the sector parity; they pick out the handful of sub-categories with the widest gaps and treat those as if they defined the comparison.

For the risk metrics (the variable the Opinion singled out as missing), Defendants assert the same argument. MTD 14 ("Their risk metric argument also rests on averages across comparator families."). But this time Defendants declined to build a "disaggregated" exhibit. The reason why is clear. One-to-one comparisons of these metrics would have required Defendants to argue that differences of 0.00 to 0.05 defeat comparability—a ludicrous argument.[7] For example, the 3-year, 5-year, and 10-year standard-deviation "differential" ranges, as compared to each of the TDF Comparators, are as follows: (i) Putnam: 3-year: 0.07-1.1pp, 5-year: 0.47-1.63pp, and 10-year: 0.46-1.32pp;[8] (ii) Voya: 3-year: 0.22-0.85pp, 5-year: 0.11-0.57pp, and 10-year: 0.06-0.76pp;[9] (iii) BlackRock: 3-year: 0.81-1.15pp, 5-year: 0.16-0.74pp, and 10-year: 0.38-0.69pp;[10] (iv)

---

[7]   The disaggregated, one-to-one comparisons Defendants demand are already in the record. Nevertheless, the one-to-one disaggregation of this Sharpe-ratio and standard-deviation data is filed herewith. Decl. of Melinda A. Nicholson, Ex. A.

[8]   All 21 differentials are within 1.63pp, and 14/21 (66.7%) are within 1pp.

[9]   All 26 differentials are within 1pp, and 18/26 (69%) are within 0.5pp.

[10]   22/25 (88%) differentials are within 1pp, and 10/25 (40%) are within 0.5pp.

T.Rowe: 3-year: 0.02-2.94pp, 5-year: 0.13-1.56pp, and 10-year: 0.02-0.94pp;[11] and (v)

Fidelity: 3-year: 0.21-1.84pp, 5-year: 0.23-0.76pp, and 10-year: 0.21-0.93pp.[12]

Here, Defendants disaggregate only where disaggregation purportedly helps their

argument (even though it does not), essentially confirming the parity they refused to chart.

The same is true of style.  Appendix B plots the Morningstar equity style box and alleges

that "the centroid of every fund at every vintage falls at nearly the exact same spot within

the same box: Large Blend."  ¶165.  That sits on top of the quantified allocation, asset-

class, sector, and risk parity already pleaded, and it answers the Court's concern about a

category label standing "without more."  *Matousek* directs courts to the "totality of the

specific allegations."  51 F.4th at 281.  Defendants' reliance on isolated outlier metrics as

dispositive misapprehends that standard.

This District's judges have applied *Matousek* as a totality inquiry, sustaining

comparator-based prudence claims pleaded with far less specificity than the FAC.  *Payne*

held that courts "may look to [a comparator's] structure, objectives, strategy, and risk

---

[11]     24/26 (92.3%) differentials are within 1pp, and 13/26 (50%) are within 0.5pp.

[12]     23/26 (88.46%) of the standard-deviation differentials are within 1pp, and 12/26
(46%) are within 0.5pp; the 5- and 10-year Sharpe-ratio differentials run from 0.00 to a
few hundredths of a point (e.g., 10-year range for the 2030-2065 3M TDFs against Fidelity
is 0.00-0.01pp). *Id.* Defendants' contrary reliance on *Beldock v. Microsoft Corp.*, 2023
WL 3058016 (W.D. Wash. Apr. 24, 2023), is misplaced.  *Beldock* expressly declined to
decide whether the comparators were meaningful benchmarks, holding only that Sharpe-
ratio allegations offered "solely on alleged underperformance" did not state a claim. *Id.* at
*3 & n.7.  In short, the case had nothing to do with whether the Sharpe ratio or standard
deviation are indicators of comparability.  Here, the FAC pleads the Sharpe ratio and
standard deviation as comparability proofs of a shared risk profile, in addition to the
disclosure regime, the glide-path deviation, and IMCO's conflict. ¶¶89-179, 290-298.

profile," and that the requirement "is not intended to be such a barrier that plaintiffs cannot bring potentially meritorious ERISA claims." 2024 WL 4228613, at *6-7. *Dionicio* held the same, warning under *Matousek* that "plans need not be numerically identical" and cautioning against "a nearly insurmountable pleading hurdle." *Dionicio v. U.S. Bancorp*, 2024 WL 1216519, at *3 (D. Minn. Mar. 21, 2024). Against that standard, Defendants point to a wider cell in one asset class at one vintage, a glide-path label, or a fund wrapper, and ask the Court to treat each as a categorical disqualifier. Such arguments fail as a matter of law and fact.

Defendants' attack also misreads what the FAC must show. *Matousek* requires "a meaningful benchmark"—one, not five. 51 F.4th at 281. The FAC identifies five for each vintage, each pleaded with the composition, strategy, and risk parity shown above and each measured against the 3M TDFs individually. The comparators are offered as alternatives, and the requirement is satisfied if any one (or the LifePath Index) is meaningful. *Cf.* Rule 8(d)(2). To win dismissal, then, Defendants must show that not one of the five—nor the Index—qualifies as a matter of law. They never contend that any family is mismatched across the board. For each, they isolate the widest cell they can find—at a different vintage, on a different metric. That Defendants can find an outlying cell among hundreds of data points does not make a comparator improper; it shows the divergences are isolated, not systemic, against parity pleaded across nine vintages and every dimension. Nor does the result turn on which comparator the Court credits—the FAC pleads multiple comparators—matched to the 3M TDFs on every variable *Matousek* names—that underperformed them substantially and consistently across the vintages the named

- 18 -

Plaintiffs hold.  *Matousek*, 51 F.4th at 281.  At the 2050 vintage, for example, the 3M fund trailed all five cumulatively, by -14 to -49 points.  ¶231.  Defendants must defeat all five. They have not defeated any.

