UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Jennifer Batt, Madhu Chandnani, Karen Davison, and Willard Jenkins, *individually and on behalf of all others similarly situated, on behalf of the 3M Voluntary Investment Plan and Employee Stock Ownership Plan, and on behalf of the 3M Savings Plan*, | File No. 25-cv-3149 (ECT/DTS) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| 3M Company; Board of Directors of 3M, *and its members*; 3M Benefits Fund Investment Committee, *and its members*; and 3M Investment Management Corporation, | |
| Defendants. | |

Melinda Nicholson and John Anthony Carriel, Kahn Swick & Foti, LLC, New Orleans, LA; and David W. Asp and Derek C. Waller, Lockridge Grindal Nauen PLLP, Minneapolis, MN, for Plaintiffs Jennifer Batt, Madhu Chandnani, Karen Davison, and Willard Jenkins.

Brian J. Lamb, Thompson Hine LLP, Cleveland, OH; Rajin Olson, Thompson Hine LLP, Minneapolis, MN; and Nathaniel W. Ingraham, Thompson Hine LLP, Washington, DC, for Defendants 3M Company, Board of Directors of 3M, 3M Benefits Fund Investment Committee, and 3M Investment Management Corporation.

Plaintiffs are current or former 3M employees who invested in customized 3M "target-date funds" available in 3M retirement plans. Plaintiffs claim the 3M target-date funds underperformed in comparison to a target-date-fund index and other target-date funds. They claim that 3M violated its duty of prudence, as required by ERISA, in continuing to offer its target-date funds as investment options in the 3M retirement plans.

A 3M subsidiary received fees for managing a portion of the plans, and Plaintiffs claim this arrangement violated ERISA's prohibitions on self-dealing and other transactions. Last, Plaintiffs allege 3M's failure to monitor plan fiduciaries was an additional breach of fiduciary duty.

Defendants are 3M and related entities, and they seek partial dismissal under Federal Rule of Civil Procedure 12(b)(1) and the entire Amended Complaint's dismissal under Federal Rule of Civil Procedure 12(b)(6). The motion will be granted in part and denied in part. This is the second round of litigation, and the earlier motion to dismiss was granted for failure to show a meaningful benchmark for the challenged funds. This time around, Plaintiffs have done so. They present five funds and one index; of those, four of the funds are sound bases for comparison. The data show that one of these—target-date funds offered by Fidelity—consistently and significantly outperformed the 3M funds. That raises a plausible inference of imprudence. The failure to monitor claim is derivative of the duty of prudence and will survive and be dismissed to the same extent.

The motion will be denied as to the prohibited-transactions and self-dealing claim. The short of it is that ERISA prohibits a fiduciary from engaging in certain transactions, including transfers of plan assets to a party providing services to the plan. Here, that encompasses the 3M subsidiary that manages a portion of the plan. 3M may very well have viable defenses, including that the fees were reasonable, but the issue cannot be resolved on a Rule 12(b)(6) motion. That claim will go forward, and 3M will be able to raise those potential defenses.

I[1]

*Defendants.*   Defendant 3M Company is the sponsor, named fiduciary, and administrator of the 3M Voluntary Investment Plan and Employee Stock Ownership Plan ("VIP Plan") and the 3M Savings Plan (collectively, the "Plans").   Am. Compl. [ECF No. 53] ¶¶ 6, 21–22; 29 U.S.C. § 1002(16)(B) (defining "plan sponsor"); 29 U.S.C. § 1102(a)(2) (defining "named fiduciary"); 29 U.S.C. § 1002(16)(A) (defining "administrator").   "3M acts through a Board of Directors," Am. Compl. ¶ 6, and the Board owes fiduciary duties to the Plans, *id.* ¶ 23.   "Defendant 3M Benefits Fund Investment Committee is responsible for designating the investment options available under the Plans."   *Id.* ¶ 24.   Defendant 3M Investment Management Corporation ("3M IMCO") is a wholly owned subsidiary of 3M Company and "an investment advisor selected by the other 3M Defendants to provide investment advice to the Plans' participants on how the Plans' assets should be invested and managed."   *Id.* ¶ 25.

*Plaintiffs.*   Plaintiffs are or were 3M employees who participated in the Plans.   *Id.* ¶¶ 16–19; *see* 29 U.S.C. § 1002(7) ("The term 'participant' means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.").

---

[1]     In accordance with the standards governing a Rule 12(b)(6) motion, the facts are drawn entirely from the Amended Complaint and the documents it necessarily embraces. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014); *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

*The 3M Plans.* The Plans are participant-directed defined-contribution plans. Am. Compl. ¶ 34; *see* 29 U.S.C. § 1002(34) ("[A] 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."); *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). New 3M employees are automatically enrolled in the VIP Plan three months after their hire date. Am. Compl. ¶ 33. In 2023, the Plans had a combined 58,127 participants—55,591 in the VIP Plan and 2,536 in the 3M Savings Plan—and about $12.4 billion in assets. *Id.* ¶¶ 38–39. In 2024, about thirty-eight percent of the Plans' assets—or roughly $4.09 billion—were invested in "3M TDF Series" funds. *Id.* ¶¶ 41, 57. "TDF" is short for "target date fund." *See id.* ¶¶ 3, 42–43.

*Target-date funds generally.* A target-date fund is "a type of fund designed to achieve certain investment results based on an investor's anticipated retirement date." *Id.* ¶ 42. TDFs generally contain a mix of stocks, bonds, and other investments, and they shift asset composition over time, becoming more conservative as the anticipated retirement date approaches. *Id.* ¶¶ 43–44. This shift is known as the "glide path." *Id.* ¶ 44. Plaintiffs allege that "all TDFs are actively managed" in the sense that "managers make active decisions when designing a TDF's asset allocation over time." *Id.* ¶ 47. "The 3M TDF Series are actively managed." *Id.* ¶ 53.

*The 3M TDF Series funds generally.* The 3M TDF Series included funds with target dates in five-year intervals. *Id.* ¶ 49. So, for example, a participant who anticipated retiring

4

in or close to 2045 might elect to invest in the "3M 2045 TDF," while a participant who anticipated retiring in or closer to 2050 might elect to invest in the "3M 2050 TDF." *See id.* The 3M TDF Series funds are "modeled after the BlackRock LifePath TDFs," and the 3M TDF Series funds are the only target-date option available to participants in the Plans. *Id.* ¶¶ 40, 48. After automatically enrolling a new hire in the VIP Plan, the employee's contributions are invested "100% in the 3M TDF Series vintage closest to the year in which the participant will reach age 65," unless or until the employee makes a different investment election. *Id.* ¶ 52 (citation modified).

*The at-issue 3M TDF Series funds.* Plaintiffs identify nine 3M TDF Series "vintages" at issue in this case and alleged their approximate value as follows:

| Fund Name | Approximate Value |
|---|---|
| 3M 2025 TDF | $564.5 million |
| 3M 2030 TDF | $758.9 million |
| 3M 2035 TDF | $734.6 million |
| 3M 2040 TDF | $568.4 million |
| 3M 2045 TDF | $464.89 million |
| 3M 2050 TDF | $405.85 million |
| 3M 2055 TDF | $283.3 million |
| 3M 2060 TDF | $231 million |
| 3M 2065 TDF | $76.5 million |

*Id.* ¶ 41. Again, each year represents an anticipated retirement date. *Id.* ¶ 42. The four Plaintiffs were invested in five of the nine 3M TDF Series: Jennifer Batt in the 3M 2045 TDF Series; Madhu Chandnani in the 3M 2050 and 2055 TDF Series; Karen Davison in the 3M 2040, 2045, and 2050 TDF Series; and Willard Jenkins in the 3M 2030 TDF Series. *Id.* ¶¶ 16–19. No Plaintiff invested in the 3M 2025, 2035, 2060, or 2065 TDF Series. *See id.*

*Limited sources of information about the 3M TDFs.* Information about the underlying investments in the 3M Series funds is scarce. *See id.* ¶ 54 ("Defendants provide minimal resources for participants in the Plans to analyze the underlying investments of the 3M TDFs."). Three primary sources exist: (1) an "Investment Fund Summary," which is a booklet describing the funds' goals, investment strategies, potential risks, investment managers, and information about how to monitor fund performance; (2) "Fund Fact Sheets,"[2] which provide the same categories of information in more detail; and (3) the Annual Fee Disclosure Statement, which "contains information about the Plan's investment funds, fees and expenses, and historical performance." *Id.* The Fund Fact Sheets "are the sole source of investment information made available to participants regarding the composition, performance, and risk characteristics of the TDFs in which their retirement savings are invested." *Id.* ¶ 58. This dearth of information is at least partially explained by the Funds' structure—they are Collective Investment Trusts ("CITs") and not mutual funds, and mutual funds are subject to more extensive reporting requirements. *Id.* 3M's limited disclosures make it difficult or impossible for Plan participants to access information about the Funds. Participants cannot track changes over time in composition,

---

[2] The 2024 Fact Sheets are attached to the Amended Complaint and will be considered. *See* Am. Compl. ¶ 56 & n.11 (explaining that 3M commissioned Morningstar to create and maintain the fact sheets for each of the nine at-issue 3M TDF Series); ECF No. 53-1 (3M 2025 TDF Fact Sheet); ECF No. 53-2 (3M 2030 TDF Fact Sheet); ECF No. 53-3 (3M 2035 TDF Fact Sheet); ECF No. 53-4 (3M 2040 TDF Fact Sheet); ECF No. 53-5 (3M 2045 TDF Fact Sheet); ECF No. 53-6 (3M 2050 TDF Fact Sheet); ECF No. 53-7 (3M 2055 TDF Fact Sheet); ECF No. 53-8 (3M 2060 TDF Fact Sheet); ECF No. 53-9 (3M 2065 TDF Fact Sheet). These Fact Sheets represent data available on September 30, 2024. Am. Compl. ¶ 56 & n.11. Plaintiffs believe more recent versions of the Fact Sheets contain numerous errors. *Id.*

performance, or risk unless they save copies of the Fact Sheets at regular intervals, which Defendants do not suggest or facilitate. *Id.* ¶ 62. Defendants make visible only the "Top 25 Aggregated Holdings," leaving "thousands of underlying securities" hidden from participants' view. *Id.* ¶ 65. That includes an asset class that the Fact Sheets mark as "Other," for which there is "no further identification, description, or explanation of what these . . . holdings are, what risks they carry, or how they are expected to perform." *Id.* ¶ 67.

*3M's disclosure errors.* Additionally, some of the Fact Sheets contain obvious errors. For example, some Fact Sheets use the "Morningstar Lifetime Mod *2050*" index as a risk benchmark for the 3M 2050, 2055, 2060, and 2065 TDF vintages. *Id.* ¶ 71. Comparing 2055, 2060, and 2065 vintages against a 2050 benchmark creates misleading risk metrics. *Id.* ¶ 73. Other Fact Sheets include "no risk or volatility data whatsoever." *Id.* ¶¶ 78–79. The September 2024 Fact Sheets compare the 3M TDFs against a pure global equity benchmark, an error only partially fixed in the December 2025 Fact Sheets.[3] *Id.* ¶¶ 74–77. The December 2025 versions list U.S. Equity exposure at 0.00% and "top holdings dominated by Japanese equities and Japanese Government Bonds." *Id.* ¶¶ 88–89, 93. That allocation is "implausible on its face and inconsistent with the fundamental purpose of a target date investment strategy," especially considering that the September 2024 Fact Sheets list around 40% to 99% equity exposure, including major U.S. securities. *Id.* Similarly implausible is the steady number of underlying assets in the December 2025

---

[3]    Plaintiffs cite data recorded in Fact Sheets available in December 2025, Am. Compl. ¶ 88, but these Fact Sheets themselves are not in the record.

Fact Sheets—"4,955 equity holdings, 996 bond holdings, and 305 other holdings"—across the 2030, 2035, 2040, 2045, 2050, and 2055 TDF vintages. *Id.* ¶¶ 90–91. Plaintiffs believe these errors are not isolated but "reflect a systemic failure by Defendants to implement and maintain adequate processes for monitoring the accuracy of participant disclosures." *Id.* ¶ 97.