For example, Defendants concede Voya is "one of the closer families."  MTD 8. Indeed, at the vintages Plaintiffs hold (2030, 2040, 2045, 2050, 2055), Voya tracks the 3M TDFs on each measure the Opinion called decisive.  For example, the differentials between the 2030, 2040, 2045, 2050 and 2055 3M TDFs (the TDFs plaintiffs invested in) and the Voya TDFs are as follows:

| TDF | 3M vs Voya "Differentials" (2030, 2040, 2045, 2050, 2055) | | |
| --- | --- | --- | --- |
| | Equity-Allocation | U.S./Non-U.S./Fixed | Std-Dev. 5/10 |
| 2030 | -1.82 | -2.05/+0.23/-5.54 | -0.52/-0.51 |
| 2040 | -3.68 | -4.08/+0.39/-0.60 | -0.34/-0.35 |
| 2045 | -1.39 | -2.67/+1.28/-2.34 | -0.17/-0.23 |
| 2050 | +0.62 | -1.88/+2.51/-2.79 | +0.11/+0.06 |
| 2055 | +2.05 | -1.43/+3.48/-3.23 | +0.26/+0.15 |

That is exactly the "comparable asset allocations" and shared "risk ratio" the Opinion said "would go a long way toward showing that the comparator TDFs are meaningful benchmarks."  Op. 15-18.  And it requires no averaging.  Against that matched benchmark, the 3M TDFs underperformed on a cumulative, compounded basis at each vintage Plaintiffs hold: 2030 (**-9.77**), 2040 (**-18.97**), 2045 (**-20.24**), 2050 (**-14.38**), 2055 (**-13.29**).[13]  Because Voya's volatility is materially identical—the standard-deviation gap

---

[13]   The same is true of LifePath Dynamic—a fund from the line the 3M funds were "modeled after."  ¶48.  Its total-equity allocation matches the 3M funds almost exactly

never exceeds roughly half a point—the 3M funds' lower cumulative returns cannot be explained as the byproduct of a more conservative posture; a half-point volatility difference cannot account for a 9.77-to-20.24-point cumulative shortfall. ¶180.

In short, Plaintiffs have alleged meaningful comparators, and have certainly "alleged enough to demonstrate" they are "comparing apples to apples and not apples to oranges." *McGeathy v. Reinalt-Thomas Corp.*, 2026 WL 617343, at \*3 (D. Ariz. Mar. 5, 2026). Holding otherwise would require "a plaintiff alleging imprudence to not just compare apples to apples but only Gala apples to Gala apples and Fuji apples to Fuji apples." *Id.*

## C. Defendants' Remaining Benchmark Attacks Provide No Basis for Dismissal

Defendants' remaining attacks on the benchmark showing all fail. Their own self-graded "Blended Benchmark" is no answer; their authorities are inapposite; and their comparability criticisms reduce to factual disputes that the Motion cannot resolve.

### 1. Defendants' Custom "Blended Benchmark" Is Not a Meaningful Comparison

Defendants' resistance to the FAC's comparators (MTD 4-14) is difficult to reconcile with the benchmark they themselves selected (a benchmark Defendants do not even bother to defend in the MTD). The 3M funds are measured, on their own Fact Sheets, against a proprietary "Blended Benchmark" that grades the funds against their own

---

(94.37% versus 94.32% at the 2050 vintage), and the 3M funds underperformed it by -12.74 to -19.57 points at the 2040 through 2055 vintages. ¶¶144, 231.

strategy, is self-administered, and is undisclosed in composition—3M "does not disclose…how the mix of indices used is actually weighted," even though it "discloses precisely the blend" for another option it offers.  ¶¶130-132.  3M chose not to disclose the weighting, and the result is what a self-built, self-graded benchmark predicts: every vintage "purportedly matched or outperformed these custom 'benchmarks' by 0.1-0.4%."  ¶131. If accepted, Defendants' position hands every fiduciary a roadmap to immunity: (i) place plan assets in a proprietary series; (ii) designate as its sole benchmark a custom blend the fiduciary weighs and never discloses; and (iii) declare the series to have "matched" (or beat) it.  On that logic no proprietary series could ever be imprudent, whatever its performance against the real funds available to the plan.  A benchmark a fiduciary builds, grades itself against, and refuses to disclose is no "sound basis for comparison" at all. *Davis*, 960 F.3d at 484.

The Department of Labor's guidance says the same.  It steers fiduciaries to "broad-based," independent benchmarks "not subject to manipulation," not affiliate-administered ones.  ¶133.  The 3M "Blended Benchmark" is the opposite.  This Court anticipated the point at the first hearing: "my goal is to get every decision out in six months, but all my colleagues are getting it out in 90 days. I meet my own goal, but my colleagues are doing things faster.…Why is that wrong?" (Hr. Tr. 10).  The same is true here.  A fund that clears a benchmark it built for itself has shown only that it met its own goal. The comparator families show what peers achieved.

### 2. Defendants' Authorities Do Not Support Dismissal

*Matousek* is the controlling standard, but it affirmed a dismissal on a barren record. There, plaintiffs pleaded "so little information" that "the composition of the peer groups remain[ed] a mystery." *Matousek*, 51 F.4th at 281. Defendants' remaining authorities were rejected in similar situations (where pleadings lacked the detail and compositions the FAC provides). *See* Arg.I.B-E. The FAC has none of these problems. It answers each question with named families and vintage-by-vintage figures, and it provides far more than *Matousek* required. ¶¶134-182, App. A-B.

### 3. The "To Versus Through" Glide-Path Objection Fails Because the Dual-Comparator Design Removes Glide-Path Philosophy as a Variable

Whether two target-date funds are proper comparators is a fact-bound question of degree. At the pleading stage, the FAC's allegations control. Defendants ask the opposite (MTD 5-6)—to resolve, on materials outside the pleading and against Plaintiffs, a contested dispute about which glide-path philosophy the 3M TDFs follow. The "necessarily embraced" exception is narrow. It is "reserved for documents 'whose contents are alleged in the complaint,'" not materials a party consulted or now offers to contradict the pleading. *Vogt v. Crow Wing County*, 2021 WL 6275271, at *3 (D. Minn. Nov. 1, 2021).

Defendants' glide path objections fail regardless, because the dual-comparator design was built to remove glide-path philosophy as a variable. Three comparators are matched to the 3M TDFs' stated "target" path (LifePath Dynamic, Putnam, and Voya), and two to their actual behavior (T. Rowe and Fidelity). And the FAC pleads the 3M TDFs

- 22 -

"underperformed regardless of which glide path model is used." ¶¶137-140. Defendants never engage the three stated-path comparators at all, treating the set as if it held only the two "through" families. And *Abel* (MTD 6) does not warrant a different conclusion; it dismissed a comparator set justified by market share alone, where the plaintiff conceded "significant differences" and pleaded no compositional or risk parity. 2024 WL 307489, at *4-6 (W.D. Wis. Jan. 26, 2024). *Abel* did not make a glide-path label a categorical bar; it held only that unexplained, market-share-only comparator allegations failed. The FAC provides the compositional data and risk parity *Abel*'s plaintiffs lacked.