*Payments to investment manager.* "Defendant 3M IMCO, a wholly owned subsidiary of Defendant 3M Company, served as co-Investment Manager of each of the nine 3M TDF vintages, receiving compensation for that role." *Id.* ¶ 59. That arrangement made Defendants "simultaneously responsible for selecting, monitoring, and evaluating the 3M TDFs and for managing those same funds for a fee." *Id.* 3M IMCO received payments "directly or indirectly . . . from the Plans relating to [investing and advising] services," though the Amended Complaint does not describe any particular transaction. *Id.* ¶ 296. More specifically, Plaintiffs allege that "the Plans paid 3M 'directly or indirectly' at least $1.83 million" between 2019 and 2024. *Id.* ¶ 26. 3M IMCO was the investment manager of the "Intermediate-Term Bond Fund," and the fees for that fund were 0.24%. *Id.* An Investment Fund Summary informed participants that "[t]he 3M LifePath Portfolios may invest in . . . the Intermediate-Term Bond Fund managed by [3M IMCO]," ECF No. 62-11 at 8,[4] and the 3M TDF Series in fact invested in the Intermediate-Term Bond Fund, Am. Compl. ¶ 26 ("3M IMCO received some portion of that 0.24% of the Plans' assets invested in the Intermediate-Term Bond Fund."). The Plan and its participants lost more than one

---

[4]    Page citations are to the CM/ECF pagination appearing in a document's upper right corner, not to a document's original pagination.

hundred million dollars and opportunity costs because of the payments to 3M IMCO.  Am. Compl. ¶ 297.

The 3M TDF Series' deviation from the stated investment strategy.  There is a discrepancy between the 3M TDF Series' stated glide path and the glide path ascertainable from public documents.  See id. ¶¶ 100–11.  "A TDF's 'glide path' is typically a gradual shift in allocation from stock funds to bond funds."  Id. ¶ 44.  The Plan documents state the 3M TDF Series follow a "to retirement" glide path, meaning that at the target date, the fund reaches its most conservative asset allocation and maintains that composition indefinitely. Id. ¶¶ 100–02.  "[U]nlike many mainstream target date fund families, the Plan documents do not disclose or provide for any permissible range of deviation from the stated glide path."  Id. ¶ 103.  However, the 2024 Fact Sheets indicate that the 3M TDF Series have deviated from the stated glide path.  Id. ¶ 104.  Plaintiffs reconstructed the approximate actual glide path by taking snapshots of asset allocation from several Fact Sheets.  Id. ¶ 104–05.  For example, the asset allocation at forty-years-out was drawn from the 3M 2065 TDF Fact Sheet, ECF No. 53-9, the allocation at twenty-years-out was drawn from the 3M 2045 TDF Fact Sheet, ECF No. 53-5, and the allocation at zero-years-out (retirement date) was drawn from the 3M 2025 TDF Fact Sheet, ECF No. 53-1.  Am. Compl. ¶ 105.  The reconstruction shows the funds' actual asset allocation varied significantly from the funds' target asset allocation.  See id. ¶¶ 111–12.  The actual allocation consistently had more U.S. Stocks and fewer U.S. Bonds than the target indicated.  Id. ¶¶ 114–15.  According to the Plan documents, "when the Portfolio reaches the target date, it will have reached its highest allocation to income-oriented investments

and will be merged into the 3M LifePath Retirement Portfolio," and the "class mix" would "remain nearly constant over time." *Id.* ¶ 102 (citation modified). However, the 3M LifePath Retirement Portfolio's asset allocations changed over a short period of time. *See id.* ¶¶ 107, 109. In September 2024, the allocations were "50.34% Bonds, 24.64% U.S. Stocks, 13.85% Non-U.S. Stocks, 4.37% Cash, and 6.46% Other," but in December 2025 they were "57.34% Bonds, 24.62% U.S. Stocks, 13.43% Non-U.S. Stocks, 4.39% Cash, and 0.23% Other." *Id.* The varying allocation post-retirement suggests the 3M TDF Series follow a "through retirement" glide path. *See id.* ¶ 117. "At no point during the period for which data is available has the 3M LifePath Retirement Portfolio's actual allocation matched its stated target." *Id.* ¶ 116.

*The 3M TDF Series' asset composition and equity allocation.* The Investment Fund Summary identifies "seven major asset classes" from which the 3M TDF Series may draw:

> ***U.S. Large-Cap Equities***: This asset class is made up of the largest company (by capitalization) stocks in the U.S. stock market. The benchmark it tracks is the Standard & Poor's (S&P) 500 Index.
>
> ***U.S. Small/Mid-Cap Equities***: This asset class is made up of stocks listed in the U.S. with the exception of the stocks in the S&P 500. Therefore this asset class includes stocks of small- and mid-capitalization companies in the U.S. The benchmark is the Dow Jones U.S. Completion Total Stock Market Index.
>
> ***International Equities***: This asset class is made up of stocks listed on exchanges outside of the U.S. The benchmark is the MSCI ACWI ex USA IMI Index (Morgan Stanley Capital International Inc. All Countries World excluding the USA Investable Market Index).
>
> ***Global Real Estate***: This asset class is composed of real estate investment trusts (REITs) from the global market. The

benchmark it tracks is the FTSE EPRA/NAREIT (FTSE International Limited European Public Real Estate Association/National Association of Real Estate Inves[t]ment Trusts) Developed Real Estate Index.

***Commodities***: This asset class is composed of a diversified range of futures on physical commodities including energy, agriculture, industrial and precious metals, and livestock. The benchmark is the Bloomberg Commodity Index.

***U.S. Bonds***: This asset class is made up of a wide variety of fixed income investments drawn from the U.S. fixed income market. The benchmarks are the Bloomberg Barclays U.S. Aggregate Bond Index and the Bloomberg Barclays U.S. Intermediate Government/Credit Index. Given the funds are actively managed, managers may invest a portion of the assets outside of the benchmark.

***U.S. Inflation Linked Bonds***: This asset class is made up of U.S. Treasury Inflation-Protected Securities (TIPS). TIPS are bonds whose principal is adjusted by changes in the Consumer Price Index, which means they can provide a limited amount of protection against inflation. The benchmark for this asset class is the Bloomberg Barclays U.S. Treasury Inflation Protected Securities (TIPS) Index.

*Id.* ¶ 55 (alteration in original). "3M's public 5500 filings do not disclose the amount invested in each of the 3M TDF Series . . . ." *Id.* ¶ 57. The following table shows the September 2024 asset allocation of each fund:

11

**3M TDFs' September 2024 Asset Allocations**

| Vintage | U.S. Equity | Non-U.S. Equity | Fixed Income | Other | Cash | Total Equity |
|---|---|---|---|---|---|---|
| 2025 | 25.33 | 14.21 | 49.97 | 6.46 | 4.03 | 39.54 |
| 2030 | 35.86 | 21.89 | 35.67 | 3.48 | 3.09 | 57.75 |
| 2035 | 43.52 | 27.01 | 24.14 | 3.34 | 1.99 | 70.53 |
| 2040 | 47.42 | 29.71 | 18.32 | 3.32 | 1.24 | 77.13 |
| 2045 | 53.57 | 33.74 | 8.41 | 3.5 | 0.77 | 87.31 |
| 2050 | 57.88 | 36.49 | 2.93 | 2.14 | 0.55 | 94.37 |
| 2055 | 59.88 | 37.97 | 0.4 | 1.30 | 0.45 | 97.85 |
| 2060 | 60.35 | 38.13 | 0.15 | 0.9 | 0.47 | 98.48 |
| 2065 | 60.36 | 38.15 | 0.12 | 0.93 | 0.45 | 98.51 |

*Id.* ¶ 92.[5] Adding up the percentage points of "U.S. Equity" and "Non-U.S. Equity" creates the sum listed in the "Total Equity" column.

*The 3M TDF Series sector allocation (Morningstar sectors).* Each Fact Sheet lists fund percentage of equity holdings by eleven sector sectors identified by Morningstar. *Id.* ¶ 156; *see, e.g.*, ECF No. 53-1 at 6 (3M 2025 TDF Fact Sheet); ECF No. 53-10 (compiling data in separate charts). The sectors are basic materials, consumer cyclical, financial services, real estate, communication services, energy, industrials, technology, consumer defensive, healthcare, and utilities. *See, e.g.*, ECF No. 53-1 at 6; Am. Compl. ¶ 156. For example, in the 3M 2035 TDF, the fund invested 4.16% in basic materials, 10.17% in consumer cyclical, 15.17% in financial services, 7.50% in real estate, 6.87% in communication services, 3.83% in energy, 10.71% in industrials, 22.98% in technology, 5.72% in consumer defensive, 10.30% in healthcare, and 2.60% in utilities. ECF No. 53-3

---

[5]     Plaintiffs note that December 2025 data offer different equity allocations but believe those figures to be "plainly erroneous." Am. Compl. ¶ 92 (citation modified); *see id.* ¶¶ 88–89.

at 4; ECF No. 53-10 at 2.  The figures for each of the 3M TDF Series from 2025 to 2065 are similar.  *See* ECF No. 53-10 at 1–5.

   *The 3M TDF Series equity style.*  Equity holdings can be classified by the Morningstar Equity Style Box.  Am. Compl. ¶ 163.  That tool charts investment funds "along two dimensions: *size* (Large, Mid, or Small capitalization) and *style* (Value, Blend, or Growth)." *Id.*  The box produces nine possible classifications. *Id.*  "The fund's *centroid* (the asset-weighted center of all the fund's equity holdings plotted on this grid) summarizes the fund's overall investment style in a single data point." *Id.*  If two funds have centroids in the same classification, they "are pursuing the same fundamental equity strategy . . . investing in stocks of similar size and similar growth/value orientation." *Id.*  Each of the 3M TDF Series has a centroid in the "Large Blend" box.  ECF No. 53-11 at 1–9 (showing composite data from the Fact Sheets); *e.g.*, ECF No. 53-1 at 5 (showing Morningstar Equity Style Box for the 3M 2025 TDF).

   *The 3M TDF Series risk metrics.*  Plaintiffs measure the 3M TDF Series' risk in two ways. *Id.* ¶¶ 121–27.  The first is standard deviation, which "measures how much an investment's returns vary from its average return over a given period." *Id.* ¶ 121.  As the target retirement date nears, a target date fund's risk decreases, so the fund's standard deviation should also decrease. *Id.* ¶ 122.  Two funds with similar standard deviations will have similar volatility; that is, they can be expected to experience similar variances in investment returns from year to year.  *See id.* ¶ 123.  The second measure is the Sharpe Ratio, "calculated by taking a fund's return above the risk-free rate (typically measured by U.S. Treasury bills) and dividing it by the fund's standard deviation." *Id.* ¶ 126.  "A higher

13

Sharpe Ratio indicates better risk-adjusted performance: the fund is delivering more return for each unit of volatility its participants bear." *Id.*