Worse still, Defendants' attack on the two halves of the dual set is self-contradictory. To discredit the stated-glide-path comparators, Defendants insist the 3M funds' allocations diverge from Putnam, LifePath Dynamic, and Voya. MTD 7-8. But those families were chosen to match the 3M TDFs' stated "to-retirement" path. So a divergence concedes the 3M funds do not hold to that path, and that they behave like the "through" comparators. To discredit the actual-path comparators, Defendants insist the 3M TDFs are "to" funds for which T. Rowe and Fidelity are the wrong shape. MTD 6. That concedes the stated-path families are the right shape. Each attack ratifies the comparators the other discards. That is why the dual design holds: whichever characterization Defendants adopt, a matched comparator remains, and the 3M funds underperformed it. ¶140.

The contradiction cuts deeper than comparability. Defendants focus heavily on the allocation gap between the 3M TDFs and the stated-glide-path Putnam comparator (MTD 7-8). But that gap is not evidence Putnam is a poor comparator; it is evidence that the 3M

funds drifted from their stated "to-retirement" allocation that 3M told participants they would follow.  A gap between a fund and the benchmark built to match its stated strategy measures the fund's departure from that strategy, not the benchmark's unsuitability—so the wider the gap Defendants identify, the stronger the §1104(a)(1)(D) plan-document claim becomes (Arg.I.F).  ¶¶112-139.[14]

Defendants' attack on the reconstructed "actual" glide path mistakes the FAC's method for a flaw, and quibbles with figures the FAC drew from Defendants' own disclosures.   Defendants  brand  the  analysis  a  "gerrymander[]"  of  "averages, reconstructions, and aggregated charts" (MTD 1) but never engage why any reconstruction was necessary.  The answer is their own doing—the reconstruction is the product of Defendants' own deficient reporting, assembled from their own figures, evidence itself of the imprudent process.  ¶¶183-187.  Defendants never disclosed a coherent "actual" glide path.  The participants have only the Fact Sheets, which report 0.00% domestic equity, identical holding counts, and blank or mismatched benchmark fields.  Arg.I.D-E.  Using "the data Defendants themselves disclosed," the reconstructed path shows deviations from

---

[14]     Defendants' primary criticism of Putnam relies on a type of document the Court has already said it will not consider.  The FAC names the Putnam XA CIT class (¶¶137, 141)— MTD Exhibit 5 is the prospectus for the Putnam *mutual fund*, which does not contain that class, as Defendants concede.  MTD 9 n.4.  The Court disregarded several exhibits due to the same mismatch the first time, declining to consider "the prospectuses that 3M included with its motion [that] do not match the funds described in the Complaint."  Op. 10.  It should do the same here.

the stated "target" glide path of up to +11.61 points in U.S. stocks and -10.98 in bonds. ¶¶112-139.[15]

### 4. The 3M TDFs Are Actively Managed, and Are Not "Index Funds"

Defendants' active-versus-passive objection (MTD 9-10) fails for the same reason. The FAC alleges "all TDFs are actively managed," because their managers "make active decisions when designing a TDF's asset allocation over time" (¶47), an allegation that must be credited and that the first order did not disturb. Whether the 3M funds are "predominantly passive" (MTD 9) is a merits question, not an adjudicated fact. Defendants argue that the 3M TDFs are "passively managed" because the "BlackRock LifePath **Index** Funds are passively managed." MTD 9 (citing *Luckett v. Wintrust Corp.*, 2023 WL 4549620 (N.D. Ill. July 14, 2023)).[16] An index fund being considered a passively managed fund is uncontroversial—indeed, this principle is explicitly explained in the FAC. ¶46. But the 3M TDFs are not "index funds"; indeed, none of the TDF Comparators are. ¶¶137-142. As explicitly alleged in the FAC, "[t]he 3M TDF Series are actively managed." ¶53.[17]

---

[15] How Plaintiffs assembled single-date data onto one timeline is argument for summary judgment, not a pleading defect resolvable now. ¶¶139-140.

[16] Defendants' reliance on *Luckett* is misplaced. There, the plaintiff "concede[d] the differences Defendants point out regarding actively- versus passively-managed funds and 'to retirement' versus 'through retirement' funds," and the court dismissed on that concession. *Id.* at *4 & n.3. Here, Plaintiffs concede nothing. The FAC pleads the vintage-by-vintage compositional and risk parity the *Luckett* plaintiff lacked, against both the stated and actual glide paths. ¶¶144-179. Moreover, *Luckett* dismissed without prejudice in an "evolving and nuanced area of law" (*id.* at *5)—it did not hold that a difference in management style forecloses comparison as a matter of law.

[17] It is for this reason that Defendants' reliance on *Davis* for the proposition that "active and passive funds 'have different aims, different risks, and different potential

Defendants cite *Phillips v. Cobham Advanced Elec. Sols., Inc.*, 2025 WL 2689268 (N.D. Cal. Sept. 19, 2025), for the proposition that what makes a TDF active is not its managers' allocation decisions but "whether they use index building blocks or actively managed underlying funds." MTD 10. But *Phillips* never discussed building blocks, or anything about a TDF's underlying investments. *Id.* *Phillips* rejected the comparators because the complaint's own data "show[ed] meaningful differences in investment strategies" (the challenged funds held "about 67%" equities against the comparators' "80% and 94%"—i.e., the difference in equity allocations ranged from *13% on the low end* to 24% on the high end). *Id.* at *6-7. Here, the differences are not so stark. For example, the difference in equity allocation as compared to the average allocations of the Comparator TDFs across all vintages ranges from just 0.47% to 4.18%. ¶144.[18] *Phillips* holds that category labels do not suffice; it does not hold that a quantitatively matched comparator set is inadequate. *Id.* Rather, its method was to "assess the similarities and differences

---

rewards," is misleading. MTD 10 (quoting *Davis*, 960 F.3d at 485). In *Davis*, the Eighth Circuit was discussing investing in "an <u>index fund</u> rather than an actively managed fund." *Id.* Plaintiffs are not attempting to compare a passive <u>index</u> fund to an actively managed fund.