*The alleged benchmarks.* Plaintiffs identify six comparators: (1) the BlackRock LifePath Custom Index ("LifePath Index"); (2) the BlackRock LifePath Dynamic Institutional ("BlackRock TDFs"); (3) the Putnam Retirement Advantage XA ("Putnam TDFs"); (4) the Voya Target Retirement R6 ("Voya TDFs"); (5) the T. Rowe Price Retirement TDF Trust A ("T. Rowe Price TDFs"); and (6) the Fidelity Freedom TDF K6 ("Fidelity Freedom TDFs"). *Id.* ¶¶ 135, 137–38. The first comparator is not a fund but "a proprietary benchmark created by BlackRock specifically to evaluate the performance of its own LifePath TDFs." *Id.* ¶ 135. The 3M TDFs were modeled on the BlackRock TDFs. *Id.* The next five comparators (the "Comparator TDFs") are funds from TDF families from financial services companies, three of which follow a "to retirement" glide path (the BlackRock TDFs, Putnam TDFs, and Voya TDFs), and two of which follow a "through retirement" glide path (T. Rowe Price TDFs and Fidelity Freedom TDFs). *Id.* ¶¶ 137–38. The following table groups these Comparator TDF sets with the associated 3M TDF Series:

| Fund | Comparator TDFs |
|---|---|
| **3M 2025 TDF** | BlackRock LifePath Dyn 2025 Instl |
| | Putnam Retirement Advantage 2025: XA |
| | Voya Target Retirement 2025 R6 |
| | T. Rowe Price Retirement 2025 Trust (Class A) F00000Z2L0 |
| | Fidelity Freedom 2025 K6 FDTKX |
| **3M 2030 TDF** | BlackRock LifePath Dyn 2030 Instl |
| | Putnam Retirement Advantage 2030: XA |
| | Voya Target Retirement 2030 R6 |
| | T. Rowe Price Retirement 2030 Trust (Class A) F00000Z2L4 |
| | Fidelity Freedom 2030 K6 FGTKX |
| **3M 2035 TDF** | BlackRock LifePath Dyn 2035 Instl |

|  | |
| --- | --- |
|  | Putnam Retirement Advantage 2035: XA |
|  | Voya Target Retirement 2035 R6 |
|  | T. Rowe Price Retirement 2035 Trust (Class A) F00000Z2L8 |
|  | Fidelity Freedom 2035 K6 FWTKX |
| **3M 2040 TDF** | BlackRock LifePath Dyn 2040 Instl |
|  | Putnam Retirement Advantage 2040: XA |
|  | Voya Target Retirement 2040 R6 |
|  | T. Rowe Price Retirement 2040 Trust (Class A) F00000Z2LC |
|  | Fidelity Freedom 2040 K6 FHTKX |
| **3M 2045 TDF** | BlackRock LifePath Dyn 2045 Instl |
|  | Putnam Retirement Advantage 2045: XA |
|  | Voya Target Retirement 2045 R6 |
|  | T. Rowe Price Retirement 2045 Trust (Class A) F00000Z2LG |
|  | Fidelity Freedom 2045 K6 FJTKX |
| **3M 2050 TDF** | BlackRock LifePath Dyn 2050 Instl |
|  | Putnam Retirement Advantage 2050: XA |
|  | Voya Target Retirement 2050 R6 |
|  | T. Rowe Price Retirement 2050 Trust (Class A) F00000Z2LK |
|  | Fidelity Freedom 2050 K6 FZTKX |
| **3M 2055 TDF** | BlackRock LifePath Dyn 2055 Instl |
|  | Putnam Retirement Advantage 2055: XA |
|  | Voya Target Retirement 2055 R6 |
|  | T. Rowe Price Retirement 2055 Trust (Class A) F00000Z2LO |
|  | Fidelity Freedom 2055 K6 FCTKX |
| **3M 2060 TDF** | BlackRock LifePath Dynamic 2060 Instl |
|  | Putnam Retirement Advantage 2060: XA |
|  | Voya Target Retirement 2060 R6 |
|  | T. Rowe Price Retirement 2060 Trust (Class A) |
|  | Fidelity Freedom 2060 K6 FDKVX |
| **3M 2065 TDF** | BlackRock LifePath Dynamic 2065 Instl |
|  | Putnam Retirement Advantage 2065: XA |
|  | Voya Target Retirement 2065 R6 |
|  | T. Rowe Price Retirement 2065 Trust-A |
|  | Fidelity Freedom 2065 K6 |

*Id.* ¶ 141. Plaintiffs allege that the Comparator TDFs "and the 3M TDFs all share similar investment objectives, hold similar asset allocations, invest in similar risk profiles, and are available as options for defined-contribution retirement plans of comparable size." *Id.* ¶ 139. More specific information about these metrics will be presented further on.

15

*The alleged underperformance.*  From 2014 to 2025, Plaintiffs allege, the 3M TDF Series underperformed the average of the Comparator TDFs on annual and trailing 3-, 5-, and 10-year bases, and cumulatively.  *See id.* ¶¶ 200–58.  Viewed from a high level over that period, annual underperformance is ascertainable starting in 2014, trailing 3-year underperformance starting in 2016, trailing 5-year underperformance starting in 2018, and trailing 10-year underperformance starting in 2023.  *See, e.g.*, *id.* ¶ 200 (comparing returns of 3M 2025 TDF Series with the Comparator TDFs).  Matched against the Comparator Funds' average, each vintage of the 3M TDF Series underperformed annually for most years, though the 3M TDFs usually outperformed at least one comparator, and occasionally outperformed the average of the comparators.  *See id.* ¶¶ 200, 206, 212, 218, 224, 230, 236, 242, 248 (showing that, across nine vintages and up to twelve years, the 3M TDF Series outperformed at least one comparator in 73 of 99 instances, and outperformed the average of the comparators 27 times in 99 instances).  In no year was any vintage of the 3M TDFs the best performer, and the 3M Series was the second best only 11 of 99 times.  *Id.*  Against the BlackRock LifePath Index, three of the 3M TDF vintages (2025, 2030, and 2035) had a higher cumulative compound performance over the years that for which measurements are available; the other vintages performed worse.  *See id.* ¶¶ 201, 207, 213, 219, 225, 231, 237, 243, 249.  The bottom-line allegation is that, had the 3M TDF Series performed as well as the BlackRock LifePath Index, or had 3M offered the Comparator TDFs instead of the 3M TDF Series, the Plans' financial gains from 2014 to 2025 would have been higher.

*Plaintiffs' legal theories.*  Plaintiffs bring this case under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  Am. Compl. ¶¶ 1–3.

Plaintiffs assert three causes of action, and the first claim proceeds along three theories.  In Count I, *id.* ¶¶ 276–89, Plaintiffs allege Defendants breached their duty of prudence "by adopting an imprudent process for evaluating and monitoring investment options in the Plans" and failing to remove the underperforming 3M TDF Series, *id.* ¶ 282; "by adopting and maintaining a disclosure regime that deprived Plan participants of the information necessary to evaluate whether the 3M TDFs were being prudently managed," *id.* ¶ 283; and "by permitting the 3M TDFs' actual asset allocations to deviate significantly from the Plans' officially stated target glide path," *id.* ¶ 284.  Count II is a claim that 3M engaged in prohibited transactions and self-dealing in retaining and paying 3M IMCO.  *Id.* ¶¶ 290–98.  And Plaintiffs allege that 3M failed to monitor the performance of those who owed fiduciary duties to the Plans.  *Id.* ¶¶ 299–304 (Count III).  Plaintiffs bring this suit as a class action with a class period from August 7, 2019, to the date of judgment.  *Id.* ¶ 11; *see id.* ¶¶ 268–75 (class action allegations).

II

A

Article III of the Constitution limits the federal judicial power (or jurisdiction) to adjudicating "Cases" and "Controversies."  This provision keeps the federal courts out of the business of the legislative and executive branches, and the Supreme Court's standing jurisprudence guides the federal courts in determining whether a litigant seeks adjudication of a genuine "Case" or "Controversy" or instead hopes to have the court act as if it were one of the political branches.  "There is no ERISA exception to Article III."  *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020).

"To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Steger v. Franco., Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified).  In other words, the injury "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (quoting *Lujan*, 504 U.S. at 560 n.1).  There is no question that physical and monetary harms are concrete, but certain intangible harms can also count, particularly when they have "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).  It is not enough for a plaintiff to show that a defendant violated a statutory requirement and that the statute authorizes her right to sue; she must still show a concrete injury-in-fact capable of satisfying Article III. *Thole*, 590 U.S. at 544.  In analyzing Article III standing, a court must assume that the plaintiff will succeed on the merits of her claim. *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 968 (8th Cir. 2016).

B

Defendants move to dismiss Count II for lack of subject-matter jurisdiction under Rule 12(b)(1).  ECF No. 61 at 11, 31.  Because they challenge the complaint's sufficiency

18

and rely on materials embraced by the pleadings, it is a facial challenge to subject-matter jurisdiction. *See Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015). In analyzing a facial challenge, a court "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citation modified). Though no party raises a standing challenge as to Count I, "[f]ederal courts have an independent duty to determine subject matter jurisdiction, even where the matter is raised . . . on the court's own motion." *City of Kansas City v. Yarco Co.*, 625 F.3d 1038, 1040 (8th Cir. 2010).[6] In their breach of the duty of prudence claim, Plaintiffs assert two new injuries: Defendants failed to disclose certain information or disclosed false information, and allowed the 3M TDF Series to deviate from the equity allocations stated in the Plans. *See* Am. Compl. ¶¶ 283–84. To the extent these theories assert an independent injury, they implicate standing doctrine.

1

Start with the failure to disclose. Plaintiffs argue that Defendants have breached the duty of prudence by maintaining a deficient disclosure regime, one which "report[ed] impossible allocations, identical holding counts across vintages, and broken benchmark fields." ECF No. 66 at 41; *see* Am. Compl. ¶¶ 58–99 (alleging inadequate and erroneous representations in the Fact Sheets). They allege that these shortcomings show that

---

[6]     Plaintiffs point out that "Defendants do not seek dismissal of the prudence disclosure theory claim on Article III grounds." ECF No. 66 at 43. But that is irrelevant to whether the informational harm satisfies the injury-in-fact requirement.

Defendants failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *see* Am. Compl. ¶ 96 ("Defendants' distribution of 3M TDF Fact Sheets containing materially erroneous portfolio composition data—and their apparent failure to detect or correct these errors over a period of years—constitutes a breach of [the duty of prudence].").

To show that an informational harm amounts to injury-in-fact that satisfies Article III, plaintiffs must identify "'downstream consequences' from failing to receive" the information required by law. *TransUnion LLC*, 594 U.S. at 442 (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)). In other words, "a *purely* informational injury" does not "satisfy the requirement of concreteness." *Hekel v. Hunter Warfield, Inc.*, 118 F.4th 938, 942 (8th Cir. 2024) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Following those rules, courts that have addressed informational injuries due to ERISA disclosure failures have dismissed claims that did not allege a resulting concrete injury. *See Smith v. UnitedHealth Grp. Inc.*, No. 22-cv-1658 (NEB/DJF), 2023 WL 3855425, at *10 (D. Minn. May 4, 2023) ("Plaintiffs have not identified any adverse effects from those failures to disclose."); *Plesha v. Ascension Health All.*, No. 4:24-cv-01459-CMS, 2026 WL 279321, at *7 (E.D. Mo. Feb. 3, 2026) ("Plaintiff's Complaint primarily alleges purely informational injuries that do not satisfy Article III's concreteness requirement." (citation modified)); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1160 (N.D. Cal. 2022) ("Plaintiffs needed to provide

20

some factual allegation to show that they faced a risk of harm because of the procedural violations of that informational entitlement."), *aff'd*, 137 F.4th 1015 (9th Cir. 2025), *cert. granted*, 2026 WL 120679 (Jan. 16, 2026); *Jacobs v. Verizon Commc'ns, Inc.*, No. 16 Civ. 1082 (PGG), 2017 WL 8809714, at *15 (S.D.N.Y. Sep. 28, 2017) (finding no standing where the plaintiff failed to show reliance on defendant's alleged misrepresentations in a Form 5500).  And when those concrete, downstream harms were identified, courts have found standing.  *See Lundstrom v. Young*, No. 18-cv-2856-GPC, 2022 WL 15524624, at *16 (S.D. Cal. Oct. 27, 2022).

Here, Plaintiffs have not shown that Defendants' misrepresentations and omissions are concrete injuries.  Plaintiffs do not allege that they suffered injury by relying on, say, the errant risk metrics, or that the opaque asset allocation disclosures injured them in some other way.  They do not tether the 3M TDF Series' underperformance to the false or withheld information.  Instead, they argue no reliance is required.  ECF No. 66 at 43.  On this case's facts, that theory runs afoul of *TransUnion* and *Hekel*.  *See TransUnion LLC*, 594 U.S. at 442 (requiring plaintiffs to identify "downstream consequences" from informational deprivations); *Hekel*, 118 F.4th at 942 (same).  In other words, it is difficult to hypothesize what injury Plaintiffs might have suffered without reliance on the alleged misrepresentations and omissions.  Plaintiffs do not have standing to sue to the extent that they allege a purely informational injury.  Whether reliance is required or not, that is all they allege, so there is not subject-matter jurisdiction over that theory of Count I.