[18] The one-to-one disaggregation does nothing to undercut these similarities. For example, as compared to the Voya TDFs, the total-equity-allocation differentials range across all vintages from just 0.78-3.68%. Of the 44 data points comparing total equity allocation between the 3M TDFs and the respective Comparator vintages, 37 are within 10% and 27 within 5%. The largest differentials are against Putnam, but even there 6 of 8 are below 13%. And those stark Putnam differences are a byproduct of Defendants' failure to follow their stated target glide path, not a defect in the comparator—indeed, the Putnam TDFs' actual allocations track the 3M TDFs' stated "target" path more closely than the 3M TDFs do. ¶¶100-101, 144.

- 26 -

between [the] comparators and the [challenged] funds." *Id.* at *4. The FAC provides what the *Phillips* plaintiffs did not—the single-digit equity parity, uniform Large Blend style, matched sectors and risk ratios, and dual design set out above. ¶¶136-182.

### 5. Defendants' CIT-Versus-Mutual-Fund Argument Is Once Again a Distraction

Defendants reassert that the 3M TDFs and the comparators come in different legal wrappers (CIT-versus-mutual-fund). This should be rejected because the FAC alleged that comparability turns on what the funds hold, not the form in which they are held: the "legal wrapper…does not determine the fund's investment strategy, asset allocation, sector exposure, or risk-return profile." ¶139 n.20. Credited as true, that defeats any inference that a CIT and a mutual fund holding materially similar portfolios are non-comparable. Defendants' cases (MTD 11) do not hold otherwise. The overwhelming majority, if not all, of the cases where courts have found that CITs and mutual funds were not meaningful benchmarks involved allegations relating to excessive fees, expense ratios, and/or whether fiduciaries breached their duties by failing to investigate moving from a mutual fund to a CIT version of an investment (because CITs generally have lower fees).[19] None of these issues exist here. Further, *Fritton v. Taylor Corp.* held only that a plaintiff cannot allege a trust is "identical" to a mutual fund "without alleging additional material" showing "the legal distinctions make no difference," and dismissed because plaintiffs pleaded nothing

---

[19] Defendants again cite such inapposite cases. *See, e.g.*, *Riley v. Olin Corp.*, 2023 WL 371872, at *6 (E.D. Mo. Jan. 24, 2023) (plaintiffs alleged breaches as the plan "qualified for the collective trust versions of these funds").

beyond a bare label. 2023 WL 5348834, at *6 (D. Minn. Aug. 21, 2023). The FAC pleads the "additional material" those complaints lacked. ¶¶144-179.

### D. The FAC Pleads a Flawed Process and Sustained, Substantial Underperformance

Defendants treat the FAC's expanded performance allegations as arithmetic that, however sliced, fails to state a claim. MTD 18. That misapprehends what prudence asks at the pleading stage, where the duty is measured by process, not results. *Davis*, 960 F.3d at 482. The FAC's decade-plus of matched-comparator underperformance and the deficient disclosure regime are the circumstances from which a flawed process is inferred—an inference Defendants do not engage.

### 1. Prudence Is Pleaded Circumstantially; From Process, Not Results

The Eighth Circuit has twice held that an ERISA plaintiff states a prudence claim without any window into the fiduciary's deliberations. *Braden* held it "sufficient for a plaintiff to plead facts indirectly showing unlawful behavior," from which a court may "infer…that the process was flawed"—there, from options "selected…despite the ready availability of better options" and retained though "most of them underperformed the market indices they were designed to track." 588 F.3d at 595-96. *Davis* confirmed that a complaint "only needed to give the district court enough 'to infer from what is alleged that the process was flawed,'" not "directly address[] the [actual] process by which the [p]lan was managed." 960 F.3d at 482-83.

The FAC does not rest on a bare assertion that returns were too low; it identifies the analysis the fiduciaries failed to perform—a prudent fiduciary would have run "a simple

analysis" comparing each vintage to its peers and "could not have reasonably concluded that retention…was appropriate." ¶¶192, 221-223. The inference rests on more than the gap: the magnitude and persistence of the underperformance, the noted deficient disclosure regime, and the structural conflict created by IMCO's dual role. Defendants retained their sole, proprietary, captive series—the only target-date option since 2006—"for at least twelve years" despite that record. ¶¶40, 282. The absence of a deliberation transcript is not a defect but the ordinary condition of ERISA litigation, *Braden*, 588 F.3d at 598, and the duty is continuing: "[i]f the fiduciaries fail to remove an imprudent investment…within a reasonable time, they breach their duty." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176-77 (2022).

2. The Deficient Disclosures Corroborate the Flawed Process and Foreclose Defendants' Data-Precision Attacks

The same disclosure failures that breach the duty independently (Arg.I.E) also corroborate the flawed process. The 3M Fact Sheets—the Plans' only evaluative disclosures for their sole target-date option—are systematically unreliable. For example, the Fact Sheets contain: (i) asset-allocation donuts reporting 0.00% U.S. Equity for six disclosed vintages; (ii) funds spanning twenty-five years reporting *identical* holding counts (4,955 equity, 996 bond, and 305 other); (iii) the top holdings flipping from more than 16,600 positions on earlier sheets to a portfolio "dominated by Japanese equities and Japanese Government Bonds"; (iv) risk benchmarks showing a single "Mod 2050" index applied to four vintages; (v) no risk data whatsoever for three vintages; and (vi) risk

benchmarks switching between September 2024 and December 2025 without explanation. ¶¶70-120.

A prudent fiduciary would "implement quality controls" verifying correct benchmarks, allocations, holdings, and cross-period consistency. Instead, Defendants "failed each of these basic verification steps…across multiple TDF vintages and multiple reporting periods," which "rais[es] a plausible inference that evaluation and monitoring are not being conducted appropriately." ¶¶83, 97-98. That inference is sharpened by IMCO's dual role: as co-Investment Manager of the very funds the Fact Sheets describe, Defendants had "a corresponding incentive to limit the depth and quality of participant disclosures." ¶59; *see Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1077 (N.D. Cal. 2017) (dismissal denied where additional indicia of imprudence included alleged conflicts that may have affected the fiduciaries' selection and retention decisions). A monitoring process that distributes facially impossible data is the circumstantial evidence of imprudence *Braden* permits. 588 F.3d at 595-96.