21

2

Turn to standing over the alleged deviation from the Plan goals. Plaintiffs argue that Defendants' failure to adhere to the Plans' stated glide path is an independent breach of the duty of prudence. ECF No. 66 at 43–46; *see* Am. Compl. ¶ 284 ("A prudent fiduciary that commits to a target glide path must either adhere to it or disclose and justify deviations; Defendants did neither."). They believe that deviating from the target glide path is a "significant allegation[] of wrongdoing [that] eliminate[s] the need to infer a fiduciary breach through the use of meaningful benchmarks." ECF No. 66 at 45 (quoting *Doll v. Evergy, Inc.*, No. 25-00043-CV-W-SRB, 2025 WL 4042583, at *3 (W.D. Mo. Sep. 10, 2025)).

To have standing to sue, it is not enough to allege a fiduciary breached its duties; plaintiffs must still show an injury-in-fact. *See Thole*, 590 U.S. at 544. The case law discussing "significant allegations of wrongdoing" confirms this principle. In *Tussey v. ABB, Inc.*, the court held that plaintiffs stated a claim for fiduciary breach by making "significant allegations of wrongdoing, including allegations that ABB used revenue sharing to benefit ABB and Fidelity at the Plan's expense." 746 F.3d 327, 336 (8th Cir. 2014). The injuries to the plan became injuries to the plaintiffs in excessive recordkeeping fees and underperforming investments. *See id.* at 337, 339 (affirming the district court's award of damages for excessive recordkeeping fees but reversing the plan selection damages calculation). In *Doll*, the complaint alleged that "the Plan lost millions of dollars" "[a]s a result of Defendant's breach of their fiduciary duties," namely, failing to remove known underperforming target-date funds. 2025 WL 4042583, at *2.

22

Here, Plaintiffs have not identified a concrete injury-in-fact traceable to this alleged breach. They do not claim any losses stemming from the failure to adhere to the stated glide path, such as that the 3M TDF Series would have produced higher returns if the funds tracked the "to retirement" glide path outlined in the Plan documents. Instead, they allege that "persistent structural divergences . . . fundamentally altered the risk and return profile of the funds relative to what was communicated to participants." Am. Compl. ¶ 284. At oral argument, Plaintiffs identified the Article III injury as investing in funds with a higher risk than was promised. But alleging an altered return profile is not the same as alleging lower returns. In fact, it's entirely consistent with the Amended Complaint that Plaintiffs earned more money than they otherwise would have because of Defendants' "structural divergences." Plaintiffs cite no case treating deviation from a plan's stated goals, without more, as a viable injury-in-fact. Assuming that on the merits Plaintiffs would succeed in showing the glide-path deviation was significant wrongdoing, Plaintiffs have not shown that it satisfies the requirements of Article III.

3

Defendants argue that there is no subject-matter jurisdiction over Count II because Plaintiffs do not allege a concrete injury traceable to any prohibited transaction, ECF No. 61 at 31. I disagree.

Under ERISA, certain transactions between the "plan and party in interest" and between the "plan and fiduciary" are prohibited, 29 U.S.C. § 1106(a)–(b), but a district court must "dismiss suits that allege a prohibited transaction occurred but fail to identify an injury." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 708 (2025) (citing *Thole*, 590

23

U.S. at 544).   Where plaintiffs fail to "allege a non-speculative financial loss actually affecting, or imminently threatening to affect, their individual retirement accounts," courts have dismissed prohibited-transaction claims.  *Peeler v. Bayada Home Health Care, Inc.*, No. 1:24-cv-00231-MR, 2026 WL 208630, at *5 (W.D.N.C. Jan. 27, 2026) (quoting *Collins v. Ne. Grocery, Inc.*, 149 F.4th 163, 171 (2d Cir. 2025)).   Alternatively, when plaintiffs identify a concrete and particularized loss resulting from the prohibited transaction, courts have found a redressable injury-in-fact.  *See Randall ex rel. Well Fargo & Co. 401(k) Plan v. GreatBanc Tr. Co.*, No. 22-cv-2354 (ECT/DJF), 2024 WL 713997, at *4 (D. Minn. Feb. 21, 2024) (finding standing where complaint alleged misappropriated funds caused plaintiffs an economic injury); *Berkelhammer v. ADP TotalSource Grp., Inc.*, No. 20cv5696 (EP) (JRA), 2026 WL 867136, at *24 n.57 (D.N.J. Mar. 30, 2026) ("Plaintiffs have sufficiently identified two injuries to the Plan stemming from the prohibited transactions: that the Plan improperly paid ADPTS and the service providers amounts in excess of what they should have been paid such that (1) the Plan suffered economic losses and (2) Defendants obtained improper gains from those payments."); *Cutrone v. Allstate Corp.*, No. 20 CV 6463, 2021 WL 4439415, at *6 (N.D. Ill. Sep. 28, 2021) (finding standing where plaintiffs alleged "they paid excessive fees, thereby diminishing their retirement accounts, due to the defendants' . . . unlawful transactions").

Plaintiffs have alleged a concrete injury-in-fact traceable to Defendants' alleged prohibited transactions.  3M IMCO received payments "directly or indirectly . . . from the Plans relating to [investing and advising] services."  Am. Compl. ¶ 296.  Some—perhaps all—of those payments were pursuant to its role as the manager of the Intermediate-Term

24

Bond Fund, for which it received from the fund a 0.24% fee. *Id.* ¶ 26. The 3M TDF Series invested in the Intermediate-Term Bond Fund, *id.*, and Plaintiffs are participants in several vintages of the 3M TDF Series, *id.* ¶¶ 16–19. Those fees, paid out of funds in which Plaintiffs invested, caused the Plaintiffs to suffer economic losses. *Id.* ¶ 297. While the allegations are framed at a somewhat high level of generality, they are not conclusory, and they are enough to show standing at the pleading stage. *See Braden v. Wal-Mart Stores*, 588 F.3d 585, 598 (8th Cir. 2009) ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences."). Count II will not be dismissed for lack of subject-matter jurisdiction.

## III

## A

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept all the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Considering "matters outside the pleadings" generally transforms a Rule 12(b)(6) motion into one for summary judgment, but not when the relevant materials are "necessarily embraced" by the pleadings. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Materials embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (quoting *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996)). In ERISA breach-of-fiduciary-duty cases like this one, "the relevant fund prospectuses and plan disclosure documents . . . are embraced by the pleadings." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 484 n.3 (8th Cir. 2020) (citation modified); *see Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (finding it "not improper" to "consider[] prospectuses not attached to the Complaint"). Here, the parties agree that relevant plan disclosure documents, fund fact sheets, and prospectuses for the 3M TDF Series and the Comparator TDFs may be considered in adjudicating Defendants' motion. ECF No. 61 at 10–11 n.2; ECF No. 66 at 12.

B

1

a

Plaintiffs' core allegation is that Defendants as plan fiduciaries breached the duty of prudence imposed by 29 U.S.C. § 1104(a). *See* Am. Compl. ¶¶ 276–89. The duty of prudence requires a plan fiduciary to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

26

capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). This duty concerns how a fiduciary "must act." *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022). "The process is what ultimately matters, not the results." *Id.*; *see Braden*, 588 F.3d at 595 ("In evaluating whether a fiduciary has acted prudently, we therefore focus on the process by which it makes its decisions rather than the results of those decisions."). "A plaintiff typically clears the pleading bar by alleging enough facts to '*infer* . . . that the process was flawed.'" *Matousek*, 51 F.4th at 278 (quoting *Davis*, 960 F.3d at 482–83). "'[C]ircumstantial allegations about [the fiduciary's] methods' based on the 'investment choices a plan fiduciary made' can be enough." *Davis*, 960 F.3d at 483 (quoting *Meiners*, 898 F.3d at 822). "The key to nudging an inference of imprudence from possible to plausible is providing 'a sound basis for comparison—a meaningful benchmark'—not just alleging that 'costs are too high, or returns are too low.'" *Matousek*, 51 F.4th at 278 (quoting *Davis*, 960 F.3d at 484). The task of determining whether an alleged benchmark is meaningful is case-specific. As the Eighth Circuit has explained, "there is no one-size-fits-all approach"; courts must consider "the totality of the specific allegations." *Id.* at 281 (quoting *Meiners*, 898 F.3d at 822).

Plaintiffs identify six comparators, Am. Compl. ¶¶ 135, 137–38, and it makes sense to start with the Comparator TDFs and leave the LifePath Index for later. The Amended Complaint tracks similarities and differences between the 3M TDFs and the Comparator

27

TDFs over five metrics: (1) glide path, (2) asset-class composition and equity allocation,[7] (3) sector allocation, (4) Morningstar style, and (5) risk ratio.  Defendants argue that dissimilarities exist in (6) management strategy and (7) investment vehicles.  Take these in turn.

(1) *Glide path.*  The Amended Complaint takes two approaches to the 3M TDF Series' glide path.  According to the Plan documents, the funds follow a "to retirement" track.  Am. Compl. ¶ 102.  The publicly-available asset allocation information instead shows the fund has followed a "through retirement" glide path.  *Id.* ¶¶ 111–12.  Plaintiffs identify comparator funds in both categories.  *Id.* ¶¶ 137–38.  Specifically, the BlackRock TDFs, Putnam TDFs, and Voya TDFs have a "to retirement" glide path, and the T. Rowe Price TDFs and Fidelity Freedom TDFS follow a "through retirement" glide path.  *Id.* Plaintiffs picked this "deliberately inclusive" "dual methodology" to "eliminate[] any argument that the comparators are inapt because they follow a different glide path philosophy."  *Id.* ¶ 140.  In essence, Plaintiffs are pleading in the alternative to make up for their information deficit and the inconsistency between the 3M TDFs' stated goals and actual behavior.  The Federal Rules allow such pleading.  Fed. R. Civ. P. 8(d)(2).

Defendants object that the 3M TDFs are "to retirement" funds and dispute Plaintiffs' reconstructed glide path, ECF No. 61 at 12–13; ECF No. 68 at 7–8, but Plaintiffs have plausibly alleged that the 3M TDF Series deviated from their stated "to retirement" goal.

---

[7]    Plaintiffs separate asset-class allocation and equity allocation, *see* ECF No. 66 at 7, 17, but the concepts overlap—the Total Equity is the sum of percentages of U.S. Equity and Non-U.S. Equity—so these categories will be discussed together.

A fund's glide path is its shift in asset allocation over time.  Am. Compl. ¶ 44.  That shift can be approximated by measuring the current reported asset allocation from different vintages.  *See id.* ¶ 104.  "Because each TDF vintage represents a different number of years until (or past) its target retirement date as of September 2024, the suite of nine TDF vintages, together with the '3M LifePath Retirement Portfolio,' provides a cross-sectional snapshot of the actual glide path at multiple time horizons."  *Id.* ¶ 104; *see id.* ¶ 102 (noting that each vintage is merged into the 3M LifePath Retirement Portfolio at the target retirement date).  That reconstructed fund increases its holdings in bonds and cash and decreases holdings in U.S. Stocks, Non-U.S. Stocks, and "Other" investments, so its glide path is best characterized as "through retirement."  *See id.* ¶ 111.

The Amended Complaint plausibly alleges that the 3M TDF Series shares a glide path with all Comparator TDFs.  It is possible that discovery will winnow the field of comparators, but at the pleading stage, the 3M TDF Series and the Comparator TDFs are alike on this metric.