Those same failures defeat Defendants' attack on the precision of the comparison. A fiduciary that produces the Plans' only evaluative disclosures inaccurately and incompletely cannot defeat a prudence claim by complaining the resulting comparison is imprecise. The FAC pleads the point directly: any "data gap is not of Plaintiffs' making" but "a direct consequence of Defendants' failure to maintain accurate participant disclosures," and "Defendants cannot be permitted to benefit from this failure by arguing that Plaintiffs' comparisons are imprecise or outdated." ¶¶183-187. The Court should evaluate the comparisons on the data Defendants disclosed and "draw appropriate

- 30 -

inferences from the fiduciary's decision to withhold or corrupt the rest." ¶¶186-187 ("ERISA's duty of prudence does not reward opacity; it demands accountability" and "[w]here a fiduciary's own failures have made any cleaner comparability unattainable, the Court should evaluate the comparisons that are possible using the data the fiduciary chose to disclose").

### 3. The Underperformance Is Substantial and Sustained Under the Standard This Court Already Applied

The Opinion found that ten years of trailing underperformance from -9.98 to -12.98 points "bear the hallmark of a successful underperformance claim: non-trivial, cumulative loss over a long timeframe," and that "occasional overperformance does not undermine the plausibility of Plaintiffs' claim." Op. 19-20. It also credited *Snyder*'s refusal to dismiss where "cumulative compound performance ranged from -6.62% to -19.68% less than the…comparators." *Id.* (quoting *Snyder v. UnitedHealth Grp., Inc.*, 2021 WL 5745852, at *3 (D. Minn. Dec. 2, 2021)). The FAC meets and exceeds that threshold. On a cumulative-compound basis against the comparator average, the 3M vintages trail by **-13.16** (2025), **-15.75** (2030), **-21.71** (2035), **-29.07** (2040), **-30.69** (2045), **-27.75** (2050), **-28.35** (2055), and **-8.0** (2060) percentage points—each within or beyond the -6.62% to -19.68% range. ¶¶199-262; Tables 1.b-9.b. The shortfall is sustained: the 3M TDFs underperformed on a trailing-three-year basis "for up to ten consecutive years (2016-2025)," trailing-five-year for "up to eight" (2018-2025), and trailing-ten-year for "up to three" (2023-2025). ¶11. That is the "consistent, ten-year underperformance" that is "substantial" and thus sufficient.

That the underperformance compounds is the substance of the claim, not an artifact of presentation. A claim for imprudent *retention* measures the loss a fiduciary inflicts by holding a lagging fund across the period it should have acted, and that loss is cumulative—which is why the Court credited "cumulative loss over a long timeframe" (Op. 19) and gauged sufficiency by *Snyder*'s cumulative-compound range. The dollar consequence is concrete: $218 million invested in the 2040 vintage, compounding at the 3M rate rather than the comparator average, has cost participants roughly $63.7 million (¶220); aggregated across the series, participants who had held the comparators "would have made, on average, approximately $352 million more"; and the Plan-wide recoverable loss is "over one hundred million dollars." ¶¶262, 297.[20] Defendants recast the decade-plus as a string of "modest" annual gaps "measured in low single digits" (MTD 20), but a fiduciary who retains an underperforming fund year after year is not absolved because each year's deficit, viewed alone, looks small. The loss is the sum of those years, compounded—the measure the Court has adopted.[21]

Defendants' authorities address a smaller, single-period gap. *Enstrom* dismissed underperformance "within one-to-two percentage points" where the funds "kept pace with, and occasionally outperformed" the benchmark, holding only that such magnitude

---

[20] While cumulative losses exceed $350 million, because of the 6-year statute of limitations for these claims, the Class could hope to recover only a third of that amount.

[21] Nor can Defendants recast the shortfall as the price of a more conservative posture: the 3M TDFs carried materially the same risk (Arg.I.B) yet still underperformed, so the inference is mismanagement, not prudent de-risking. ¶¶173-180.

"without more" cannot support a claim. *Enstrom v. SAS Inst.*, 2025 WL 685219, at *5 (E.D.N.C. Mar. 3, 2025); MTD 19. The FAC supplies both the magnitude *Enstrom* lacked and the "more" those plaintiffs never pleaded—vintage-by-vintage parity on allocation, sector, style, and risk. ¶¶144-180, App. A-B. And *Cho*'s "up to 3.71 percent" figure (MTD 19) was a single outlier "with the next highest being 1.08%" over a "fairly short" window, but *Cho* confirmed that "consistent, ten-year underperformance" that is "substantial" does support a claim. *Cho v. Prudential Ins. Co. of Am.*, 2021 WL 4438186, at *9 (D.N.J. Sept. 27, 2021). Neither holds the decade-plus, double-digit shortfall the FAC pleads insufficient.

4.    Defendants' Exhibit 12 Confirms the Claim It Was Built to Defeat

Read on its own terms, Exhibit 12 corroborates the FAC's allegations. The "3M vs. Fidelity" tab shows the 3M TDFs underperformed Fidelity at every vintage and trailing period, with ten-year gaps reaching -14.55 (2040), -12.14 (2035), and -11.73 (2045) points—within and beyond the -9.98 to -12.98 band the Court credited. Op. 19. The "mixed" label (MTD 20) survives only by spotlighting a few favorable early-vintage cells while passing over the uniformly adverse Fidelity column. Again, the totality controls.

The exhibit distorts in a second way: for each vintage it reports a single reading as of the most recent (2025) endpoint. But prudence is measured by the information available at each annual review, not whichever endpoint proves most favorable in hindsight. ¶11. The 3M series' strong late-2025 results (after this lawsuit was filed) suppress the recent readings, while at the earlier endpoints the FAC pleads, the same vintages show materially larger trailing gaps. *Id.* The Court's own authority forecloses the move:

- 33 -

"[o]utperformance…in one year alone does not preclude" a cumulative-underperformance theory.  *Snyder*, 2021 WL 5745852, at *3.

The FAC does not claim uniform underperformance for the LifePath Index and need not: the near-dated vintages outperformed the LifePath Index over their shorter windows, a result the FAC surfaces rather than hides (¶255, Table 10.a), and the newest vintages show smaller gaps because their records are shorter.  The claim is sharpest where the underperformance is most sustained—the accumulation-phase vintages.   The theory requires a flawed process inferred from the whole, and a decade-plus of consistent, double-digit lagging against funds matched on allocation, sector, style, and risk—in addition to a deficient disclosure regime—provides it.

**E.      The Deficient Disclosure Regime Is an Independent Breach of Prudence**

Defendants recast the FAC's catalogue of Fact Sheet defects as a parade of "vendor anomalies," isolated Morningstar slips with no tie to any fiduciary act.  MTD 15-17.  The characterization is mistaken. The disclosure regime is the fiduciaries' own, and the FAC pleads its deficiencies as an independent breach of the duty of prudence (¶283)—a breach that, like the process inference it corroborates (Arg.I.D.2), does not depend on any participant's reliance.