(2) *Asset-class composition and equity allocation*.  Recall that the 3M TDF Series asset allocations were grouped into U.S. Equity, Non-U.S. Equity, Fixed Income, Other, and Cash, and that the sum of U.S. Equity and Non-U.S. Equity was classified as Total Equity.  *Id.* ¶ 92.  Plaintiffs provide tables comparing the percentage of assets of each 3M TDF vintage with the corresponding vintage of each Comparator TDF.  The following table provides the Total Equity allocation of each 3M vintage alongside that of comparator funds:

29

**Total Equity Allocation**

| Fund Family | Vintage Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
| 3M | 39.54 | 57.75 | 70.53 | 77.13 | 87.31 | 94.37 | 97.85 | 98.47 | 98.51 |
| BlackRock | **[8] | 51.79 | 63 | 75.39 | 85.46 | 94.32 | 98.56 | 99.86 | 98.75 |
| Putnam | **[9] | 34.03 | 56.98 | 68.98 | 77.83 | 82.59 | 87.26 | 91.65 | 94.96 |
| Voya | 37.5 | 59.57 | 69.75 | 80.81 | 88.7 | 93.75 | 95.8 | 96.12 | 95.49 |
| T. Rowe | 52.85 | 62.03 | 73.57 | 83.44 | 91.4 | 93.9 | 95 | 95.07 | 95.11 |
| Fidelity | 54.18 | 60.41 | 68.24 | 82.58 | 91.25 | 91.99 | 92.73 | 92.8 | 92.8 |

*Id.* ¶ 144.  The following table shows the percentage of U.S. Equity within each fund's

total assets:

**U.S. Equity Allocation**

| Fund Family | Vintage Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
| 3M | 25.33 | 35.86 | 43.52 | 47.42 | 53.57 | 57.88 | 59.88 | 60.35 | 60.36 |
| BlackRock | ** | 26.33 | 31.33 | 33.00 | 35.35 | 37.13 | 39.96 | 39.73 | 39.88 |
| Putnam | ** | 25.44 | 47.06 | 55.26 | 60.51 | 65.02 | 63.94 | 68.81 | 72.64 |
| Voya | 25.10 | 37.91 | 45.14 | 51.50 | 56.24 | 59.76 | 61.31 | 61.49 | 60.74 |
| T. Rowe | 36.39 | 41.68 | 46.24 | 53.65 | 59.92 | 61.87 | 62.57 | 62.62 | 62.65 |
| Fidelity | 28.38 | 31.89 | 36.32 | 44.43 | 49.23 | 49.65 | 50.41 | 50.45 | 50.46 |

*Id.* ¶ 149.  The following table shows the percentage of Non-U.S. Equity within each fund's

total assets:

---

[8]    Morningstar gives the figure "11.74" for the 2025 BlackRock TDF's total equity allocation.  Am. Compl. ¶ 144.  Plaintiffs are skeptical this is correct, because the same data provide that nearly 60% of the fund is invested in "Other."  *Id.* ¶ 144 n.22.  The U.S. Equity and Non-U.S. Equity tables do not provide underlying information for the Total Equity figure.  *See id.* ¶ 149.  Drawing all reasonable inferences in Plaintiffs' favor, I will leave this cell blank and not include it in the calculations.

[9]    This information (and other data marked with two asterisks) is not available.  Am. Compl. ¶ 144 n.23.

**Non-U.S. Equity Allocation**

| Fund Family | Vintage Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
| 3M | 14.21 | 21.89 | 27.01 | 29.71 | 33.74 | 36.49 | 37.97 | 38.13 | 38.15 |
| BlackRock | ** | 25.83 | 31.60 | 35.87 | 40.58 | 45.19 | 48.32 | 49.93 | 50.08 |
| Putnam | ** | 8.59 | 9.91 | 13.72 | 17.32 | 17.56 | 18.16 | 19.37 | 20.33 |
| Voya | 12.40 | 21.66 | 24.61 | 29.32 | 32.46 | 33.98 | 34.49 | 34.62 | 34.75 |
| T. Rowe | 16.47 | 20.35 | 23.65 | 27.38 | 30.51 | 31.45 | 31.87 | 31.89 | 31.87 |
| Fidelity | 25.80 | 28.52 | 31.92 | 38.15 | 42.02 | 42.34 | 42.32 | 42.35 | 42.34 |

*Id.* The following table shows the percentage of Fixed Income within each fund's total assets:

**Fixed Income Allocation**

| Fund Family | Vintage Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
| 3M | 49.97 | 35.67 | 24.14 | 18.32 | 8.41 | 2.93 | 0.4 | 0.15 | 0.12 |
| BlackRock | ** | 39.54 | 30.55 | 23.45 | 16.17 | 9.87 | 5.71 | 4.43 | 4.20 |
| Putnam | ** | 53.57 | 34.79 | 25.40 | 17.94 | 14.84 | 11.88 | 7.61 | 4.25 |
| Voya | 64.10 | 41.21 | 30.30 | 18.92 | 10.75 | 5.72 | 3.63 | 3.02 | 3.07 |
| T. Rowe | 40.49 | 31.48 | 23.12 | 12.77 | 4.29 | 1.74 | 1.43 | 1.43 | 1.52 |
| Fidelity | 45.58 | 39.62 | 31.74 | 17.46 | 9.5 | 9.29 | 8.70 | 8.64 | 8.62 |

*Id.* The Plaintiffs have not included allocation data for "Other" and "Cash" for each Comparator TDF.

As a starting point, I will not weigh the challenged fund's asset allocation against the average of the comparators' asset allocations. While "there is no one-size-fits-all approach," the mean value taken from aggregated funds will generally not be a "sound basis for comparison." *Matousek*, 51 F.4th at 280–81. If the asset allocations of two comparators are equally and significantly off in both directions, then their average will be identical to the asset allocation of the challenged fund, even though the actual allocations differ greatly. *See Anderson*, 579 F. Supp. 3d at 1151 ("The TDFs in these categories could

31

all have differing aims, risks, and rewards than the [challenged] TDFs.  Courts have held

that it is insufficient for an average to be a meaningful benchmark.").  The disaggregated

data are what matter for the meaningful-benchmark analysis.

The following table disaggregates and categorizes the asset-allocation data for the

Comparator TDFs.  It compares the difference in percentage points between each 3M TDF

vintage and its corresponding Comparator TDF over U.S. Equity, Non-U.S. Equity, and

Fixed Income.  The numbers represent instances in which the comparator was a particular

distance from the 3M TDF.  For example, the "5" to the immediate right of "Voya"

indicates that across the nine vintages and three categories, the Voya TDFs came within a

single percentage point of the 3M TDFs five times.  I chose to measure when a comparator

fund's asset allocation for any particular asset fell within 1, 3, 5, 10, and more than 10

percentage points, not because anything hinged on those specific numbers, but to better

understand the data Plaintiffs presented.

**Comparators' Divergence from 3M TDF over U.S. Equity, Non-U.S. Equity, and Fixed Income**

| Fund | < 1 pp[10] | 1–3 pp | 3–5 pp | 5–10 pp | > 10 pp |
|---|---|---|---|---|---|
| BlackRock | 0 | 0 | 5 | 9 | 10 |
| Putnam | 0 | 0 | 3 | 7 | 14 |
| Voya | 5 | 14 | 5 | 2 | 1 |
| T. Rowe | 0 | 12 | 5 | 9 | 1 |
| Fidelity | 1 | 2 | 9 | 14 | 1 |

Because Total Equity is the sum of the percentages of U.S. Equity and Non-U.S. Equity,

it's reasonable to consider how closely the Comparator TDFs hew to the Total Equity

figures in the 3M TDFs.  To simplify, if a challenged fund includes a substantial amount

---

[10]    Percentage point(s).

32

of U.S. Equity and little Non-U.S. Equity, and a comparator includes little U.S. Equity and a substantial amount of Non-U.S. Equity, they could have similar Total Equity figures, even though there was significant divergence in each narrower category.  For the meaningful benchmark analysis, it is worth knowing whether the challenged and comparator funds have similar equity holdings, regardless of whether those holdings are predominantly American or foreign.  The following table measures the divergence looking at only the Total Equity and Fixed Income categories.

**Comparators' Divergence from 3M TDF over Total Equity and Fixed Income**

| Fund | < 1 pp | 1–3 pp | 3–5 pp | 5–10 pp | > 10 pp |
|---|---|---|---|---|---|
| BlackRock | 3 | 3 | 3 | 7 | 0 |
| Putnam | 0 | 0 | 2 | 6 | 8 |
| Voya | 3 | 9 | 3 | 2 | 1 |
| T. Rowe | 1 | 6 | 7 | 3 | 1 |
| Fidelity | 1 | 4 | 3 | 9 | 1 |

The first conclusion is that the Voya and T. Rowe Price TDFs have very similar asset allocation as the 3M TDFs.  In most instances, the former two are within 5 percentage points of the latter.  The Fidelity Freedom TDFs are not quite as close a match, but still a large majority fall within ten percentage points.  The BlackRock and Putnam TDFs diverge from the 3M TDFs more often, and Putnam's asset allocation was more than ten percentage points off from 3M's more often than not.  Courts have rejected comparators with that wide of asset allocation divergence.  For example, in *Phillips v. Cobham Advanced Elec. Sols., Inc.*, the challenged fund held 67% volatile assets like stocks, and the comparators held 80% to 94% stocks; those funds were not meaningful benchmarks. No. 23-cv-03785, 2025 WL 2689268, at *6 (N.D. Cal. Sep. 19, 2025).  When the U.S. Equity and Non-U.S. Equity categories were merged into a single "Total Equity" category, both the Putnam and

33

BlackRock TDFs more closely match the asset allocation of the 3M TDFs, and BlackRock especially improves.  Over the eight vintages for which data are available, BlackRock consistently invested in less U.S. Equity and more Non-U.S. Equity, but the figures even out in the Total Equity investments.  *See* Am. Compl. ¶¶ 144, 149.

(3)  *Sector allocation*.  Attached to the Complaint is Appendix A, which provides charts showing the 3M TDFs' sector investments and those of the Comparator TDFs, broken down vintage by vintage.  *See id.* ¶ 155 n.26; ECF No. 53-10.  Without repeating those ten tables, it's worth noting a few points.  The sector with the highest allocation across all vintages and all funds was Technology, followed by Financial Services.  Am. Compl. ¶¶ 156–57; *see* ECF No. 53-10.  On the other end of the spectrum, each vintage of each fund invested a relatively small amount in Basic Materials, Energy, Consumer Defensive, and Utilities.  *See* ECF No. 53-10.  The 3M TDFs consistently invested more in Real Estate than the Comparator TDFs did.  *See id.*

The following table represents the number of instances in which the Comparator TDFs diverged from the 3M TDFs' sector holdings by range of percentage points.  For example, the "41" to the immediate right of "BlackRock" indicates that, across the eight vintages for which we have data and the eleven Morningstar sectors, the BlackRock TDFs were within a single percentage point of the 3M TDF sector percentage in 41 instances.  I have used 1, 3, 5, and 10 percentage points again, not because those numbers have special significance but because they give a snapshot of the data that informs the meaningful-benchmark analysis.

**Comparators' Divergence from 3M TDF over Sector Allocations**

| Fund | < 1 pp | 1–3 pp | 3–5 pp | 5–10 pp | > 10 pp |
|---|---|---|---|---|---|
| BlackRock | 41 | 31 | 14 | 2 | 0 |
| Putnam | 64 | 0 | 19 | 5 | 0 |
| Voya | 58 | 14 | 12 | 4 | 0 |
| T. Rowe | 48 | 47 | 4 | 0 | 0 |
| Fidelity | 27 | 45 | 18 | 9 | 0 |

All five Comparator TDFs allocate investments across sectors in a similar manner as the 3M TDF Series. The vast majority of individual sector-by-sector comparisons are within three percentage points. The only instances in which the Comparator TDFs diverged by more than five percentage points was in Real Estate, and no fund diverged by more than ten percentage points in that sector. *See* ECF No. 53-10. Those differences are relatively minor considering the far greater similarities in sector allocations. As Plaintiffs note,

> the differentials are even closer with certain TDF families— for example, as compared to the: (i) Fidelity TDFs, 90 of the 99 (90.9%) are within 5pp; (ii) [BlackRock] TDFs, 83 of 88 (94.3%) of the data points are within 4pp; (iii) T. Rowe TDFs, 93 of the 99 (93.9%) are within 2pp; (iv) Voya TDFs, 72 of the 88 (81.8%) are within 2pp; and (v) the Putnam TDFs, 64 of the 88 (72.7%) are within just 1pp.