  1. <u>The Disclosure Regime Is Defendants' Own, and Maintaining It Deficiently Is Itself a Breach</u>

Because the 3M TDFs are CITs, there is no prospectus or annual report; the Fact Sheets are "the primary source of information," and they are "woefully deficient."  ¶56. The only disclosures the fiduciaries made about their sole target-date option are

systematically unreliable—reporting impossible allocations, identical holding counts across vintages, and broken benchmark fields, as Arg.I.D.2 details. ¶¶72-93. Disclosures reporting that a domestic-tilted retirement series holds zero U.S. equity and is full of Japanese government bonds are not the product of a functioning quality-control process. Maintaining a disclosure regime this unreliable is itself a breach of the duty of prudence. ¶283. The deficiency is the fiduciaries' own, and a fiduciary who distributes facially impossible data without catching errors visible on the page (¶¶97-98; Arg.I.D.2) has not prudently discharged that duty.

Defendants' lead authority, *Christensen v. Qwest Pension Plan*, 462 F.3d 913 (8th Cir. 2006) (MTD 16), is the opposite case. Decided at summary judgment, it held that a single, data-entry slip by a ministerial vendor alleged to have resulted in "three or four benefit estimates per month" being "incorrect by 10% or more" did not breach the duty of care (i.e., plaintiffs alleged between 36-48 errors delivered a year)—particularly considering the system, which was "used more than 115,000 [times] a year" was "substantially accurate." *Id.* at 916-18. Moreover, all disclosures explicitly said the "estimates are not binding." *Id.* Here, the *only disclosures* provided to all 58k+ participants have numerous disclosure deficiencies. As such, in contrast to *Qwest*, where approximately 0.0417% (48/115,000) had issues, here, every Fact Sheet contains facially impossible data; those issues are impossible for anyone other than Defendants to cure, and there is no disclaimer saying the funds' allocations and performance disclosures might have mistakes and should not be relied on. ¶¶72-98.

This is also the "rubber-stamping" the MTD says the FAC does not allege.  MTD 15 (quoting *Barrett v. O'Reilly Auto., Inc.*, 112 F.4th 1135 (8th Cir. 2024)).  A fiduciary that commissions the funds' sole participant disclosures, receives outputs impossible on their face, and "fail[s] each of [the] basic verification steps" has rubber-stamped deficient disclosures and not prudently discharged its duty.  ¶¶56-98.  A fiduciary who distributes facially erroneous outputs without catching errors visible on the page has "rubber-stamped" that work—a direct process failure that does not turn on inferring imprudence from performance.  *Id.*; *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

Defendants' remaining authority fares no better.  *Wright v. Medtronic, Inc.* held only that ERISA does not compel disclosure of nonpublic corporate information about employer-stock value, while preserving the duty to disclose "plan- and benefit-specific information…of interest to plan participants."  2011 WL 31501, at *7 (D. Minn. Jan. 5, 2011).  The premise of the MTD's footnote 7—that no *specific* disclosure requirement is implicated—is mistaken: ERISA's participant-disclosure regulation requires that fund information be "complete and accurate," requiring comparison against "an appropriate broad-based securities market index," and forbidding information that is "inaccurate or misleading." 29 C.F.R. §2550.404a-5(b)(1), (d)(1)(iv), (d)(2)(ii).  And that the Fact Sheets bear Morningstar's name does not absolve Defendants.  Conveying plan information to participants is itself plan administration, "essentially the same kind of plan-related activity" as other fiduciary functions, *Varity Corp. v. Howe*, 516 U.S. 489, 503 (1996), and the fiduciaries chose to make the funds' sole disclosures through the Fact Sheets and chose not to verify them.

- 36 -

2.  Reliance Is Not an Element of a §404 Prudence Theory

Defendants' argument that the FAC "does not tie the fact sheet allegations to any alleged loss" (MTD 18) is also wrong—the deficient disclosure regime is evidence of Defendants' imprudent procedures and monitoring, and the alleged loss is in excess of $100 million.  ¶¶58-109, 183-86.  Similarly, Defendants' citation to *Anderson v. Intel Corp. Investment Policy Committee*, 579 F. Supp. 3d 1133 (N.D. Cal. 2022), *aff'd*, 137 F.4th 1015 (9th Cir. 2025), *cert. granted*, No. 25-498, for the proposition that disclosure allegations fail absent pleaded reliance (MTD 16-18) misreads the court's holding.  There, the court dismissed the disclosure counts on Article III Standing ground (a failure to allege "injury in fact"), and the prudence claim was dismissed for lack of the comparator detail the FAC pleads (e.g., "investment strategies" and "glide paths").  *Id.* at 1150-62; ¶¶144-179.  There is no such failure to allege injury here—indeed, Defendants do not seek dismissal of the prudence disclosure theory claim on Article III grounds.  MTD 16-18.

F.  **The Glide-Path Deviation States a Claim for Breach of the Duty to Follow Plan Documents Under §1104(a)(1)(D)**

The glide-path deviation does three kinds of work, and the Court need accept only one.  It explains why the actual-path comparators fit (Arg.I.C.3); it is circumstantial evidence of the flawed process Count I alleges (Arg.I.D); and, independently, it states a claim under §1104(a)(1)(D).

1.  The Plan Documents Committed the Fiduciaries to a Fixed Glide Path, and the Funds Deviated from It Without Disclosure

ERISA requires a fiduciary to discharge its duties "in accordance with the documents and instruments governing the plan," 29 U.S.C. §1104(a)(1)(D), and the FAC

alleges the governing documents "set forth a specific Target Asset Allocation for each TDF vintage at each stage." ¶119.  The stated target is a fixed "to-retirement" schedule, pleaded with a vintage-and-interval table and no disclosed deviation range, and the governing document carries the commitment past the target-date: the fund "will have reached its highest allocation to income-oriented investments and will be merged into the 3M LifePath Retirement Portfolio," whose asset-class mix "is intended to remain *nearly constant* over time." ¶¶100-111.

Reconstructed from the funds' own Fact Sheet allocations, the actual path departed from that target by wide margins—U.S. stocks as much as +11.61 points above target near retirement, bonds as much as 10.98 points below.  ¶112.  The portfolio the Plan promised would "remain nearly constant" did no such thing: bonds moved from 50.34% to 57.34% and "Other" collapsed from 6.46% to 0.23% within fifteen months, a seven-point swing the FAC alleges "is not consistent with" the represented near-constancy.  ¶117.  And the departures were hidden—"neither the 3M TDF Fact Sheets nor any other Plan documents disclosed these deviations to participants."  ¶120.  An undisclosed, systematic departure from a represented allocation schedule is the conduct §1104(a)(1)(D) forbids.