ECF No. 66 at 21 n.6. So on the sector-allocation metric, all five Comparator TDFs are similar to the challenged fund.

(4) *Morningstar style.* Morningstar categorizes the 3M TDF Series' strategy as a "Large Blend," meaning that the fund invests in large companies (by capitalization) and pursues a blend of growth and value. Am. Compl. ¶¶ 163, 165. All nine 3M TDF vintages are fit in the Large Blend centroid of Morningstar's 3×3 grid. *Id.* ¶ 165; ECF No. 53-11 (Appendix B). Each vintage of each Comparator TDF also falls into the same centroid,

35

often in nearly the same spot within the centroid. *See* Am. Compl. ¶¶ 165–66; ECF No. 53-11. The Comparator TDFs and the 3M TDF Series are pursuing a similar investment strategy. *See* Am. Compl. ¶ 168 ("The 3M TDFs and the Comparator TDFs are not merely investing in the same sectors . . . ; they are investing in the *same types of stocks within those sectors* (large, diversified companies that form the core of the U.S. and global equity markets)).

(5) *Risk ratio.* Recall that an investment's standard deviation is "an absolute measure of an investment's volatility (i.e., how much its returns fluctuate)," *id.* ¶ 125, and the Sharpe Ratio is "a fund's return above the risk-free rate . . . divid[ed] . . . by the fund's standard deviation," *id.* ¶ 126. The Sharpe Ratio is not a measure of risk but of "risk-adjusted performance." *Id.*; *see Beldock v. Microsoft Corp.*, No. C22-1082, 2023 WL 3058016, at *3 (W.D. Wash. Apr. 24, 2023) (explaining that the Sharpe ratio is an "additional measurement[] of investment performance" (quoting *Hall v. Cap. One Fin. Corp.*, No. 1:22-cv-00857, 2023 WL 2333304, at *6 (E.D. Va. Mar. 1, 2023))). Here, the volatility or risk of the challenged fund and its comparators is relevant, and that is expressed by the standard deviation. If any of the comparators is a meaningful benchmark, then the funds' returns (part of what the Sharpe Ratio measures) may be relevant for determining if the challenged fund underperformed. The funds' Sharpe Ratios will not be considered here as a matter of risk *simpliciter*.

Plaintiffs present three tables comparing the 3M TDF Series' and Comparator TDFs' standard deviation:

36

### Standard Deviation (3-Year) of 3M TDFs and Comparator TDFs

| Fund Family | Vintage Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
| 3M | 10.71 | 8.20 | 9.12 | 9.90 | 10.53 | 10.96 | 11.16 | 11.19 | 11.20 |
| Putnam | ** | 7.10 | 8.37 | 9.16 | 9.73 | 10.23 | 10.67 | 11.07 | 11.27 |
| Voya | 10.48 | 9.05 | 9.90 | 10.66 | 11.10 | 11.36 | 11.40 | 11.41 | 11.48 |
| BlackRock | 11.80 | 9.18 | 9.93 | 10.75 | 11.39 | 12.11 | 12.16 | 12.17 | 12.27 |
| T. Rowe | 7.77 | 8.74 | 9.71 | 10.38 | 10.83 | 10.94 | 11.03 | 11.00 | 11.00 |
| Fidelity | 8.87 | 9.28 | 10.07 | 11.03 | 11.42 | 11.43 | 11.42 | 11.44 | 11.41 |

### Standard Deviation (5-Year) of 3M TDFs and Comparator TDFs

| Fund Family | Vintage Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
| 3M | 11.22 | 10.46 | 11.67 | 12.67 | 13.45 | 13.96 | 14.19 | 14.19 | 14.21 |
| Putnam | ** | 8.83 | 10.36 | 11.40 | 12.09 | 12.72 | 13.26 | 13.72 | ** |
| Voya | 10.65 | 10.98 | 12.04 | 13.01 | 13.62 | 13.85 | 13.93 | 14.02 | 14.02 |
| BlackRock | 11.96 | 10.85 | 11.83 | 12.96 | 13.77 | 14.47 | 14.56 | 14.53 | 14.62 |
| T. Rowe | 9.66 | 10.82 | 11.94 | 12.80 | 13.28 | 13.42 | 13.48 | 13.48 | 13.52 |
| Fidelity | 10.50 | 11.02 | 12.21 | 13.43 | 13.70 | 13.73 | 13.70 | 13.74 | 13.7 |

### Standard Deviation (10-Year) of 3M TDFs and Comparator TDFs

| Fund Family | Vintage Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
| 3M | 9.38 | 10.62 | 11.86 | 12.86 | 13.65 | 14.15 | 14.34 | 14.35 | ** |
| Putnam | ** | 9.30 | 10.88 | 11.99 | 12.67 | 13.31 | 13.88 | ** | ** |
| Voya | 10.14 | 11.13 | 12.27 | 13.21 | 13.88 | 14.09 | 14.19 | 14.27 | ** |
| BlackRock | 9.82 | 11.08 | 12.24 | 13.55 | 14.31 | 14.72 | 14.73 | ** | ** |
| T. Rowe | 10.32 | 11.42 | 12.41 | 13.19 | 13.67 | 13.75 | 13.77 | 13.77 | ** |
| Fidelity | 10.19 | 11.21 | 12.79 | 13.80 | 13.93 | 13.94 | 13.94 | 13.94 | ** |

Am. Compl. ¶ 177.

The tables show that the Comparator TDFs and 3M TDF Series have similar risk ratios. For example, almost all the individual standard-deviation comparisons are within a single point, and the largest difference is within three points. *See id.* ¶ 177. Notably, Defendants do not challenge the risk calculations, but fall back on their position that the Comparator TDFs and 3M TDFs lack "comparable asset allocations." ECF No. 61 at 20

37

(quoting *Batt v. 3M Co.*, No. 25-cv-3149 (ECT/DTS), 2026 WL 674322, at \*6 (D. Minn. Mar. 10, 2026)).  Plaintiffs have now plausibly alleged comparable asset allocations, as discussed above, and the standard deviation data show comparable risk ratios.

(6) *Management strategy.*   Defendants argue that "a fundamental strategy mismatch" undermines the similarity between the challenged fund and its comparators. ECF No. 61 at 15.  They believe the 3M TDFs are passively managed, akin to index funds, like the BlackRock LifePath Index Funds on which the 3M TDFs were modeled.  *Id.*  In contrast, some of the Comparator TDFs are actively managed, and others have a blended approach.  *Id.* at 15–16.  On a Rule 12(b)(6) motion, the complaint's factual allegations must be accepted as true, *Gorog*, 760 F.3d at 792, and Plaintiffs have alleged that the "3M TDF Series are actively managed," Am. Compl. ¶ 53.  Defendants have cited no cases describing the active-versus-passive-management issue as a legal question, and the Amended Complaint's description of the difference is thoroughly factual.  *See id.* ¶ 46 ("Passive funds, such as 'index funds,' are meant to mirror the performance of an index. . . . .  In contrast, actively managed funds are meant to beat the market through superior investment selection and are comprised of individual stocks, bonds, and/or assets selected by a manager or investment advisor.").  This factor supports finding the Comparator TDFs to be meaningful benchmarks.

(7) *Investment vehicle.*   Defendants argue that the Comparator TDFs are not meaningful benchmarks for the 3M TDF Series because the latter is a collective investment trust ("CIT") and the former are trusts or mutual funds.  ECF No. 61 at 16–18.  There are some legal differences between CITs and mutual funds.  "[C]ollective investment trusts

38

and mutual funds are regulated by different agencies (the Office of the Comptroller of the Currency for collective investment trusts and the Securities and Exchange Commission for mutual funds) and operate under distinct regulatory regimes." *Fritton v. Taylor Corp.*, No. 22-cv-415 (ECT/TNL), 2023 WL 5348834, at *5 (D. Minn. Aug. 21, 2023) (collecting cases); *see Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1306 (D. Minn. 2021). Legal differences may be considered in a motion to dismiss. *Fritton*, 2023 WL 5348834, at *6. But because the duty of prudence is a "context specific" inquiry, *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022), the existence of regulatory differences is not dispositive, *see Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1153 (10th Cir. 2023) ("[W]e reject the notion that CITs could *never* be considered comparable to mutual funds."). To "plausibly allege that an investment in a collective trust is identical to an investment in a mutual fund," a plaintiff must "alleg[e] additional material plausibly showing that, in a given case, the legal distinctions make no difference." *Fritton*, 2023 WL 5348834, at *6.

Plaintiffs have done so. They alleged that CITs and mutual funds differ in regulatory obligations and fee structure, but may still share common "investment strategy, asset allocation, sector exposure, or risk-return profile." Am. Compl. ¶ 139 n.20. According to the Amended Complaint,

> A CIT and a mutual fund that hold similar mix of U.S. equities, international equities, and fixed income securities along a similar glide path should produce comparable investment returns regardless of their legal structure. The comparability analysis set forth herein is based on the funds' actual portfolio compositions, not their organizational form. Indeed, in the defined-contribution marketplace, plan fiduciaries routinely evaluate CITs and mutual funds side by side when selecting target date fund options, and industry benchmarking tools such

> as Morningstar report performance and allocation data for CITs and mutual funds using identical metrics and classifications—as evidenced by the fact that Morningstar assigns the 3M TDFs and all of the Comparator TDFs to the same analytical categories and reports their data in the same format.

*Id.* Those allegations supply what was missing in *Fritton* and *Parmer*. And those cases are distinguishable for another reason. There, the plaintiffs claimed that defendants breached their fiduciary duty by investing in mutual funds when defendants could have invested in CITs, which would have reduced the plaintiffs' fees. *Fritton*, 2023 WL 5348834, at *4; *Parmer*, 518 F. Supp. 3d at 1305. CITs are generally able to charge lower fees because they are subject to fewer regulatory requirements. *See White v. Chevron Corp.*, No. 16-cv-0793, 2016 WL 4502808, at *12 (N.D. Cal. Aug. 29, 2016) ("It is inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly. In particular, mutual funds have unique regulatory and transparency features, which make any attempt to compare them to investment vehicles such as collective trusts and separate accounts an apples-to-oranges comparison." (citation modified)). Here, Plaintiffs' claims are not about excessive fees or costs, but about performance, and they have plausibly alleged facts showing the legal differences between CITs and mutual funds does not affect performance.

*

To summarize, all five Comparator TDFs are similar to the 3M TDF Series in sector allocation, Morningstar style, and risk ratio. The Voya, T. Rowe Price, and Fidelity Freedom TDFs are also similar in asset-class and equity allocation, but the BlackRock and

40

Putnam TDFs at times notably diverge from the 3M TDFs on this metric. Understood as pleading in the alternative, Plaintiffs' "dual methodology" plausibly alleges that the 3M TDFs share a glide path with all five Comparator TDFs—a "to retirement" path with the Blackrock, Putnam, and Voya TDFs, and a "through retirement" path with the T. Rowe Price and Fidelity Freedom TDFs. Defendants' countervailing criteria of active versus passive management and CITs versus mutual funds do not move the needle.

The "totality of the specific allegations" shows that the Voya, T. Rowe Price, and Fidelity Freedom TDFs are meaningful benchmarks upon which Defendants' prudence or imprudence can be assessed. *See Matousek*, 51 F.4th at 281 (quoting *Meiners*, 898 F.3d at 822). Every factor the parties have litigated supports a like-for-like comparison. Whether the BlackRock and Putnam TDFs also make the cut is a closer call, but the better answer is that BlackRock does and Putnam does not. The Putnam TDFs' asset composition diverges too widely and consistently from the 3M TDFs to be appropriate comparators. The differences in asset composition between the BlackRock TDFs and the 3M TDFs significantly diminish once the distinction between U.S. Equity and Non-U.S. Equity are ignored, and the Eighth Circuit has not spoken of stocks and bonds in the sort of granular detail that would make that distinction relevant. *See Meiners*, 898 F.3d at 823 n.2 (approvingly quoting the district court's statement that "Wells Fargo funds have a higher allocation of bond[s] than Vanguard funds").