### 2.    Defendants' Own Exhibit Forecloses the "No Mandate" Reading, and No Prior Position Estops the Claim

Defendants argue there was no fixed commitment, pointing to language in their July 2021 Investment Fund Summary describing the glide path as a "general description" that managers "gradually adjust" and that "may be subject to change."  MTD 16, Ex. 11.  But the same summary, on the same pages, is the source of the near-constancy representation.

¶117.  A document considered on a motion to dismiss is considered in full; Defendants cannot quote the permissive clauses of Exhibit 11 while suppressing the constraining one. A fiduciary that told participants a portfolio was "intended to remain nearly constant over time" may not now disclaim a seven-point swing in the dominant asset class by pointing to "gradually adjust" language in the very summary that promised constancy.

Defendants also argue the deviation theory contradicts Plaintiffs' earlier positions— the original complaint's acknowledgment that a glide path "is not static" and the first opposition's argument that target allocations are "just that, targets."  MTD 15-16.  There is nothing contradictory or inconsistent.  The first opposition argued that the original comparators' allocations were targets as they expressly allowed for "10% plus or minus deviation." ECF 35 at 36.  Here, Defendants disclose no such allowance.  Rather, as alleged no permissible deviation range is disclosed for any vintages.  ¶¶100-103.

### 3. The Deviation Claim Is an Independent Ground for the Imprudence Claim

Defendants argue the deviation theory "does not cure the benchmark defect" (MTD 14), but, in addition to supporting the use of the dual-comparator methodology, it constitutes an independent breach of the duty to follow plan documents under §1104(a)(1)(D) (¶119), and the kind of "significant allegation[] of wrongdoing" that, under the authority Defendants invoke, carries a prudence claim past a benchmark objection.  For example, in *Doll v. Evergy, Inc.*, the court held that "significant allegations of wrongdoing eliminate the need to infer a fiduciary breach through use of meaningful benchmarks," and denied dismissal of a target-date-fund prudence claim built on monitoring and plan-

document failures. 2025 WL 4042583, at *3 (W.D. Mo. Sept. 10, 2025). *Fritton* confirms the point, defining that formulation, quoting *Tussey*, as self-dealing—"allegations that ABB used revenue sharing to benefit ABB and Fidelity at the Plan's expense"—the very category Count II pleads against IMCO. *Fritton v. Taylor Corp.*, 2022 WL 17584416, at *5 & n.4 (D. Minn. Dec. 12, 2022). Under these standards, the failures alleged and identified in the FAC are precisely the "significant wrongdoing" sufficient to state an independent deviation claim.

## II.      The FAC States a Prohibited-Transaction and Self-Dealing Claim

Count II is new to the FAC, and the standard that governs it has been settled by the Supreme Court. *Cunningham*, 604 U.S. 693, resolved a circuit split on this question, holding that "[t]o state a claim under §1106(a)(1)(C), a plaintiff need only plausibly allege the elements contained in that provision itself, without addressing potential §1108 exemptions." *Id.* at 693. Defendants' MTD gets that burden backwards—it faults the FAC for not quantifying the affiliate's compensation (MTD 22) and offers a plan provision as an innocent explanation for the transfers, treating both as defects Plaintiffs were obliged to negate. Neither is Plaintiffs' burden at the pleading stage.

### A.      IMCO Is a Party-in-Interest, and Its Retention Caused Transfers of Plan Assets Within §406(a)(1)(D)

The elements of a §406(a)(1)(D) claim are straightforward: "(1) the fiduciary causes (2) a listed transaction to occur (3) between the plan and a party in interest." *Randall v. GreatBanc Trust Co.*, 2024 WL 713997, at *6 (D. Minn. Feb. 21, 2024). The FAC pleads all three. The fiduciary element is uncontested: the Investment Committee and delegating

- 40 -

fiduciaries caused the retention of, and payments to, IMCO.  ¶¶291-294.  IMCO is a party-in-interest (a wholly-owned 3M subsidiary that served as Investment Manager of each TDF vintage and the underlying Bond Fund) because ERISA defines the term to reach a plan's service providers.  29 U.S.C. §1002(14); ¶¶25-26, 293-294.  The Bond Fund's asset-based fee is paid out of Plan assets, and IMCO—as that fund's manager—is compensated from it.  Plan assets thus flowed to IMCO: a §406(a)(1)(D) transfer regardless of its precise, presently-undiscoverable amount.  ¶¶293-296.  That is the use of Plan assets for the benefit of an insider service provider §406(a)(1)(D) enumerates.

Defendants brand the allegation that IMCO drew compensation from the Bond Fund "speculation" (MTD 22), but their own exhibit confirms it: the Investment Fund Summary they filed as Exhibit 11 states that the Plans' "Intermediate-Term Bond Fund [is] managed by [IMCO], a subsidiary of 3M Company."  MTD Ex. 11, at 8.  What remains unknown—IMCO's precise share of that fee—is the internal allocation between a parent and its affiliate, which the FAC candidly states is "presently unknown" (¶26) and which no participant could obtain before discovery.  *Braden*, 588 F.3d at 598 ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.").

*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996), on which Defendants rely (MTD 21), similarly confirms the point.  What it placed outside §406(a) was "the payment of benefits pursuant to an amended plan," not a transfer to an insider; the transactions the provision reaches are "commercial bargains…struck with plan insiders, presumably not at

- 41 -

arm's length." *Id.* at 893, 895. The furnishing of investment-management services by a wholly-owned affiliate, compensated from Plan assets, is that kind of bargain.

> **B.** **The Arrangement Is Self-Dealing Under §406(b)(1), and the §1108 Defense Cannot Be Resolved on the Pleadings**

The same facts state a self-dealing claim under §406(b)(1). A fiduciary that retains a wholly-owned affiliate from whose continued engagement it profits, and that profits from the affiliate's asset-based fee on a fund the proprietary series holds, deals with Plan assets in its own interest. ¶¶25, 296. A court in this District sustained a materially similar theory in *Becker*, rejecting the two pleading-stage attacks Defendants make here. 2021 WL 1909632. There, the court held "Becker need not plead subjective intent." *Id.* at *5.