After seeing that the BlackRock, Voya, T. Rowe Price, and Fidelity Freedom TDFs are meaningful benchmarks, it is easier to understand why the LifePath Indices are not. The Amended Complaint does not supply the factual detail to determine whether they make

41

for sound comparisons with the 3M TDF Series.  Plaintiffs allege that the LifePath Index "is a proprietary benchmark created by BlackRock specifically to evaluate the performance of" the BlackRock TDFs.  Am. Compl. ¶ 135.  And "the 3M TDFs were initially modelled after the BlackRock TDFs." *Id.*  Beyond that, the Amended Complaint says little about the characteristics of the LifePath Indices that would allow for a proper comparison.  Plaintiffs allege in a conclusory manner that "[b]ecause the 3M TDFs were initially intended to replicate the LifePath approach, the BlackRock LifePath Indices and the 3M TDFs also share 'like composition,' satisfying the . . . requirement . . . under *Matousek*." *Id.* ¶ 254.  In their briefing, Plaintiffs confirm that they do not allege the 3M TDF Series was designed to "track" the LifePath Indices, and that the commonality is instead "shared composition and lineage." ECF No. 66 at 16–17.  That is not enough to show a meaningful benchmark.  Plaintiffs do not say whether the 3M TDFs have changed after being "initially" modeled on the BlackRock TDFs.  A shared lineage is not enough; apples and oranges may have a (distant) common ancestor, but that doesn't make them comparable.

b

The next step is to determine whether the challenged fund underperformed any of the meaningful benchmarks.  Courts will not find liability where a plaintiff alleges only modest underperformance.  *See Antoine v. Marsh & McLennan Cos.*, No. 22 Civ. 6637, 2023 WL 6386005, at *11 (S.D.N.Y. Sep. 30, 2023) (finding no liability where "the lowest underperformance Plaintiffs cite is around 2.5 percent"); *Abel v. CMFG Life Ins. Co.*, No. 22-cv-449, 2024 WL 307489, at *5 (W.D. Wis. Jan. 26, 2024) (reasoning that underperformance ranging from 0.2 percent to 5 percent, alongside some overperformance,

42

failed to state a claim for breach of fiduciary duty). However, where plaintiffs demonstrate "consistent, ten-year underperformance" that is "substantial," those allegations may be sufficient to support a breach-of-fiduciary-duty claim. *Patterson v. Morgan Stanley*, No. 16-cv-6568, 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019); *Payne v. Hormel Foods Corp.*, No. 24-cv-545 (SRN/DTS), 2024 WL 4228613, at *2, *8 (D. Minn. Sep. 18, 2024) (denying motion to dismiss claim where challenged plan's crediting rate was 0.71 percent to 4.00 percent lower than comparators' crediting rates). Outperforming a comparator is evidence against breach, but if it is minimal and brief, it will not be dispositive. *See Antoine*, 2023 WL 6386005, at *11 ("Further undercutting Plaintiffs' underperformance-based theory is the fact that the TDFs did not consistently underperform relative to the Comparators throughout the Class Period. Indeed, the TDFs appear to have been on somewhat of an upswing in rankings among the Comparators toward the end of the Class Period, often ranking anywhere from third to first out of the five in 2021 and 2022."); *cf. Snyder v. UnitedHealth Grp., Inc.*, No. 21-cv-1049 (JRT/BRT), 2021 WL 5745852, at *3 (D. Minn. Dec. 2, 2021) ("Outperformance by the Wells Fargo TDFs in one year alone does not preclude Snyder from arguing that Defendants acted imprudently in retaining the funds based upon their cumulative underperformance.").

In the previous motion to dismiss, granted for lack of a meaningful benchmark, the Plaintiffs would have plausibly alleged underperformance with trailing 10-year returns of the following percentage points: −10.55, −10.46, −12.33, −12.98, −12.27, −10.76, −9.98. *Batt*, 2026 WL 674322, at *8. Trailing 10-year returns of −4.57, −3.69, −4.46, −5.03, −4.93, −4.91, −4.92 percentage points were insufficient to raise an inference that the

43

fiduciary breached their duty of prudence. *Id.* As I explained in that order, it was a "close call":

> Those figures exceed the plausibly alleged underperformance in *Payne*, for instance. *See* 2024 WL 4228613, at *2. But complicating the picture is that the 3M TDF Series generally did better in more recent years, outperforming the S&P Indices over the trailing 3-year and 5-year snapshots in 38 of the 98 instances measured. *See* Compl. [ECF No. 1] ¶¶ 84, 91, 98, 105, 112, 119, 126. This moderate and inconsistent underperformance does not plausibly state a claim for relief under persuasive precedent. *See Antoine*, 2023 WL 6386005, at *11.

*Batt*, 2026 WL 674322, at *8.

With those numbers serving as a guidepost, Plaintiffs have plausibly alleged underperformance relative to the Fidelity Freedom TDFs. The disaggregated data appear in a document filed by Defendants, ECF No. 62-12, but they are drawn from the Amended Complaint. *See* ECF No. 62 ¶ 14 (attesting in declaration that the information comes from "the performance data Plaintiffs set forth in Tables 1.2 through 9a of the First Amended Complaint"). Plaintiffs do not dispute the exhibit's accuracy. *See* ECF No. 66 at 39 (arguing that the exhibit "corroborates" the Amended Complaint's allegations). Here are the percentage points by which the 3M TDF vintages underperformed the corresponding Fidelity Freedom TDF vintages:

| 3M vs. Fidelity | | | |
|---|---|---|---|
| **Vintage** | **Trailing 3Y** | **Trailing 5Y** | **Trailing 10Y** |
| 2025 | −0.56 | −2.94 | −8.57 |
| 2030 | −3.41 | −1.71 | −9.00 |
| 2035 | −3.43 | −2.83 | −12.14 |

44

| 2040 | −6.12 | −6.24 | −14.55 |
| 2045 | −5.55 | −5.18 | −11.73 |
| 2050 | −2.83 | −2.14 | −7.86 |
| 2055 | −1.44 | −0.67 | −5.89 |
| 2060 | −1.26 | −0.44 | −5.78 |
| 2065 | −1.10 | −0.35 | N/A |

ECF No. 62-12 at 2. This shows sustained underperformance in the ballpark of the first set of figures. Multiple trailing 10-year returns are in the double digits, and the 3M TDFs never outperformed the Fidelity Freedom TDFs over a 3-year, 5-year, or 10-year period. Defendants argue that the recent "narrower trailing-period gaps against Fidelity" do not support an inference of imprudence. ECF No. 61 at 26. But even at their lowest, the trailing 10-year returns are higher than the "close[] call" in the previous opinion. *See Batt*, 2026 WL 674322, at \*8. And the 3M TDFs consistently underperformed against Fidelity Freedom over the multi-year periods, even though the magnitude of underperformance decreased in later years.

The 3M TDFs' underperformance against the other funds was smaller and less consistent, and insufficient to state a claim. After Fidelity Freedom, the T. Rowe Price TDFs were the next strongest, but the 3M TDFs outperformed them in the last five trailing 5-year returns, and the trailing 10-year returns for the 3M 2055 and 2060 TDF vintages underperformed by 2.47 and 2.37 percentage points, respectively. ECF No. 62-12 at 3. Putnam is not a meaningful benchmark, but even if it were, 3M had higher trailing 10-year returns in two of the seven vintages for which data are available. *Id.* at 4. The 3M TDFs' underperformance against the BlackRock and Voya TDFs was scattered and relatively

45

small. *See id.* at 5–6. Against BlackRock, the 3M TDFs' worst underperformance on the trailing 5-year returns was −2.38 percentage points, hardly lower than their best performance, at +1.73 percentage points. *Id.* at 5; *see Cho v. Prudential Ins. Co. of Am.,* Civil No. 19-19886, 2021 WL 4438186, at *9 (D.N.J. Sep. 27, 2021) (finding trailing 5-year "underperformance percentages ranging from .07% to 3.71%" to be insufficient to state a claim). Against Voya, the trailing 10-year returns (−3.24, −2.30, −2.81, −4.94, −4.56, −1.85, −0.97, and −1.52 percentage points), ECF No. 62-12 at 6, were consistently lower than the trailing 10-year returns identified in the previous order, which did not raise a plausible inference of imprudence. *Batt,* 2026 WL 674322, at *8.

Plaintiffs argue that the cumulative compound performance shows a breach of fiduciary duty. ECF No. 66 at 37. The alleged underperformance exceeds the "cumulative compound performance rang[ing] from −6.62% to −19.68% less than the . . . comparators," cited in the previous order granting the motion to dismiss. *Id.* (quoting *Batt,* 2026 WL 674322, at *7). Those figures came from *Snyder,* and that is the only case the parties cite that discusses that metric; it is also the only ERISA case I have independently found discussing cumulative compound performance. *See* 2021 WL 5745852, at *3. On that measure, the 3M TDFs fell behind the Comparator TDFs by the following percentage points:

**3M TDF Cumulative Compound Performance Versus Comparator TDFs**

| Fund Family | Vintage Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
| Voya | −7.02 | −9.77 | −10.58 | −18.97 | −20.24 | −14.38 | −13.29 | −3.01 | ** |
| BlackRock | ** | −3.83 | −5.23 | −12.74 | −17.13 | −17.80 | −19.57 | ** | −1.66 |
| T. Rowe | −28.63 | −29.64 | −29.90 | −31.71 | −32.05 | −25.64 | −22.71 | −6.35 | ** |
| Fidelity | −14.96 | −24.18 | −34.25 | −43.95 | −40.47 | −32.19 | −28.04 | −14.64 | −6.01 |

Am. Compl. ¶¶ 201, 207, 213, 219, 225, 231, 237, 243, 249. At oral argument—though not in briefing—Defendants argued that cumulative compound performance was an inappropriate measuring stick, as a weak performance many years ago is compounded over time, and a recent strong performance has less effect. They noted that a regulation requires plan administrators to disclose "the average annual total return of the investment for 1-, 5-, and 10-calendar year periods," 29 C.F.R. § 2550.404a-5(d)(1)(ii)(A), but does not require cumulative compound performance. *Snyder* does not discuss this argument, and my review of that case file shows that the issue was not briefed. Notably, the cumulative period cited in *Snyder* was only six years. Complaint ¶ 77, *Snyder*, 2021 WL 5745852 (ECF No. 1). Here, it is eleven or twelve years. *E.g.*, Am. Compl. ¶¶ 201, 207.

I am not persuaded to rely on the cumulative compounded performance figures. There is little case law supporting it, and no opinions addressing the appropriateness to determine underperformance. The support that does exist found cumulative compounding performance over a shorter time period, where the outsize effect of early poor performances would be mitigated. The case law provides much clearer support for examining trailing 3-year, 5-year, and 10-year returns. That data provide good reason to reject the T. Rowe Price TDFs, the second-strongest performer on the cumulative compound performance metric. Lastly, taking the figures at face value, there is a marked decline in the 2060 and 2065 vintages, which suggests a late 3M TDF upswing, and which undermines the inference of imprudence.

2

Recall that ERISA prohibits certain transactions between the "plan and party in interest" and between the "plan and fiduciary." 29 U.S.C. § 1106(a)–(b). "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). A party in interest includes a plan fiduciary and any person who provides services to the plan. 29 U.S.C. § 1002(14)(A)–(B). Section 1106(a)(1) requires a showing that a plan fiduciary, "with actual or constructive knowledge of the facts satisfying the elements of a § [11]06(a) transaction, caused the plan to engage in the transaction." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000). Broken down, a plaintiff states a § 1106(a)(1)(D) claim if she plausibly alleges

> (1) the person or entity is a fiduciary with respect to the plan;
> (2) the fiduciary causes the plan to engage in the transaction at issue; (3) the transaction uses plan assets; (4) the transaction's use of the assets is for the benefit of a party in interest; and (5) the fiduciary knows or should know that elements three and four are satisfied.