Defendants' contrary authorities are inapposite. They cite *Collins* and *Peeler* for the rule that a §1106(b)(1) claim needs factual content "distinguishing ordinary compensation from prohibited self-dealing" (MTD 23), but both dismissed generic revenue-sharing-and-kickback theories that "provided no factual basis to distinguish between ordinary compensation for services…and illicit kickbacks." *Collins v. Ne. Grocery, Inc.*, 2025 WL 2383710, at *5 (2d Cir. Aug. 18, 2025); *accord Peeler v. Bayada Home Health Care, Inc.*, 2026 WL 208630, at *14 (W.D.N.C. Jan. 27, 2026). The FAC pleads no generic kickback but a structural conflict. That is, Defendants retained a wholly-owned 3M subsidiary as the Plans' investment manager and profited from its continued engagement and asset-based fee, occupying both sides of the transaction. ¶¶25, 59, 296. That affiliate-self-dealing structure is the factual content *Collins* and *Peeler* found missing.

Defendants' argument that the Plan's §4.5 reimbursement clause furnishes an innocent explanation (MTD 24) similarly fails. First, the clause does not reach the challenged transaction: §4.5 authorizes reimbursing 3M for administrative expenses but it says nothing about the separate asset-based fee that flowed to IMCO from the Bond Fund. ¶26. Second, Defendants' reliance on *McDonough v. Anoka County*, 799 F.3d 931 (8th Cir. 2015) to argue the §4.5 reimbursement is an "obvious alternative explanation" that defeats Count II (MTD 24) is misplaced. *McDonough* is a Driver's Privacy Protection Act case (completely dissimilar to the instant action). *Id.* Nevertheless, there is nothing "obvious" about the alleged prohibited transactions being mere "reimbursements." There is no proof that any outflows from the Plans to 3M were, in fact, for reimbursements of any kind. This is a fact question warranting discovery. Choosing the reimbursement reading over the inference that the fiduciaries retained and paid their own affiliate is the weighing prohibited on a Rule 12(b)(6) motion. Lastly, an exemption is not an alternative explanation at all: Defendants' reasonable-compensation argument under §1108(b)(2) is theirs to plead and prove (*Cunningham*, 604 U.S. at 696), not a defect Plaintiffs must negate.

## C. The FAC Identifies a Concrete Injury, and Article III Standing Is Satisfied

Defendants' final argument is that Count II fails for lack of Article III standing because Plaintiffs identify no injury traceable to the IMCO transactions. MTD 25. *Cunningham* does direct courts to "dismiss suits that allege a prohibited transaction occurred but fail to identify any injury," MTD 25 (citing 604 U.S. at 708), but the FAC

identifies one.  The §1106 injury here is the transfer itself: Plan assets paid to IMCO are a loss to the Plans the moment they leave them, recoverable as disgorgement under §1109(a)—independent of whether IMCO's fee drove the funds' underperformance. Defendants' demand for that causal link conflates the transfer injury with a but-for performance injury §1106 does not require.

Defendants' lead standing authority confirms this reading.  *Thole v. U.S. Bank N.A.* denied standing to defined-benefit participants because their "fixed payment each month…do[es] not fluctuate with the value of the plan," and drew the contrast: "in a defined-contribution plan, such as a 401(k) plan, the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions." 590 U.S. 538, 540 (2020).  The 3M Plans are defined-contribution plans, and Plaintiffs hold accounts invested in the challenged vintages (¶¶15-40).  Thus, under *Thole*, Plaintiffs have concrete standing.  Defendants' remaining cases do nothing to change this.  *Peeler* dismissed for lack of any alleged transfer of plan assets—i.e., the transfer the FAC pleads (¶¶26, 293-296).  *Peeler*, 2026 WL 208630, at *13.  And *Stalley v. Catholic Health Initiatives* (a case involving the Medicare Secondary Payer statute) involved a plaintiff who alleged no injury to himself.  509 F.3d 517, 520 (8th Cir. 2007). In contrast, Plaintiffs here allege losses to accounts they own.

What remains, taken as true, is a fiduciary's retention of a wholly-owned affiliate as the Plans' Investment Manager, the transfer of Plan assets to that affiliate through direct and indirect compensation and an asset-based fee, and a structural incentive to keep the affiliated, underperforming funds in place.  Those allegations state a transaction proscribed

by §1106(a)(1)(D), self-dealing proscribed by §1106(b)(1), and a concrete injury sufficient

for Article III.  That is all *Cunningham* requires.  604 U.S. at 709.  Count II should proceed.

## III.  Plaintiffs Plausibly Allege Claims for Failure to Monitor

The parties agree that the monitoring claim is derivative of the duty of prudence

claim.  MTD 25-26.  Because Plaintiffs' prudence claims are sufficiently alleged, this claim

likewise survives.  *See, e.g.*, Op. 20 n.4.

### CONCLUSION

Plaintiffs respectfully request that the Motion be fully denied.[22]

Dated: June 5, 2026                    Respectfully submitted,

                                       */s/ Melinda A. Nicholson*
                                       Melinda A. Nicholson (*admitted pro hac vice*)
                                       Nicolas Kravitz (*admitted pro hac vice*)
                                       John A. Carriel (*admitted pro hac vice*)
                                       **KAHN SWICK & FOTI, LLC**
                                       1100 Poydras Street, Suite 960
                                       New Orleans, LA 70163
                                       Telephone: (504) 648-1842
                                       Facsimile: (504) 455-1498
                                       Email: melinda.nicholson@ksfcounsel.com
                                       Email: nicolas.kravitz@ksfcounsel.com
                                       Email: john.carriel@ksfcounsel.com

                                       - AND -

                                       David W. Asp, MN #0344850

---

[22] In the event of dismissal, Plaintiffs again request that the court stay its dismissal order by thirty days, allowing Plaintiffs to consider whether any shortcomings can be cured, and to submit a motion for leave to amend in accordance with L.R. 15.1(b).  While Plaintiffs have had an opportunity to amend, the FAC directly addresses the Opinion's original reasoning for granting dismissal, and Plaintiffs respectfully request that, should the Court determine to dismiss once more, Plaintiffs be provided the opportunity to address any new or different deficiencies identified in that opinion.  Op. 20-21.

Derek C. Waller, MN #0401120
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4091
Facsimile: (612) 339-0981
Email: dwasp@locklaw.com
Email: dcwaller@locklaw.com

*Attorneys for Plaintiffs, the Plans, and the*
*Proposed Class*