*Reich v. Compton*, 57 F.3d 270, 278 (3d Cir. 1995) (citation modified); *accord Reich v. Constr. Laborers Loc. No. 1140*, 908 F. Supp. 697, 706 (D. Neb. 1995).[11] As the Supreme

---

[11]   The Third Circuit concluded that the fourth element requires a showing of the fiduciary's subjective intent to benefit the party in interest. *Compton*, 57 F.3d at 279 (explaining the ordinary meaning of "'for the benefit of' x" means "for the purpose of benefitting x"). Without it, § 1106(a)(1)(D)

> would appear to prohibit a fiduciary from causing a plan to engage in any transaction that he or she should know would

48

Court noted in reference to a related subdivision, "[a]ny transaction that satisfies [those] elements is presumptively unlawful."  *Cunningham*, 604 U.S. at 700 (referring to § 1106(a)(1)(C)).

Under the related self-dealing claim, a fiduciary may not "deal with the assets of the plan in his own interest or for his own account."  29 U.S.C. § 1106(b)(1).  "[V]iolations of [29] U.S.C. § 1106(b)(1) generally involve an ERISA fiduciary's use of plan assets for personal profit, gain or advantage."  *Alves v. Harvard Pilgrim Health Care Inc.*, 204 F. Supp. 2d 198, 214 (D. Mass. 2002).  Courts have found § 1106(b)(1) violations where a defendant "hires itself to perform work and then sets its own fees."  *Perez v. Koresko*, 86 F. Supp. 3d 293, 385 (E.D. Pa. 2015); *accord Chao v. Crouse*, 346 F. Supp. 2d 975, 988 (S.D. Ind. 2004).  On the other hand, courts have dismissed self-dealing claims where the plaintiff alleged only that the defendant "did something expressly permitted by the Plan

---

> result in any form or degree of benefit for any party in interest, even if the transaction would be highly advantageous for the plan and the benefit for the party in interest would be unintended, indirect, and slight.

*Id.*  The Sixth Circuit agrees, *Jordan v. Mich. Conf. of Teamsters Welfare Fund*, 207 F.3d 854, 861 (6th Cir. 2000), although a later panel questioned that conclusion, *Chao v. Hall Holding Co.*, 285 F.3d 415, 440 n.12 (6th Cir. 2002) (collecting cases).  I am aware of no Eighth Circuit precedent on point, and the only court in this District to address the issue concluded that subjective intent is not an element of the claim.  *Becker v. Wells Fargo & Co.*, No. 20-cv-2016 (DWF/BRT), 2021 WL 1909632, at *7 (D. Minn. May 12, 2021).

I am persuaded by *Chao*'s reasoning that subjective intent cannot be an element of a per se violation.  285 F.3d at 440 n.12.  The Supreme Court has repeatedly explained that "Congress intended for § 1106(a) to create '*per se* prohibitions on transacting with a party in interest.'"  *Cunningham*, 604 U.S. at 704–05 (quoting *Harris Tr.*, 530 U.S. at 252).  So I side with "the great weight of authority" and conclude that § 1106(a)(1)(D) imposes no subjective-intent requirement.  *Chao*, 285 F.3d at 441 n.12.

49

Document," *Cain v. Siemens Corp.*, Civil No. 24-8730, 2025 WL 2172684, at *5 (D.N.J. July 31, 2025), or where the allegations were conclusory, *Collins v. Ne. Grocery, Inc.*, No. 24-2339-cv, 2025 WL 2383710, at *5 (2d Cir. Aug. 18, 2025) (summary order); *see Peeler*, 2026 WL 208630, at *14 (dismissing a case with "[n]early identical allegations" as those in *Collins*). Section 1106(b)(1) is written broadly and should be construed broadly. *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987); *Leigh v. Engle*, 727 F.2d 113, 123, 126 (7th Cir. 1984); *Bailey v. Sedgwick Claims Mgmt. Servs. Inc.*, No. 2:24-cv-02749, 2025 WL 2779899, at *20 (W.D. Tenn. Sep. 26, 2025).

The statute casts a wide net. Section 1106 "would appear to prohibit fiduciaries from causing a retirement plan to contract with any third-party service provider." *Peeler*, 2026 WL 208630, at *12. "The administrator of an ERISA plan . . . will almost always find it necessary to employ outside firms," or, as here, subsidiary entities, "to provide services that the plan needs." *Cunningham*, 604 U.S. at 710 (Alito, J., concurring). Congress attempted to "mitigate that result," *Peeler*, 2026 WL 208630, at *12, with several exemptions, including for "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor," 29 U.S.C. § 1108(b)(2)(A); *see also* 29 U.S.C. § 1108(c)(2) ("Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from . . . receiving any reasonable compensation for services rendered . . . in the performance of his duties with the plan . . . ."); *cf. Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 908–09 (8th Cir. 2002) (applying § 1108(c)(2) exemption to § 1106(b)(1) claim). Because the exemptions

50

are affirmative defenses, so they "must be pleaded and proved by the defendant who seeks to benefit from them." *Cunningham*, 604 U.S. at 702 (majority opinion); *see Braden*, 588 F.3d at 601–02. "The upshot is that all that a plaintiff must do in order to file a complaint that will get by a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to allege that the administrator did something that, as a practical matter, it is bound to do." *Cunningham*, 604 U.S. at 710 (Alito, J., concurring). The Supreme Court noted that district courts could use Federal Rule of Civil Procedure 7 to "insist that the plaintiff file a reply putting forward specific, nonconclusory factual allegations showing the exemption does not apply." *Id.* at 708 (majority opinion) (citation modified); *see id.* at 711 (Alito, J., concurring) ("District courts should strongly consider utilizing [the Rule 7] option—and employing the other safeguards that the Court describes—to achieve 'the prompt disposition of insubstantial claims.'" (quoting *Crawford-El v. Britton*, 523 U.S. 574, 597 (1998))).

Plaintiffs have met all elements of their § 1106(a)(1)(D) prohibited-transaction claim and their related § 1106(b)(1) self-dealing claim. (1) 3M IMCO is a fiduciary with respect to the Plans, and it was selected as an investment advisor by the other 3M Defendants, who are also fiduciaries. Am. Compl. ¶¶ 6–9, 25. (2) In its role as investment manager for the at-issue 3M TDF vintages, 3M IMCO received compensation. *Id.* ¶ 59. (3) That compensation came from Plan assets. *Id.* ¶¶ 26, 296. (4) 3M IMCO is a party in interest because it is a fiduciary and because it provides services to the Plan. *Id.* ¶¶ 9, 26; 29 U.S.C. § 1002(14)(A)–(B). The most reasonable inference from the Amended Complaint is that the transactions were for the benefit of 3M IMCO, as the payments

51

compensated 3M IMCO for services rendered. *See id.* ¶ 26.[12] (5) All the 3M defendants engaged in this scheme knowingly, as the other 3M Defendants selected 3M IMCO to be the investment advisor. *See id.* ¶ 25.

These allegations, accepted as true, show that 3M IMCO dealt with Plan assets for its own account. 29 U.S.C. § 1106(b)(1); *see Randall*, 2024 WL 713997, at *7 ("The remaining elements of a § 1106(b)(1) violation cross-apply with the alleged § 1106(a)(1)(D) violation . . . ."). By employing 3M IMCO as an investment manager, 3M essentially "hire[d] itself to perform work and then set[] its own fees." *Perez*, 86 F. Supp. 3d at 385; *see* Am. Compl. ¶¶ 25–26. Though the Plan Documents expressly provide that a "Participating Company" could collect "reasonable expenses of administering and operating the Plan," ECF No. 62-14 at 12; ECF No. 62-15 at 12, this justification resembles an affirmative defense that cannot be resolved in a Rule 12(b)(6) proceeding, *Cunningham*, 604 U.S. at 702. And cases that have recognized this defense in a motion to dismiss have not construed it to cover allegations that a defendant hired itself and set its own fees. *See Cain*, 2025 WL 2172684, at *5.

Defendants' arguments to dismiss Count II are unsuccessful. They reason that Plaintiffs do not identify "any transaction by which plan assets were transferred to, or used for the benefit of, [3M IMCO]." ECF No. 61 at 27. At the pleading stage, Plaintiffs do not

---

[12]   Even if subjective intent were an element of the offense, Defendants have not argued that Plaintiffs failed to plead it. Defendants selected 3M IMCO as the investment advisor, and Defendants structured the Plans to pay 3M IMCO out of Plan assets. Am. Compl. ¶¶ 25–26. Drawing all reasonable inferences in Plaintiffs' favor, Defendants intended to benefit 3M IMCO.

need to identify specific transactions from Plan assets to 3M IMCO, especially considering that information about monetary transactions between 3M entities and subsidiaries are not likely to be available until discovery begins. *See Braden*, 588 F.3d at 598; *Becker v. Wells Fargo & Co.*, No. 20-cv-2016 (DWF/BRT), 2021 WL 1909632, at *8 (D. Minn. May 12, 2021) ("At this stage in the proceedings, [the plaintiff] need not trace the specific path of the fees; it is sufficient to allege that the path is traceable."). Defendants' case law is distinguishable. In *Lockheed Corp. v. Spink*, the alleged prohibited transaction was the employee's release of employment-related claims in exchange for increased pension benefits. 517 U.S. 882, 885, 893 (1996). The Court ruled that the waiver of employment-related claims was categorically outside § 1106(a)(1)(D). *Spink*, 517 U.S. at 895. Similarly, the court in *Polanco v. WPP Group USA, Inc.*, found that "using forfeitures to cover employer contributions [was] not a transaction within the meaning of [§§ 1106(a)(1)(A) or (b)(1)]." No. 24-cv-9548, 2025 WL 3003060, at *9 (S.D.N.Y. Oct. 27, 2025). Here, there is no dispute that the payments to 3M IMCO are transactions under § 1106(a)(1), because they are "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Spink*, 517 U.S. at 892–93. Plaintiffs' allegations are not conclusory, unlike in Defendants' cited cases. *See Collins*, 2025 WL 2383710, at *5; *Peeler*, 2026 WL 208630, at *14. Lastly, to the extent that *Collins* and *Peeler* require plaintiffs to plead facts to screen out obvious lawful alternatives, as Defendants argue, ECF No. 61 at 29–30, *Cunningham* contradicts that principle, *see* 604 U.S. at 702. Count II will not be dismissed.

53

It's reasonable to assume Defendants will raise one or more of the § 1108 defenses. *See* ECF No. 61 at 28 n.9 (noting that § 1108(b)(2)(A) may apply); *id.* at 30 (discussing implementing regulation of § 1108(b)(2)(A), codified at 29 C.F.R. § 2550.408b-2). The Amended Complaint gives no reason to think that 3M IMCO was paid "more than reasonable compensation" than was "necessary for the establishment or operation of the plan." 29 U.S.C. § 1108(b)(2)(A); *see* 29 U.S.C. § 1108(c)(2). But it would be unwise to order Plaintiffs to reply before knowing whether Defendants will raise a § 1108 defense or what its contents will be. *See* 5 *Wright & Miller's Federal Practice & Procedure* § 1185 (4th ed. & April 2026 Update) ("A substantial reason must be given or necessity must be demonstrated by the movant to justify the court ordering a reply to an answer."). Defendants may request or move for Plaintiffs to reply to the Answer consistent with the Federal Rules of Civil Procedure.

3

The breach of a duty to monitor claim is derivative of the duty of prudence claim. *See Allen v. Wells Fargo & Co.*, 967 F.3d 767, 777 (8th Cir. 2020); *Dionicio v. U.S. Bancorp*, No. 23-cv-26 (PJS/DLM), 2024 WL 1216519, at *6 (D. Minn. Mar. 21, 2024). Because Plaintiffs' duty of prudence claim survives in part, the duty to monitor claim survives to the same extent, and will otherwise be dismissed.

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Motion to Dismiss [ECF No. 59] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      To the extent Count I relies on Defendants' failure to disclose information about the Plans or the Plans' failure to adhere to stated goals, it is **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.

2.      To the extent Count I identifies as a meaningful benchmark any other fund or index than the Fidelity Freedom TDFs, it is **DISMISSED WITH PREJUDICE** for failure to state a claim.

3.      The motion is **DENIED** in all other respects.


Dated: August 11, 2026                          s/Eric C. Tostrud
                                                Eric C. Tostrud
                                                Chief Judge, United States District Court